# EXHIBIT 1

*21-000030989*

CHIEF FINANCIAL OFFICER
JIMMY PATRONIS
STATE OF FLORIDA

---

FRONTIER DEVELOPMENT, LLC

PLAINTIFF(S)

VS.

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY

DEFENDANT(S)

_____/

SUMMONS, COMPLAINT, DISCOVERY

**CASE #:** 2021-000819-CA-01
**COURT:** ELEVENTH JUDICAL CIRCUIT COURT
**COUNTY:** MIAMI-DADE
**DFS-SOP #:** 21-000030989

# <u>NOTICE OF SERVICE OF PROCESS</u>

NOTICE IS HEREBY GIVEN of acceptance of Service of Process by the Chief Financial Officer of the State of Florida. Said process was received in my office by ELECTRONIC DELIVERY on Monday, January 25, 2021 and a copy was forwarded by ELECTRONIC DELIVERY on Tuesday, January 26, 2021 to the designated agent for the named entity as shown below.

ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY
RICHARD M APPEL
750 THIRD AVE, 18TH FL
NEW YORK, NY 10017

**\*Our office will only serve the initial process(Summons and Complaint) or Subpoena and is not responsible for transmittal of any subsequent filings, pleadings, or documents unless otherwise ordered by the Court pursuant to Florida Rules of Civil Procedure, Rule #1.080**

Jimmy Patronis
Chief Financial Officer

AMBERLYNNE FERNANDEZ
LEGAL SECRETARY
BRODSKY FOTIU-WOJTOWICZ, PLLC
200 SE 1ST AVE, SUITE 400
MIAMI, FL 33131

DKG

Filing # 119975207 E-Filed 01/21/2021 10:15:56 AM

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2021-000819-CA-01 |

| PLAINTIFF(S)<br><br>FRONTIER DEVELOPMENT, LLC | VS. DEFENDANT(S)<br><br>ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | SERVICE |
|---|---|---|

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on
defendant(s): Endurance American Specialty Insurance Company

c/o Florida Chief Financial Officer as Registered Agent

200 East Gaines Street

Tallahassee, FL 32399

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: Joshua Truppman, Esq. FBN: 111795

whose address is: Brodsky Fotiu-Wojtowicz, PLLC

200 SE 1st St., Ste. 400, Miami, FL 33131

joshua@bfwlegal.com; docketing@bfwlegal.com; 305-503-5054

CLOCK IN

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies,**
**or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days.**
**When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days.**" after service of this summons
on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before
service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for
the relief demanded in the complaint or petition.

RECEIVED AS STATUTORY REGISTERED AGENT<br>on 25 January, 2021 and served on defendant or named party on 26 January, 2021<br>by the Florida Department of Financial Services

**HARVEY RUVIN**
**CLERK of COURTS**



310009

DEPUTY CLERK

DATE

1/22/2021

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to
participate in this proceeding, you are entitled, at no cost to you, to the provision of certain
assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA
Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400,
Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email
ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your
scheduled court appearance, or immediately upon receiving this notification if the time
before the scheduled appearance is less than seven (7) days; if you are hearing or voice
impaired, call 711."**

Case 1:21-cv-20611-DPG   Document 1-1   Entered on FLSD Docket 02/12/2021   Page 4 of 156

**IN THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO. 2021-000819-CA-01

FRONTIER DEVELOPMENT, LLC,

        Plaintiff,

v.

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY,

        Defendant.

_____/

## AMENDED COMPLAINT

    Plaintiff, Frontier Development, LLC, hereby sues Defendant, Endurance American Specialty Insurance Company, and in support alleges the following:

**I.      PARTIES, JURISDICTION AND VENUE**

    1.    Plaintiff, Frontier Development, LLC ("Frontier") is a Florida limited liability company with its principal place of business at 1801 S.W. 3rd Avenue, Suite 500, Miami, FL 33129.

    2.    Defendant Endurance American Specialty Insurance Company ("Defendant") is a surplus lines insurance carrier authorized to do business and doing business in the State of Florida, including insuring properties located in Miami-Dade County, Florida, such as the subject property at issue in this lawsuit.

    3.    This Court has subject matter jurisdiction over this action as it seeks damages in excess of $30,000.00 exclusive of interest, costs, and fees.

    4.    Venue is proper because, among other things, the cause of action accrued in Miami-Dade County and the property in litigation is located in Miami-Dade County.  Fla. Stat. § 47.011.

1



## II.      FACTUAL BACKGROUND

### A.      The Subject Insurance Policy.

5.      Frontier and Defendant entered into an insurance contract bearing policy No. MPR30000603002 (the "Policy"), with effective dates from March 8, 2020 through March 8, 2021, which provided coverage to Frontier's commercial facility located at 1801 S.W. 3rd Avenue, Suite 500, Miami, Florida 33129 (the "Property").  A true and correct copy of the Policy is attached hereto as Exhibit "A."

6.      The Policy is an "all risk" insurance policy that covers any and all losses to the Property that are not specifically excluded.

7.      In addition, the Policy includes coverage for loss of business income and extra expenses, which is commonly referred to as business interruption insurance.

8.      Specifically, Defendant promised to pay for:

> the actual **business income** loss sustained by you due to the necessary partial or total interruption of your business operations, services or production during the **period of indemnity** as a result of direct physical loss or damage to: (1) **covered property** by a **covered cause of loss**; or (2) property of the type insured under this Policy by a **covered cause of loss** which directly affects your use of the **covered property**, provided that you are a lessee or occupant of the premises where the direct physical loss or damage occurred.

(*Id.* at p. 29 of 64.)

9.      "Covered Property" includes real property and personal property at or within a covered location that Frontier owns, operates, or controls. (*Id.* at p. 1 of 64.)

10.      The Policy defines "Covered Location" as (1) the locations specified in the most recent Statement of Locations and Values on file with Defendant, (2) a "miscellaneous unnamed location," or (3) a location covered in accordance with the "Errors or Omissions Additional Coverage" located in the Coverage Territory. (*Id.* at p. 61.)  A Miscellaneous Unnamed Location

2

means a location, building, or part of a building owned, rented or leased by Frontier that is not reported on the Statement of Locations and Values on file with Defendant. (*Id.* at p. 64.)

11.    Defendant further promised to pay for covered damage for locations within the Coverage Territory that are owned, leased, or operated by Frontier where such loss is not payable under the Policy solely due to:

a.    Any inadvertent error or unintentional omission in the description of the address of the property whether made at the inception of the policy period or subsequent thereto; or

b.    Failure through any inadvertent error or unintentional omission to:

i. Include in the Statement of Locations and Values any location that you intended to cover at the inception of this Policy; or

ii. Report any newly acquired property before the automatic coverage period ceases under the Newly Acquired Property Additional Coverage.

(*Id.* at p. 24.)

12.    The Policy broadly defines a "covered cause of loss" as "a peril or other type of loss, not otherwise excluded under this policy." (*Id.* at p. 49 of 64.)

13.    Under the Policy, Business Income can be determined by calculating either Gross Profits or Gross Earnings. Gross Profits means the net profit plus charges and expenses, while Gross Earnings means net sales less the cost of raw materials, materials or supplies consumed in the operations or services, services purchased from others that do not continue under contract, merchandise sold, and ordinary payroll. (*Id.* at p. 41.)

14.    The Period of Indemnity is calculated as follows:

i. With respect to business operations, services and production (except as set forth in Subsection **a.ii.** below), the period of time that:

(a) (i) Begins on the date and time of the loss or damage to the **covered property** or property of the type insured as described in the INSURING AGREEMENT Subsection of the TIME ELEMENT COVERAGES Section.

(*Id.* at p. 56 of 64 (emphasis supplied.))

15.     Additionally, Defendant also promised to cover "extra expenses" incurred by Frontier due to a covered loss under the Policy. Extra expenses are those "reasonable and necessary" expenses that are "incurred to temporarily continue as nearly as normal as practicable the conduct of your business," or the "[e]xtra costs of temporarily using your property or your facilities or the property or facilities of others."  (*Id.* at p. 51-52 of 64.)

16.     Importantly, the Policy further provides for multiple separate "***Additional*** Time Element Coverages."  These are additional coverages set forth under Section V of the Policy.

17.     The fact that these are ***additional*** coverages is set forth from the very beginning of the Policy.  The first page of the Policy provides: "The words 'Additional Coverage(s)' (without further description) include all: Additional Coverages and Additional Time Element Coverages." (*Id.* at p. 1 of 64.)

18.     Of particular importance to this claim are the Additional Time Element Coverages afforded under Section V(D)(2), V(D)(7), V(D)(8), V(D)(9) and Section V(D)(10).

19.     Section(V) ("Additional Time Element Coverages") provides, in relevant part, follows:

> The following Additional Time Element Coverages and any Additional Time Element Coverages added to this Subsection by endorsement or through the Special Terms and Conditions are subject to the terms and conditions of this Policy. All loss or damage, including **business income** loss and **extra expense**, for which coverage is provided under the Additional Time Element Coverages is subject to the sublimits of liability as shown in Item **7.C.** of the Declarations, the sublimits of liability shown elsewhere in this Policy and the **Policy Limit**. All **extra expense** is further limited to the Extra Expense sublimit of liability as shown in Item **7.C.** of the Declarations.

(*Id.* at pp. 31-32 of 64 (emphasis in original).)

20.     Section V(D)(2) ("CONTINGENT TIME ELEMENT") provides:

4



a. If direct physical loss or damage caused by a **covered cause of loss** to property of the type insured under this Policy is sustained by your direct supplier or your direct customer, anywhere in the world and such loss or damage:

    i. Wholly or partially prevents your direct supplier from supplying their goods and/or services to you; or

    ii. Wholly or partially prevents your direct customer from accepting your goods and/or services;

then we will pay the actual **business income** loss and **extra expense** sustained by you during the **period of indemnity** with respect to such property of the type insured under this Policy. This coverage does not apply to new buildings or additions in the course of construction of any direct supplier or direct customer. You will cooperate with your direct supplier or direct customer and take any reasonable and necessary actions, including the use of other machinery, supplies or locations, to mitigate the loss payable herein.

b. Subject to the Contingent Time Element sublimit(s) of liability shown in Item **7.C.** of the Declarations, we will pay the actual **business income** loss and **extra expense** sustained by you in accordance with Subsection **a.** above:

    i. If ingress to or egress from your direct supplier's or your direct customer's location is partially or totally prevented in accordance with the same exclusions, limitations and time period that apply to the Ingress & Egress Additional Time Element Coverage;

    ii. If an order of civil or military authority limits, restricts or prohibits access to property not insured under this Policy, provided that the effect of such order partially or totally prohibits access to your direct supplier's or your direct customer's location in accordance with the same exclusions, limitations and time period that apply to the Interruption By Civil Or Military Authority Additional Time Element Coverage; or

    iii. If an order of civil or military authority limits, restricts or prohibits partial or total access to your direct supplier's or your direct customer's location and such order is a direct result of: (i) a violent crime, suicide, attempted suicide, or armed robbery at such location, or (ii) a death or bodily injury (not including, disease or sickness) at such location. Coverage begins on the date and time that the order of civil or military authority limits, redirects or prohibits partial or total access to your direct supplier's or your direct customer's location and ends on the date such location could be reopened for business but in no event for more than the number of days shown in Item **C.** of the Declarations under Interruption By Civil Or Military Authority.

No Extended Period of Indemnity shall apply to Subsection **b.(i)**, **b.(ii)**, or **b.(iii)**.



c. For the avoidance of doubt, the sublimit(s) of liability for Contingent Time Element is/are subject to any applicable sublimit of liability for **earth movement**, **flood** or **named storm**.

d. Notwithstanding the foregoing, this Contingent Time Element Additional Time Element Coverage does not apply to:

    i. Any supplier of electricity, gas, fuel, steam, water, refrigeration, sewerage service, internet, **cloud computing service** or **data, voice or video service**; or

    ii. Your customers, if you are a supplier of electricity, gas, fuel, steam, water, refrigeration, sewerage service, internet, **cloud computing service** or **data, voice or video service**.

(*Id.* at pp. 32-33 of 64 (emphasis in original).)

    21.    Section V(D)(7) ("INGRESS AND EGRESS") provides:

We will pay the actual **business income** loss sustained by you and **extra expense** caused by direct physical loss or damage caused by a **covered cause of loss** to property not insured under this Policy, provided that:

a. Such direct physical loss or damage to such property totally prevents physical ingress to or egress from a **covered location**; and

b. Such property not insured under this Policy is within the distance from the **covered location** as shown in Item **7.C.** of the Declarations under Ingress & Egress.

Coverage begins on the date and time that ingress to or egress from the **covered location** is totally prevented and ends on the date and time that the **covered location** could be reopened for business, but in no event for more than the lesser of 30 days or the number of days shown in Item **7.C.** of the Declarations under Ingress & Egress.

This Ingress & Egress Additional Time Element Coverage does not apply to any loss resulting from disruption of incoming or outgoing electricity, gas, fuel, water, steam, sewerage, refrigeration, **cloud computing service**, or any **data, voice or video service**.

(*Id.* at p. 34 of 64 (emphasis in original).)

    22.    Section V(D)(8) ("INTERRUPTION BY CIVIL OR MILITARY AUTHORITY")

provides:



We will pay the actual **business income** loss sustained by you and **extra expense** if an order of civil or military authority limits, restricts or prohibits access to property not insured under this Policy, provided that:

a. Such property sustains direct physical loss or damage caused by a **covered cause of loss**;

b. Such property is within the distance from the **covered location** as shown in Item **7.C.** of the Declarations under Interruption by Civil or Military Authority; and

c. The effect of such order is to totally prohibit access to a **covered location**.

Coverage begins on the effective date and time of such order and ends on the date and time that the **covered location** could be reopened for business, but in no event for more than the lesser of 30 days or the number of days shown in Item **7.C.** of the Declarations under Interruption By Civil Or Military Authority.

(*Id.* at p. 35-36 of 64 (emphasis supplied).)

23.     Section V(D)(9) ("LEASEHOLD INTEREST") provides:

If **covered property** is: (1) rendered wholly or partially untenantable by direct physical loss or damage to the **covered property** by a **covered cause of loss** during the policy period; and (2) your lease is canceled by an entity other than you or an entity that has a common ownership with you, in accordance with the conditions of the lease, then we will pay **your interest as lessee** or **your interest as lessor**, whichever is applicable, but as lessor only for the first three months following the date of the loss and the **net lease interest** shall be paid for the remaining months of the unexpired lease unless a shorter time period is indicated in Item **7.C.** of the Declarations.

Recovery as lessee under this Additional Time Element Coverage shall be the pro-rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on your interest in:

**a.** The amount of bonus paid by you for the acquisition of the lease not recoverable under the terms of the lease;

**b.** Improvements and betterments to real property which are not covered under any other provision of this Policy; and

**c.** The amount of advance rental paid by you and not recoverable under the terms of the lease.

You shall use due diligence to mitigate loss under this Leasehold Interest Additional Time Element Coverage. Any amount payable under this Leasehold



Interest Additional Time Element Coverage shall only be provided to the extent not covered under any other provision of this Policy.

(*Id.* at p. 36 of 64 (emphasis in original).)

24.     Section V(D)(10) ("RENTAL VALUE") provides:

We will pay the actual **rental value** loss sustained by you due to direct physical loss or damage by a **covered cause of loss** to **covered property** held for rental to others at a **covered location**. The **rental value** loss shall not exceed the reduction in **rental value** less charges and expenses which do not necessarily continue.

The conditions set forth in the ADDITIONAL TIME ELEMENT CONDITIONS Subsection of the TIME ELEMENT COVERAGES Section shall apply to the calculation of **rental value** loss. For the purpose of this Rental Value Additional Time Element Coverage, any reference to **business income** or **period of indemnity** contained in such Subsection shall be deemed to mean **rental value** or **rental value period**, respectively.

Coverage is provided for the **rental value period** plus the Extended Period of Indemnity.

(*Id.* at p. 36-37 of 64 (emphasis supplied.))

25.     The Policy further defines "Rental value" as follows:

**Rental value** means the sum of:

a.  The total anticipated gross rental income from tenant occupancy of the **covered location** (due consideration shall be given to the rental experience before the date of damage or destruction), as furnished and equipped by you including taxes, rent based on percentage of sales, and other charges paid by tenants with respect to the leased premises;

b.  The amount of all charges which, by the terms of a written lease, are the legal obligation of the tenant(s) and which would otherwise be your obligations; and

c.  The fair rental value of any portion of such **covered location** which you occupy; less any operating expenses that do not continue from tenant occupancy of the **covered location** as furnished and equipped by you.

**Rental value period** means the period of time that:

a.  Begins on the date and time of the loss or damage to **covered property** held for rental to others at a **covered location**; and

b.  Ends on the earlier of:

8



i.    The date when such property could be repaired, rebuilt or replaced with materials of like kind, size, capacity and quality to the same or equivalent physical operating conditions with the exercise of due diligence and dispatch, including any additional time to meet the applicable and covered **law or ordinance** requirements, if any; or

ii.   The date when the business is resumed at a new permanent location.

This period of time shall not be cut short by the end of the policy period.

(*Id.* at p. 59 of 64 (emphasis supplied.))

26.    The Contingent Time Element, Ingress & Egress, Interruption by Civil or Military Authority, Leasehold Interest and Rental Value provisions are each independent bases for coverage under the Policy.  That is, they can be triggered even when the standard business interruption coverage is not.

27.    In addition, these additional coverages are not subject to any exclusions which would be applicable to the instant loss.

28.    In particular, the Policy enumerates the limited perils that are excluded from coverage in Section IV - "Excluded Perils," which states as follows:

**Except as otherwise provided under the Additional Coverages or Additional Time Element Coverages** (and in such event, only to the extent provided therein), we do not insure loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage.

(*Id.* at p. 25 of 64 (emphasis supplied).)

29.    The plain language of the Policy provides that the Excluded Perils under Section IV, and the exclusions contained therein, do not apply to any coverages afforded "under the Additional Coverages or Additional Time Element Coverages."

30.    This is underscored by the fact that there are specific additional enumerated exclusions that apply to the Additional Time Element Coverages.  These are set forth under Section

9



V(E) of the Policy, which is entitled "Additional Time Element Exclusions."

31.     Accordingly, the exclusions listed under Section IV do not apply to losses covered by the Additional Time Element Coverages applicable to Contingent Time Element, Ingress & Egress, Interruption by Civil or Military Authority, Leasehold Interest and Rental Value set forth under Sections V(D)(2), V(D)(7), V(D)(8), V(D)(9) and V(D)(10) of the Policy.

32.     Similarly, any language that could be construed as anti-concurrent cause language, including the language set forth under Section IV concerning damage being caused "directly or indirectly" by any of the enumerated exclusions, does not apply to losses covered by the Additional Time Element Coverages applicable to Contingent Time Element, Ingress & Egress, Interruption by Civil or Military Authority, Leasehold Interest and Rental Value set forth under Sections V(D)(2), V(D)(7), V(D)(8), V(D)(9) and V(D)(10) of the Policy.

33.     Accordingly, because the Policy is an all-risk policy and separately provides Additional Time Element Coverages for Contingent Time Element, Ingress & Egress, Interruption by Civil or Military Authority, Leasehold Interest and Rental Value set forth under Sections V(D)(2), V(D)(7), V(D)(8), V(D)(9) and V(D)(10) of the Policy, and does not specifically exclude the losses that Frontier has suffered under the Additional Coverages or Additional Time Element Coverages, those losses are covered.

**B.     Frontier's Covered Losses.**

34.     "Coronaviruses are a family of viruses that can cause illnesses such as the common cold, severe acute respiratory syndrome (SARS) and Middle East respiratory syndrome (MERS). In 2019, a new coronavirus was identified as the cause of a disease outbreak that originated in China" designated as SARS-CoV-2 also known as the 2019 Novel Corona Virus or COVID-19

(hereinafter "COVID-19").[1]

35.     The presence of COVID-19 and the public health emergency it has created have prompted actions by civil authorities throughout the United States, including but not limited to civil authorities with jurisdiction over Frontier and its covered properties: the City of Miami, Miami-Dade County, Broward County and the State of Florida, just to name a few.

36.     Each of these actions by civil authorities have restricted and prohibited access to the insured's properties.  In addition, in Florida, violations of an executive order issued by the Governor pursuant to the State Emergency Management Act are second-degree misdemeanors punishable by imprisonment.

37.     On March 1, 2020, Florida Governor Ron DeSantis declared a Public Health Emergency as a result of COVID-19.[2]

38.     On March 9, 2020, Florida Governor DeSantis, on the recommendations of the Centers for Disease Control and Prevention ("CDC"), the State Surgeon General, and the State Health Officer, declared that a State of Emergency exists in Florida as a result of the COVID-19 outbreak.[3]

39.     On March 10, 2020, Broward County issued a Declaration of Emergency due to the presence of COVID-19 posing "a clear and present threat to the health and welfare of the people of Broward County."[4]

---

[1] Mayo Clinic, Coronavirus Disease 2019 (COVID-19), https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963.

[2] Office of the Governor of Florida, Executive Order No. 20-51 (March 1, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-51.pdf

[3] Office of the Governor of Florida, Executive Order Number 20-52 (March 9, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/eo_20-52.pdf.

[4] Bertha Henry, Broward County Administrator, Declaration of Emergency (March 10, 2020), https://www.broward.org/coronavirus/documents/declaration-of-emergency-1.pdf.



40.     On March 11, 2020, Miami-Dade County declared a local State of Emergency due to the presence of COVID-19, while noting that the "threat posed by COVID-19/novel Coronavirus may require extraordinary and immediate actions by Miami-Dade County in order to protect the public health, safety and welfare."[5]

41.     On March 11, 2020, the World Health Organization announced that, due to "alarming levels of spread and severity," the COVID-19 outbreak rose to the level of a pandemic.[6]

42.     On March 13, 2020, United States President Donald J. Trump declared that the "COVID-19 outbreak constitutes a national emergency" and applied same retroactively to March 1, 2020.[7]

43.     On March 17, 2020, Florida Governor DeSantis issued Executive Order 20-68 requiring that restaurants "immediately limit its occupancy to 50% of current building occupancy" and ensure "at a minimum, a 6-foot distance between any group of patrons and limiting parties to no more than 10 individuals."

44.     On March 17, 2020, Miami-Dade County issued Emergency Order 03-20, which went further than the order from Governor DeSantis in requiring that all restaurants or any other food service establishment "close on-premise service of customers."[8]  This Order remains in effect until expiration of the Miami-Dade County's State of Emergency.

---

[5] Mayor Carlos Gimenez, Miami-Dade County Mayor, Declaration of Emergency (March 11, 2020), https://www.miamidade.gov/information/library/coronavirus-state-of-emergency.pdf.

[6] World Health Organization, WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19 11-march-2020.

[7] President Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020) https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[8] Carlos Gimenez, Miami-Dade County Mayor, Emergency Order 03-20 (March 17, 2020), https://www.miamidade.gov/information/library/coronavirus-emergency-order-03-20-food-service.pdf.

45.     On March 17, 2020, the City of Miami issued an order requiring that dine-in restaurants provide only takeout, delivery or drive-thru service at any hour.[9]

46.     On March 19, 2020, Miami-Dade County issued Emergency Order 07-20, requiring the closure of all non-essential businesses.[10]

47.     On March 20, 2020, Florida Governor Ron DeSantis signed Executive Order No. 20-71 which, among other things, ordered that all restaurants and food establishments licensed under Chapters 500 and 409, Florida Statutes, within the State of Florida suspend on-premises food consumption for customers.[11]

48.     On March 20, 2020, Florida Governor Ron DeSantis also issued Executive Order 20-72, which prohibited "[a]ll hospitals, ambulatory surgical centers, office surgery centers, dental, orthodontic and endodontic offices, and other health care practitioners' offices in the State of Florida . . . from providing any medically unnecessary, non-urgent or non-emergency procedure or surgery which, if delayed, does not place a patient's immediate health, safety, or well-being at risk, or will, if delayed, not contribute to the worsening of a serious or life-threatening medical condition."[12]  Accordingly, "all health care practitioners licensed in the State of Florida, including dentists," were required to "immediately cease performing these elective services."

49.     Accordingly, Governor Ron DeSantis' Executive Order 20-72 required that certain healthcare providers immediately close their medical facilities and stop performing any elective

---

[9] Arthur Noriega V, City Manager, City of Miami, Florida, Executive Order 20-03 (March 17, 2020), https://www.miamigov.com/files/sharedassets/public/news/2020/0317-major-closures.pdf.

[10] Carlos Gimenez, Miami-Dade County Mayor, Declaration of Emergency (March 19, 2020), https://www.miamidade.gov/information/library/coronavirus-emergency-order-17-20-unpackaged-food-sales.pdf.

[11] Office of the Governor of Florida, Executive Order Number 20-71 (March 22, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-71.pdf.

[12] Office of the Governor of Florida, Executive Order Number 20-72 (March 20, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-72.pdf.

medical procedures.  In addition, Executive Order 20-72 did not expire until the expiration of Executive Order 20-52, including any extensions.

50.     On March 22, 2020, Broward County issued Emergency Order 20-01 ordering the closure of all nonessential retail and commercial businesses due to "the propensity of [COVID-19] to spread person to person and also because ***the virus is physically causing property damage*** due to its proclivity to attach to surfaces for prolonged periods of time."[13]

51.     The idea that COVID-19 was attaching to and causing physical damage to property has been expressed by several leaders in their efforts to slow the spread and damage caused by this deadly, devastating virus. For example, the Mayor for the City of New York Bill de Blasio banned all "shared rides" or "pooled rides" in vehicles in a March of 2020 executive order "because of the propensity of the virus to spread person-to-person and also ***because the virus physically is causing property loss and damage.***"

52.     On March 24, 2020, the City of Miami ordered all residents to "shelter in place" and "remain at home until further notice" in order to "help halt the spread of the COVID-19 coronavirus."  Under this order, all non-essential travel within the City of Miami, including by automobile, public transit, motorcycle, etc. was prohibited until further notice.[14]

53.     On March 30, 2020, the Governor of Florida signed Executive Order No. 20-89, ordering Miami-Dade County, among other counties, "to restrict public access" to non-essential businesses.[15]

---

[13] BerthaHenry, BrowardCounty Administrator, Emergency Order 20-01 (March 22, 2020), https://www.broward.org/coronavirus/documents/berthahenryexecutiveorder20-01.pdf (emphasis added).

[14] Arthur Noriega V, City Manager, City of Miami, Florida, Executive Order 20-04 (March 24, 2020), https://www.miamigov.com/files/sharedassets/public/news/2020/0324-shelter-in-place.pdf.

[15] Office of the Governor of Florida, Executive Order Number 20-89 (March 30, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-89.pdf.



54. On April 29, 2020, Florida Governor Ron DeSantis signed Executive Order No. 20-112, which sets forth a phased re-opening of certain businesses in the state.[16]  This Executive Order continues to restrict access to restaurants and food establishments by, among other things, requiring that they "limit their indoor occupancy to no more than 25 percent of their building occupancy."

55. On April 29, 2020, Miami-Dade County further extended its State of Emergency through and including May 7, 2020.[17]

56. On May 14, 2020, Florida Governor Ron DeSantis signed Executive Order No. 20-123, which provided in relevant part that restaurants and food establishments licensed under Chapters 500 or 509, Florida Statutes, may serve patrons at indoor seating so long as they limit indoor occupancy up to fifty (50) percent of their seating capacity, excluding employees, that the requirement for a minimum of six (6) feet between parties is superseded to the extent appropriate partitioning is in place, that bar counters are to remain closed to seating, and that outdoor seating remains available with social distancing.[18]

57. On May 18, 2020, Florida Governor Ron DeSantis issued Executive Order 20-122, which lifted the restrictions in Governor DeSantis' Executive Order 20-112 applicable to Miami-Dade, Broward and Palm Beach Counties.[19] Accordingly, hospital ambulatory surgical centers,

---

[16] Office of the Governor of Florida, Executive Order Number 20-112 (April 29, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-112.pdf.

[17] Carlos Gimenez, Miami-Dade County Mayor, Declaration of State of Emergency (April 29, 2020), https://www.miamidade.gov/information/library/04.29.20-state-of-emergency-declaration-extension-7.pdf.

[18] Office of the Governor of Florida, Executive Order Number 20-123 (May 14, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-123.pdf.

[19] Office of the Governor of Florida, Executive Order Number 20-122 (May 18, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-122.pdf.



office surgery centers, dental offices, orthodontic offices, endodontic offices or other health care practitioners' offices in these counties are now permitted to perform procedures prohibited by Executive Order 20-72 if, and only if: "(A) The facility has the capacity to immediately convert additional facility-identified surgical and intensive care beds for treatment of COVID-19 patients in a  surge capacity situation; (B) The facility has adequate personal protective equipment (PPE) to complete all medical procedures and respond to COVID-19 treatment needs, without the facility seeking any additional federal or state assistance regarding PPE supplies; (C) The facility has not sought any additional federal, state, or local government assistance regarding PPE supplies since resuming elective procedures; and (D) The facility has not refused to provide support to and proactively engage with skilled nursing facilities, assisted living facilities and other long-term care residential providers."[20]

58.     On May 19, 2020, the City of Miami formally extended the State of Local Emergency and also issued Order No. 20-11, which began the Phase 1 City of Miami Reopening.[21] On May 20, 2020, by virtue of City of Miami Order No. 20-11, the City of Miami lifted its nightly curfew and shelter-in-place orders.

59.     In addition, beginning on May 27, 2020, restaurants were permitted to reopen for dine-in customers subject to numerous restrictions, including the following: Restaurant capacity is capped at fifty (50) percent of maximum approved occupancy; Diners must wait outside or in their car until called by host for seating; Facemasks are required at all times, unless seated at table; Social distancing rules are in effect at all times inside and outside, unless seated at table; No parties

---

[20] *See* Office of the Governor of Florida, Executive Order Number 20-72 (March 20, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-72.pdf.

[21] Arthur Noriega V, City Manager, City of Miami, Florida, Executive Order 20-11 (May 19, 2020), https://www.miamigov.com/files/sharedassets/public/news/2020/0317-major-closures.pdf.

larger than four (4) allowed, except household parties which are capped at six (6); Restaurant bars

remain closed; Valet parking service is prohibited.[22]

60.     Miami Mayor Francis Suarez explained the impact of Order No. 20-11 with respect

to restaurants in the following manner:

> Restaurants are a big part of our local economy, directly employing thousands of
> Miamians, and we are ready to begin carefully reopening them to dine-in customers
> . . . To that end, there are number of rules in place to help safeguard both restaurant
> employees and customers and limit the continued spread of COVID-19, which is
> still present in our community. I'm calling on all Miamians to do their part to follow
> these rules and keep each other safe.

(https://www.miamigov.com/Notices/News-Media/COVID-19-Updates.)

61.     On May 31, 2020, Miami-Dade County issued Emergency Order 24-20, which

ordered that all restaurants, bars, taverns, pubs, night clubs, banquet halls, cocktail lounges,

cabarets, breweries, cafeterias, and any other alcohol and/or food business establishment with

seating for more than eight (8) people within the incorporated and unincorporated areas of Miami-

Dade County be permitted to open to on-premises service of customers.[23]

62.     On June 3, 2020, Florida Governor Ron DeSantis issued Executive Order No. 20-

139 which modified Executive Order No. 20-112 and 20-123.[24]   Executive Order No. 20-139

provided that restaurants may operate at fifty (50) percent of their indoor capacity, that bar areas

may be open with seated service, and that outdoor seating is permissible with appropriate social

distancing.

63.     On June 30, 2020, Miami-Dade County issued Amendment No. 1 to Emergency

---

[22]  https://www.miamigov.com/Government/Reopening-Miami/Restaurant-Reopening-and-Recovery-Program.

[23] Carlos Gimenez, Miami-Dade County Mayor, Amendment 1 to Miami-Dade County Emergency Order 23-20 (May
31, 2020), http://www.miamidade.gov/information/library/coronavirus-emergency-order-24-20.pdf.

[24] Office of the Governor of Florida, Executive Order Number 20-139 (June 3, 2020), https://www.flgov.com/wp-
content/uploads/orders/2020/EO_20-139.pdf.



Order 25-20, which ordered food service establishments with seating for more than eight (8) people to close for on-premises dining between the hours of 12:01 a.m. and 6:00 a.m. each day beginning on July 1, 2020.[25]

64.     On July 3, 2020, Miami-Dade County issued Emergency Order 27-20, which instituted a mandatory curfew from 10:00 p.m. through 6:00 a.m. daily for all non-essential personnel and business until cancelled or revised.[26]

65.     On July 7, 2020, Florida Governor Ron DeSantis issued Executive Order No. 20-166, which extended the state of emergency declared in Executive Order 20-52, and as previously extended by Executive Order 20-114 for sixty (60) days for the entire State of Florida.[27]

66.     On July 7, 2020, Miami-Dade County issued Amendment No. 2 to Emergency Order 26-20, which ordered restaurants to limit service for on-site consumption between the hours of 6:00 a.m. and 10:00 p.m. each day commencing on July 9, 2020.[28]

67.     On July 17, 2020, Broward County issued Emergency Order 20-22 implementing a county-wide curfew from 11:00 p.m. to 5:00 a.m. each day until August 1, 2020.[29]  This curfew was later extended to August 3, 2020 through subsequent Emergency Order 20-23 on July 29,

---

[25] Carlos Gimenez, Miami-Dade County Mayor, Amendment 1 to Miami-Dade County Emergency Order 25-20 (June 30, 2020), https://www.miamidade.gov/information/library/06.30.20-amendment-5-to-emergency-order-23-20-with-exhibits.pdf.

[26] Carlos Gimenez, Miami-Dade County Mayor, Amendment 2 to Miami-Dade County Emergency Order 26-20 (July 3, 2020), https://www.miamidade.gov/information/library/07.02.20-emergency-order-27-20.pdf.

[27] Office of the Governor of Florida, Executive Order Number 20-166 (July 7, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-166.pdf.

[28] Carlos Gimenez, Miami-Dade County Mayor, Amendment 2 to Miami-Dade County Emergency Order 26-20 (July 7, 2020), https://www.miamidade.gov/information/library/07.07.20-amendment-2-to-26-20.pdf.

[29] Bertha Henry, Broward County Administrator, Emergency Order 20-04 (July 17, 2020), https://www.broward.org/CoronaVirus/Documents/EmergencyOrder20-22.pdf.

2020.[30]

68.    On August 19, 2020, Miami-Dade County extended the Declaration of State of
Local Emergency due to the novel Coronavirus.[31]

69.    On August 21, 2020, Broward County issued Emergency Order 20-24 to allow
certain qualifying restaurants and establishments to resume indoor dining with fifty (50) percent
capacity, all tables and chairs to be socially distanced six (6) feet apart and with six (6) people
maximum at a table.[32]

70.    On August 28, 2020, Miami-Dade County issued Emergency Order 28-20, which
amended prior Emergency Orders to allow certain qualifying restaurants and establishments to
resume indoor dining at fifty (50) percent capacity with six (6) people maximum at a table.[33]

71.    On September 2, 2020, Miami-Dade County extended the Declaration of State of
Local Emergency due to the novel Coronavirus.[34]

72.    In addition, throughout this time, the Governor of Florida, City of Miami and
Miami-Dade County extended state of emergencies, which continue to remain in place to today.

73.    A majority of other local and state jurisdictions throughout the United States of
America have implemented the same or similar measures, restrictions and closures in response to

---

[30] BerthaHenry,  BrowardCounty Administrator,    Emergency       Order    20-04  (July      29,      2020),
https://www.broward.org/CoronaVirus/Documents/EmergencyOrder20-23.pdf.

[31] Carlos       Gimenez,      Miami-Dade      County     Mayor,      (August      19,      2020),
https://www.miamidade.gov/information/library/08.19.20-state-of-emergency-declaration-extension-24.pdf.

[32] BerthaHenry,  BrowardCounty Administrator,    Emergency       Order    20-04  (August    21,      2020),
https://www.broward.org/CoronaVirus/Documents/Emergency%20Order%2020-24_Attachment2.pdf.

[33] Carlos Gimenez, Miami-Dade County Mayor, Miami-Dade County Emergency Order 28-20 (August 28, 2020),
http://www.miamidade.gov/information/library/coronavirus-emergency-order-28-20.pdf.

[34] Carlos      Gimenez,      Miami-Dade      County     Mayor,      (September    2,      2020),
https://www.miamidade.gov/information/library/09.02.20-state-of-emergency-declaration-extension-26.pdf.

the COVID-19 pandemic and continue to do so to this day.

74. This includes local and state jurisdiction where Frontier's covered properties are located, including but not limited to Baldwin County, AL, Kent County, DE, Peoria County, IL, Hartford County, MD, Sykesville County, MD, Wicomico County, MD, Baltimore County, MD, Mecklenburg County, NC, Atlantic County, NJ, Burlington County, NJ, Middlesex County, NJ, Ocean County, NJ, Curry County, NM, Monroe County, NY, Cayuga County, NY, Erie County, NY, Oneida County, NY, Rockland County, NY, Onondaga County, NY, Tulsa County, OK, Montgomery County, PA, York County, PA, Tioga County, PA, Cherokee County, SC, Bexar County, TX, Montgomery County, VA, Roanoke County, VA, Salem County, VA, Suffolk County, VA, Lynchburg County, VA, Chesapeake County, VA, Blacksburg County, VA, Virginia Beach County, VA, Chesterfield County, VA, Newport News County, VA, Midlothian County, VA, Rockingham County, VA and Independent County, VA.

75. Each of these actions of civil authority were carried out because COVID-19 attaches to physical surfaces, thereby creating a dangerous physical condition that motivated local, state and national authorities to prohibit access to public areas, including Frontier's commercial properties.

76. Specifically, the general scientific and medical community have concluded and repeatedly stated that COVID-19 spreads through infected droplets that are physical objects that attach to and cause harm to other objects based on the virus' ability to survive on surfaces for extended periods of time and infect other people.

**C.**    **The Claim.**

77. Frontier acquires, develops, builds and manages commercial assets in Florida and throughout the United States. This includes commercial properties such as shopping centers, strip

malls, and standalone commercial buildings. In its role as manager of commercial real estate, Frontier acts as a landlord to commercial tenants from numerous sectors, including but not limited to food and beverage services, retailers, automotive, supermarkets, and healthcare services.  By way of example, some of Frontier's largest commercial tenants include Starbucks, AutoZone, Aspen Dental, Verizon, KFC and Ruby Tuesdays.

78.     A significant portion of Frontier's revenue and profits are derived from the rental income collected from its hundreds of commercial tenants in Florida and across the country.

79.     These commercial tenant locations are covered property under the aforementioned Policy.

80.     Given the positivity rates and number of COVID-19 cases in South Florida from February 2020 through the present, on information and belief, customers, employees and/or other visitors to Frontier's commercial tenants were infected with COVID-19 and thereby spread or brought the COVID-19 virus onto the insured's property during the relevant time period.

81.     This is especially true given that COVID-19 has and continues to spread through widespread community transmission across all sectors of society and all corners of the State of Florida.

82.     Thus, upon information and belief, the COVID-19 virus was physically present, active on inert physical surfaces and/or emitted into the air at Frontier's commercial tenants' properties between March 8, 2020 and the present.

83.     The presence of COVID-19 at Frontier's commercial tenants' properties caused direct physical loss and damage to property because, among other things, it made Frontier unable to utilize something in the real, material, or bodily world, resulting from a given cause (i.e., COVID-19).

84.     The presence of COVID-19 at Frontier's commercial tenants' properties further caused direct physical loss and damage to property because the COVID-19 virus particles attach to, live on and are active on inert physical surfaces while also being emitted into the air.

85.     Accordingly, the presence of COVID-19 caused direct physical loss of and/or damage to the covered premises under the Policy by, among other things, attaching to and damaging the property, denying access to the property, preventing employees and customers from physically occupying the property, causing the property to be physically uninhabitable by employees and customers, causing its function to be nearly eliminated or destroyed, and/or causing a suspension of business operations on the premises.

86.     Given the positivity rates and number of COVID-19 cases in South Florida and the locations in Paragraph 74 from February 2020 through the present, upon information and belief, COVID-19 was also present within one mile of one or multiple of Frontier's commercial tenants' properties.

87.     Due to the presence of COVID-19 both at Frontier's commercial tenants' properties and within one-mile of these properties, and the fact that COVID-19 caused directly physical loss or damage to property, many of these businesses were specifically ordered to be closed or shut down as non-essential business by local, state or federal officials.

88.     These orders totally prohibited access to Frontier's commercial tenants' properties by prohibiting these tenants from opening or otherwise using their respective businesses.

89.     The actions of local, state and federal civil authorities prohibiting public access to the covered premises and the surrounding area were issued in response to dangerous physical conditions, physical loss and physical damage, including but not limited to the COVID-19 virus particle attaching to, living on and remaining active on inert physical surfaces and being emitted

into the air, which thereby caused a suspension of business operations on the covered premises.

90.     Each of the civil authority actions set forth herein, as well as other civil authority actions taken by the United States Government, State of Florida, other States in the Union, Miami-Dade County and Broward County which are not set forth herein, continue to prohibit access to the Frontier properties leased to its commercial tenants.

91.     In addition, Frontier has suffered loss of actual rental value as result of the actual presence of COVID-19 at Frontier's commercial tenants' properties.

92.     As a result of the presence of COVID-19, Frontier has suffered a loss of actual rental value.

93.     These losses and expenses have continued through the date of filing of this action.

94.     These losses and expenses are not excluded from coverage under the Policy.  In fact, these losses are specifically covered under the Additional Time Element Coverages in the Policy.

95.     These losses and expense are also covered because the Policy is an all-risk policy.

**D.      The Defendant's Response.**

96.     Based on these facts, on May 26, 2020, Frontier provided notice of its losses and expenses to Defendant under the terms and conditions of the Policy.  This notice was timely.

97.     Defendant responded to the loss by opening claim number 10275421 (the "Claim").

98.     Through its adjustment of the Claim, Defendant has been afforded the opportunity to fully inspect the Loss, investigate the cause of the Loss, and quantify the amount of the Loss.

99.     On June 19, 2020, Defendant sent Frontier a correspondence requesting additional documentation pertaining to the Claim, to which Frontier timely responded in full.  This was the last time that Frontier heard anything from Defendant whatsoever regarding the Claim.  A true and

correct copy of this correspondence is attached hereto as Exhibit B.

100. Moreover, since Frontier provided all requested information, Defendant has not taken any action in relation to the Claim and has been dilatory in completing its investigation of the Claim.

101. In addition, Defendant has failed to render a timely determination as to coverage for the Claim under the Policy. Defendant cannot simply ignore the Claim or cause unreasonable delay to avoid fulfilling its contractual obligations under the Policy.

102. Frontier has complied with all prerequisites, whether denominated conditions precedent, duties after loss, or otherwise, to receive benefits or proceeds under the Policy, or maintain the instant suit for the breach or declaration of the Policy; alternatively, Defendant has waived or never had standing to assert any prerequisites, whether denominated as conditions precedent, duties after loss, or otherwise.

**CAUSES OF ACTION**
**COUNT I: BREACH OF CONTRACT**
**(Contingent Time Element)**

103. Frontier re-adopts and re-alleges each of the Paragraphs preceding the first Count of this Complaint.

104. In the Policy, pursuant to the Additional Time Elements Coverages, Defendant promised to afford additional coverage to Plaintiffs as follows:

a. If direct physical loss or damage caused by a **covered cause of loss** to property of the type insured under this Policy is sustained by your direct supplier or your direct customer, anywhere in the world and such loss or damage:

i. Wholly or partially prevents your direct supplier from supplying their goods and/or services to you; or

ii. Wholly or partially prevents your direct customer from accepting your goods and/or services;

then we will pay the actual **business income** loss and **extra expense** sustained by you during the **period of indemnity** with respect to such property of the type insured under this Policy. This coverage does not apply to new buildings or additions in the course of construction of any direct supplier or direct customer. You will cooperate with your direct supplier or direct customer and take any reasonable and necessary actions, including the use of other machinery, supplies or locations, to mitigate the loss payable herein.

b. Subject to the Contingent Time Element sublimit(s) of liability shown in Item **7.C.** of the Declarations, we will pay the actual **business income** loss and **extra expense** sustained by you in accordance with Subsection **a.** above:

   i. If ingress to or egress from your direct supplier's or your direct customer's location is partially or totally prevented in accordance with the same exclusions, limitations and time period that apply to the Ingress & Egress Additional Time Element Coverage;

   ii. If an order of civil or military authority limits, restricts or prohibits access to property not insured under this Policy, provided that the effect of such order partially or totally prohibits access to your direct supplier's or your direct customer's location in accordance with the same exclusions, limitations and time period that apply to the Interruption By Civil Or Military Authority Additional Time Element Coverage; or

   iii. If an order of civil or military authority limits, restricts or prohibits partial or total access to your direct supplier's or your direct customer's location and such order is a direct result of: (i) a violent crime, suicide, attempted suicide, or armed robbery at such location, or (ii) a death or bodily injury (not including, disease or sickness) at such location. Coverage begins on the date and time that the order of civil or military authority limits, redirects or prohibits partial or total access to your direct supplier's or your direct customer's location and ends on the date such location could be reopened for business but in no event for more than the number of days shown in Item **C.** of the Declarations under Interruption By Civil Or Military Authority.

No Extended Period of Indemnity shall apply to Subsection **b.(i)**, **b.(ii)**, or **b.(iii)**.

c. For the avoidance of doubt, the sublimit(s) of liability for Contingent Time Element is/are subject to any applicable sublimit of liability for **earth movement**, **flood** or **named storm**.

d. Notwithstanding the foregoing, this Contingent Time Element Additional Time Element Coverage does not apply to:

i. Any supplier of electricity, gas, fuel, steam, water, refrigeration, sewerage service, internet, **cloud computing service** or **data, voice or video service**; or

ii. Your customers, if you are a supplier of electricity, gas, fuel, steam, water, refrigeration, sewerage service, internet, **cloud computing service** or **data, voice or video service**.

(*Id.* at pp. 32-33 of 64 (emphasis in original).)

105.    As set forth herein, COVID-19 caused direct physical loss or damage to property of the type insured under the Policy.

106.    In addition, COVID-19 caused direct physical loss or damage to direct suppliers and direct customers of Plaintiff.

107.    These losses and damage wholly or partially prevented Plaintiff's direct supplier from supplying their goods and/or services to Plaintiff.

108.    These losses and damage also prevented Plaintiff's direct customers from accepting Plaintiff's goods and/or services.

109.    In addition, as alleged herein, ingress to or egress from Plaintiff's direct supplier's and/or Plaintiff's direct customer's locations have been partially or totally prevented under the Ingress and Egress Additional Time Element Coverage.

110.    Moreover, as alleged herein, an order of civil or military authority has limited, restricted or prohibited access to property not insured under the Policy with the effect of such order partially or totally prohibiting access to Plaintiff's direct supplier's or Plaintiff's direct customer's locations, in accordance with the Interruption By Civil Or Military Authority Additional Time Element Coverage.

111.    Plaintiff suffered a loss of actual business income and extra expense during the period of indemnity with respect to property insured under this Policy.

112.     Nonetheless, Defendant, through unreasonable delay and inaction, and without justification, has failed to tender any payment to Plaintiff pursuant to the Contingent Time Element coverage, which is an Additional Time Element Coverage, or any other coverage under the Policy.

113.     This failure constitutes a breach of the Policy by Defendant.

114.     Defendant's breaches of the Policy have directly and proximately caused Frontier to suffer significant damages in the past and said damages are of a continuing nature and as such Frontier will incur damages including loss of business income and extra expenses into the future.

WHEREFORE, Frontier requests that this Court award Frontier all damages permitted under Florida law, including but not limited to Frontier's losses of business income and extra expenses, consequential damages, attorneys' fees as provided under Fla. Stat. § 626.9373, prejudgment interest and costs and granting any further relief as this Court deems just and proper.

## COUNT II: BREACH OF CONTRACT
### (Ingress and Egress)

115.     Frontier re-adopts and re-alleges each of the Paragraphs preceding the first Count of this Complaint.

116.     In the Policy, pursuant to the Additional Time Elements Coverages, Defendant promised to afford additional coverage to Plaintiffs as follows:

We will pay the actual **business income** loss sustained by you and **extra expense** caused by direct physical loss or damage caused by a **covered cause of loss** to property not insured under this Policy, provided that:

a. Such direct physical loss or damage to such property totally prevents physical ingress to or egress from a **covered location**; and

b. Such property not insured under this Policy is within the distance from the **covered location** as shown in Item **7.C.** of the Declarations under Ingress & Egress.

Coverage begins on the date and time that ingress to or egress from the **covered location** is totally prevented and ends on the date and time that the **covered location** could be reopened for business, but in no event for more than the lesser of

30 days or the number of days shown in Item **7.C.** of the Declarations under Ingress & Egress.

This Ingress & Egress Additional Time Element Coverage does not apply to any loss resulting from disruption of incoming or outgoing electricity, gas, fuel, water, steam, sewerage, refrigeration, **cloud computing service**, or any **data, voice or video service**.

(*Id.* at p. 34 of 64 (emphasis in original).)

117.    Based on the rates of COVID-19 throughout South Florida during the relevant time period, upon information and belief, COVID-19 was physically present and thereby caused direct physical loss or damage to multiple properties not insured under the Policy.

118.    Each of these properties were within one-mile of a covered location, as identified in Item 7.C. of the Declarations under Ingress & Egress of the Policy.

119.    Moreover, the direct physical loss or damage to such property caused by COVID-19 totally prevented physical ingress to or ingress from covered locations under the Policy.

120.    Plaintiff suffered a loss of actual business income and extra expense during the period of indemnity with respect to property insured under this Policy.

121.    Nonetheless, Defendant, through unreasonable delay and inaction, and without justification, has failed to tender any payment to Plaintiff pursuant to the Ingress & Egress coverage, which is an Additional Time Element Coverage, or any other coverage under the Policy.

122.    This failure constitutes a breach of the Policy by Defendant.

123.    Defendant's breaches of the Policy have directly and proximately caused Frontier to suffer significant damages in the past and said damages are of a continuing nature and as such Frontier will incur damages including loss of business income and extra expenses into the future.

WHEREFORE, Frontier requests that this Court award Frontier all damages permitted under Florida law, including but not limited to Frontier's losses of business income and extra

expenses, consequential damages, attorneys' fees as provided under Fla. Stat. § 626.9373, prejudgment interest and costs and granting any further relief as this Court deems just and proper.

### COUNT III: BREACH OF CONTRACT
**(Interruption by Civil or Military Authority)**

124.    Frontier re-adopts and re-alleges each of the Paragraphs preceding the first Count of this Complaint.

125.    Defendant afforded Additional Time Element Coverage to Plaintiff as follows:

We will pay the actual **business income** loss sustained by you and **extra expense** if an order of civil or military authority limits, restricts or prohibits access to property not insured under this Policy, provided that:

a. Such property sustains direct physical loss or damage caused by a **covered cause of loss**;

b. Such property is within the distance from the **covered location** as shown in Item **7.C.** of the Declarations under Interruption by Civil or Military Authority; and

c. The effect of such order is to totally prohibit access to a **covered location**.

Coverage begins on the effective date and time of such order and ends on the date and time that the **covered location** could be reopened for business, but in no event for more than the lesser of 30 days or the number of days shown in Item **7.C.** of the Declarations under Interruption By Civil Or Military Authority.

(*Id.* at p. 35-36 of 64 (emphasis supplied).)

126.    Accordingly, under the Policy, pursuant to the Additional Time Element Interruption by Civil or Military Authority Coverage, Defendant promised to pay for losses of and/or damages related to loss of business income sustained as a result of an order of civil or military authority that limits, restricts or prohibits access to covered property or property in close proximity to covered property.

127.    As alleged in Paragraphs 86-87, COVID-19 was present at locations within one-mile of covered locations shown in Item 7.C. of the Declarations of the policy, which includes without limitation properties those located throughout the State of Florida and in each of the local



municipalities and/or counties identified in Paragraph 74.

128.    As set forth at Paragraphs 50, 75, 76, 82, 84 and 89, COVID-19 caused direct physical loss and damage to property caused by a covered loss.

129.    During the relevant period, Miami-Dade County, the City of Miami, Broward County and the State of Florida each issued orders which totally prohibited access to multiple covered locations identified in Item 7.C. of the Policy.  These orders include, without limitation, those set forth in Paragraphs 37 through 75.

130.    These orders resulted in the loss of actual business income and extra expense by Frontier.

131.    Defendant, through unreasonable delay and inaction, and without justification, has failed to provide coverage for the Claim as required under the Policy.

132.    This failure constitutes a breach of the Policy by Defendant.

133.    Defendant's breaches of the Policy have directly and proximately caused Frontier to suffer significant damages in the past and said damages are of a continuing nature and as such Frontier will incur damages including loss of business income and extra expenses into the future.

WHEREFORE, Frontier requests that this Court award Frontier all damages permitted under Florida law, including but not limited to Frontier's losses of business income and extra expenses, consequential damages, attorneys' fees as provided under Fla. Stat. § 626.9373, prejudgment interest and costs and granting any further relief as this Court deems just and proper.

## COUNT IV: BREACH OF CONTRACT
### (Leasehold Interest)

134.    Frontier re-adopts and re-alleges each of the Paragraphs preceding the first Count of this Complaint.

135.    In the Policy, pursuant to the Additional Time Elements Coverages, Defendant promised to afford additional coverage to Plaintiffs as follows:

> If **covered property** is: (1) rendered wholly or partially untenantable by direct physical loss or damage to the **covered property** by a **covered cause of loss** during the policy period; and (2) your lease is canceled by an entity other than you or an entity that has a common ownership with you, in accordance with the conditions of the lease, then we will pay **your interest as lessee** or **your interest as lessor**, whichever is applicable, but as lessor only for the first three months following the date of the loss and the **net lease interest** shall be paid for the remaining months of the unexpired lease unless a shorter time period is indicated in Item **7.C.** of the Declarations.
>
> Recovery as lessee under this Additional Time Element Coverage shall be the pro-rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on your interest in:
>
> **a.** The amount of bonus paid by you for the acquisition of the lease not recoverable under the terms of the lease;
>
> **b.** Improvements and betterments to real property which are not covered under any other provision of this Policy; and
>
> **c.** The amount of advance rental paid by you and not recoverable under the terms of the lease.
>
> You shall use due diligence to mitigate loss under this Leasehold Interest Additional Time Element Coverage. Any amount payable under this Leasehold Interest Additional Time Element Coverage shall only be provided to the extent not covered under any other provision of this Policy.

(*Id.* at p. 36 of 64 (emphasis in original).)

136.    Based on the rates of COVID-19 throughout South Florida during the relevant time period, upon information and belief, COVID-19 was physically present and thereby caused direct physical loss or damage to covered properties by a covered cause of loss during the policy period.

137.    As a result of direct physical loss or damage to the covered property by a covered cause of loss during the policy period, such covered property was rendered wholly or partially untenantable.

31



138.   In addition, during the policy period, multiple of Plaintiff's leases were cancelled by an entity other than Plaintiff or an entity that has a common ownership with Plaintiff, thereby causing harm to Plaintiff.

139.   Defendant is therefore required to pay Plaintiff's interest as a lessee and Plaintiff's interest as a lessor, under each applicable scenario, as set forth under the Additional Time Element – Leasehold Interest Coverage.

140.   Nonetheless, Defendant, through unreasonable delay and inaction, and without justification, has failed to tender any payment to Plaintiff pursuant to the Leasehold Interest Coverage, which is an Additional Time Element Coverage, or any other coverage under the Policy.

141.   This failure constitutes a breach of the Policy by Defendant.

142.   Defendant's breaches of the Policy have directly and proximately caused Frontier to suffer significant damages in the past and said damages are of a continuing nature and as such Frontier will incur damages including loss of business income and extra expenses into the future.

WHEREFORE, Frontier requests that this Court award Frontier all damages permitted under Florida law, including but not limited to Frontier's interest as a lessee or interest as a lessor, as applicable, under the Additional Time Element Coverage – Leasehold Interest Coverage, consequential damages, attorneys' fees as provided under Fla. Stat. § 626.9373, prejudgment interest and costs and granting any further relief as this Court deems just and proper.

## COUNT V: BREACH OF CONTRACT
### (Rental Value)

143.   Frontier re-adopts and re-alleges each of the Paragraphs preceding the first Count of this Complaint.

144.   In the Policy, pursuant to the Additional Time Elements Coverages, Defendant promised to afford additional coverage to Plaintiffs as follows:

We will pay the actual **rental value** loss sustained by you due to direct physical loss or damage by a **covered cause of loss** to **covered property** held for rental to others at a **covered location**. The **rental value** loss shall not exceed the reduction in **rental value** less charges and expenses which do not necessarily continue.

The conditions set forth in the ADDITIONAL TIME ELEMENT CONDITIONS Subsection of the TIME ELEMENT COVERAGES Section shall apply to the calculation of **rental value** loss. For the purpose of this Rental Value Additional Time Element Coverage, any reference to **business income** or **period of indemnity** contained in such Subsection shall be deemed to mean **rental value** or **rental value period**, respectively.

Coverage is provided for the **rental value period** plus the Extended Period of Indemnity.

(*Id.* at p. 36-37 of 64 (emphasis supplied.))

145.    Accordingly, pursuant to the Additional Time Elements Coverage – Rental Value Coverage, Defendant promised to pay the actual rental value loss sustained by Frontier due to direct physical loss or damage by a covered cause of loss to covered property held for rental to others at a covered location.

146.    Based on the transmission rates of COVID-19 throughout South Florida and other relevant locations during the relevant time period, upon information and belief, COVID-19 was present at multiple covered properties held for rental to others at a covered location, which includes without limitation those properties located throughout the State of Florida and in each of the local municipalities and/or counties identified in Paragraph 74.

147.    As set forth at Paragraphs 50, 75, 76, 82, 84 and 89, COVID-19 caused direct physical loss and damage to these properties.

148.    As a result, Frontier suffered actual rental value loss.

149.    Defendant, through unreasonable delay and inaction, and without justification, has failed to provide coverage for the Claim as required under the Policy.

150.    This failure constitutes a breach of the Policy by Defendant.

151.    Defendant's breaches of the Policy have directly and proximately caused Frontier

to suffer significant damages in the past and said damages are of a continuing nature and as such Frontier will incur damages including loss of business income and extra expenses into the future.

WHEREFORE, Frontier requests that this Court award Frontier all damages permitted under Florida law, including but not limited to Frontier's loss of actual rental value, consequential damages, attorneys' fees as provided under Fla. Stat. § 626.9373, prejudgment interest and costs and granting any further relief as this Court deems just and proper.

## COUNT VI: DECLARATORY JUDGMENT

152.    Plaintiff re-adopts and re-alleges each of the Paragraphs preceding the first Count of this Complaint.

153.    In the Policy, Defendant promised to pay for losses of and/or damages related to loss of business income sustained as a result of perils not excluded under the Policy.

154.    Specifically, Defendant promised to pay for losses of and/or damages specifically afforded coverage under the Additional Time Elements Coverage provision of the Policy, including but not limited to under Sections V(D)(2), V(D)(7), V(D)(8), V(D)(9) and V(D)(10) of the Policy.

155.    As alleged herein, COVID-19 caused direct physical loss or damage to covered properties as well as to properties not covered under the subject Policy.

156.    This direct physical loss or damage to covered properties as well as to properties not covered under the subject policy triggered coverage under the Additional Time Elements Coverage provision of the Policy, including but not limited to under Sections V(D)(2), V(D)(7), V(D)(8), V(D)(9) and V(D)(10) of the Policy.

157.    Plaintiff has complied with all applicable provisions of its respective policies, including payment of premiums.

158.    Defendant, without justification, disputes that the Policy provides coverage for these losses.

159.    Accordingly, Plaintiff seeks a Declaratory Judgment that, among other things:

(a) The Policy is an all-risk policy with no exclusions applicable to Plaintiff's loss;

(b) The losses suffered by Plaintiff in this action constitute direct physical loss of or damage to property at the premises;

(c) The terms "physical loss" and "physical damage to" property are terms with distinct meanings under the Policy and Florida law;

(d) Construing "physical loss" and "physical damage to" property as the same would render terms surplusage;

(e) Loss of use constitutes "physical loss" and "physical damage" under the terms of the Policy;

(f) Plaintiff in fact suffered loss of use as a result of the actions and inactions described in this Complaint;

(g) The loss or damage suffered by Plaintiff is or was caused by or result from a Covered Cause of Loss under the all-risk Policy;

(h) There has been a "suspension" of the Plaintiff's "operations" during the "period of restoration" under the Policy;

(i) The Policy includes Additional Time Element Coverage which affords coverage for Contingent Time Element, Ingress and Egress, Interruption by Civil or Military Authority, Leasehold Interest and Rental Value;

(j) The acts alleged herein by the governments of Miami-Dade County, Broward County, the City of Miami, the State of Florida and the United States' Government constitute actions of civil authority under the Policy;

(k) Access to the area within one-mile of Plaintiff's property was prohibited by said actions of civil authority;

(l) Plaintiff sustained loss of Business Income and Extra Expense as a result of said actions of civil authority;

(m) The Policy provides coverage for the losses of business income and extra expenses;

35

(n) The Policy provides coverage for losses that Plaintiff has sustained and incurred caused by actions of civil authorities, including but not limited to those alleged herein.

(o) Any purported anti-concurrent cause language, including the language set forth under Section IV concerning damage being caused "directly or indirectly" by any of the enumerated exclusions, does not apply to losses covered by the Additional Time Element Coverages; and/or

(p) Any purported anti-concurrent cause language, including the language set forth under Section IV concerning damage being caused "directly or indirectly" by any of the enumerated exclusions, does not apply specifically to losses covered by the additional coverages pertinent to Contingent Time Element, Ingress & Egress, Interruption by Civil or Military Authority, Leasehold Interest and Rental Value set forth under Sections V(D)(2), V(D)(7), V(D)(8), V(D)(9) and V(D)(10) of the Policy.

160.    An actual case or controversy exists regarding Plaintiff's and Defendant's obligations to reimburse Plaintiff for the full amount of its losses. Accordingly, the Declaratory Judgment sought is justiciable.

WHEREFORE, Plaintiff requests that this Court enter a declaratory judgment on each of the items set forth herein, awarding attorneys' fees as provided under Fla. Stat. § 626.9373 as well as any other applicable statues or case law, and granting any further relief as this Court deems just and proper.

## III.    **DEMAND FOR JURY TRIAL**

The undersigned hereby demands a trial by jury as to all issues so triable.

Dated: January 21, 2021.

Respectfully submitted,

By: */s/ Joshua Truppman*
Joshua Truppman, Esq.
Florida Bar No. 111795
By: */s/ Robert Visca*
Robert Visca, Esq.
Florida Bar No. 111800
By: */s/ Benjamin H. Brodsky*
Benjamin H. Brodsky, Esq.
Florida Bar No. 73748
BRODSKY FOTIU-WOJTOWICZ, PLLC
*Counsel for Plaintiff*
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: (305) 503-5054
bbrodsky@bfwlegal.com
joshua@bfwlegal.com
robert@bfwlegal.com
docketing@bfwlegal.com

-AND-

By: */s/ Keith A. Truppman*
Keith A. Truppman, Esq.
Florida Bar No. 473715
MINTZ TRUPPMAN, P.A.
*Counsel for Plaintiff*
1700 San Souci Blvd.
North Miami, FL  33181
Tel: (305) 893-5506
ktruppman@mintztruppman.com

# EXHIBIT A



## Florida Surplus Lines Cover Page

**Insured Name:** Frontier Development, LLC

**Policy No:** MPR30000603002

**Term:** 03/08/2020 - 03/08/2021

**Surplus Lines Agent's Name:** Daniel Beck

**Surplus Lines Agent's License No:** W402929

**Surplus Lines Agent's Address:** 198 W High Street, Somerville, NJ 08876

Producing Agent's Name: Yvonne Davis
Producing Agent's Address: 1201 W. Cypress Creek Road, Suite 130
                             Fort Lauderdale, FL 33309

**INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW. PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER. SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY.**

**Taxable Premium:** $212,970.00     **Policy Fee:**

**Non Taxable Premium:**             **Inspection Fee:**

**Tax:** $10,648.50                  **Service    Fee:** $212.97

**EMPA Surch:**            0.00      **Citizen's Assessment:** _____

**Surplus Lines Agent's Counter Signature:**    **FHCF Assessment:** _____

☐  **THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR HURRICANE OR WIND LOSSES, WHICH MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU.**

☐  **THIS POLICY CONTAINS A CO-PAY PROVISION THAT MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU.**



**Endurance American Specialty
Insurance Company**

New York, NY

## COMMERCIAL PROPERTY
## POLICY DECLARATIONS

POLICY NUMBER:         MPR30000603002

PRIOR POLICY NUMBER:    MPR30000603001

| | |
|---|---|
| Premium: | $212,970.00 |
| Surplus Lines Tax: | $10,648.50 |
| Stamping Fee: | $212.97 |
| Policy Fee: | |
| Total: | $223,831.47 |

**Item 1.**   **Named Insured**:        Frontier Development, LLC
         Address:                 1801 SW 3rd Ave., Suite 500
                               Miami, FL 33129

The Named Insured includes you and/or your affiliated and subsidiary companies and/or corporations as now exist or may hereafter be incorporated, constituted or acquired, including their interests as may appear in partnerships or joint ventures which you are legally obligated to insure.

**Item 2.**   **Mortgageholders, Loss Payees, and Additional Insureds:** Per Schedules on file with us or any endorsement attached to and forming a part of this Policy.

**Item 3.**   **Policy Period**:        From:  March 8, 2020        To:  March 8, 2021
                            (Both dates at 12:01 AM at the address of the Named Insured referenced in Item 1.)

**Item 4.**   **Coverage Territory:**

United States, its territories and possessions, Puerto Rico and Canada, including their respective coastal waters.

This **coverage territory** shall not include any jurisdiction prohibited or restricted under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America. Losses are only covered within the **coverage territory**.

**Item 5.**   **Premium:**
          **A.**  **Premium:**             $ 208,794
          **B.**  **TRIPRA Premium:**    $ 4,176
          **C.**  **Surcharges:**         $ N/A
              **(If Applicable)**
          **D.**  **Jurisdictional Inspection**
              **Fees:**              $ 0
          **E.**  **Total:**              $ 212,970

**Item 6.**   **Policy Limit:**        $ 100,000,000

This is our maximum liability in any one **occurrence** as a result of all covered loss or damage regardless of the number of **covered locations**, coverages, or **covered causes of loss** under this Policy.

Policy Issuance Date:        <<Policy Issuance Date >>                           <<Endurance Insurer>>
Policy Issuance Office:      <<Endurance Insurer Address>>                      MMP 0001 0918
Page 1 of 10

Item 7.　　**Sublimits of Liability:**

The sublimits of liability stated in this Policy are part of and not in addition to the **Policy Limit** and any sublimits of liability shown in Item **7.A.** below.  The sublimits of liability are: (1) the  maximum amount  we  will  pay  for  all  covered  loss  or  damage arising out of the specific perils or coverages; and/or (2) the maximum number of hours/days/months for which we will pay for all covered loss or damage for a specific coverage, regardless of the number of **covered locations**, coverages or **covered causes of loss** under this Policy. The sublimits of liability stated in this Policy are per **occurrence**  unless otherwise indicated.

Regardless of the number of **occurrences,** any Annual Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss**.

If "Not Covered" is shown instead of a limit, sublimit amount or number of hours/days/months, then no coverage is provided for that coverage or **covered cause of loss**.

If "Included" is shown instead of a limit or sublimit amount, then the maximum liability for all covered loss or damage for the coverage or **covered cause of loss** is the **Policy Limit** shown in Item **6**.

　　**A.** **Sublimits Applicable to Specified Covered Causes of Loss –** Each of these sublimits is part of and not in addition to the **Policy Limit** and is excess of underlying deductibles.  If "Not Covered" is shown, then there is also no Additional Time Element Coverage for the specified coverage or **covered cause of loss**.

　　　　**1.** **Earth Movement:**

　　　　　　**a.** Annual Aggregate: $5,000,000 for all covered loss or damage arising out of **earth movement**

　　　　　　**b.** Subject to **A.1.a.** above, the Annual Aggregate for all covered loss or damage arising out of **earth movement** in California:
NOT COVERED

　　　　　　**c.** Subject to **A.1.a.** above, the Annual Aggregate for all covered  loss  or  damage arising  out  of  **earth  movement** in the **Pacific Northwest Earthquake Zone**:
NOT COVERED

　　　　　　**d.** Subject to **A.1.a.** above, the Annual Aggregate for all covered loss or damage arising out of **earth movement** in the **New Madrid Earthquake Zone**:
NOT COVERED

　　　　　　**e.** Subject to **A.1.a.** above, the Annual Aggregate for all covered loss or damage arising out of **earth movement** in Alaska, Hawaii, and Puerto Rico combined:
NOT COVERED

**2. Flood**:

    **a.**    Annual Aggregate: $5,000,000 for all covered loss or damage arising out of **flood**

    **b.**    Subject to **A.2.a.** above, the Annual Aggregate for all covered loss or damage arising out of **flood** in a **Special Flood Hazard Area** at the time of the loss: $1,000,000

        Regardless if the property that sustains physical loss or damage due to **flood** is determined at the time of loss to be wholly or partially situated in such **Special Flood Hazard Area**, then the entire property shall be deemed to be in that **Special Flood Hazard Area** and the loss or damage will be subject to the sublimit stated in **A.2.b.** above.

    **c.**    Subject to **A.2.a.** above, the Annual Aggregate for all covered loss or damage arising out of **flood** in a **Moderate Flood Hazard Area** at the time of the loss: $5,000,000

        Regardless if the property that sustains physical loss or damage due to **flood** is determined at the time of loss to be wholly or partially situated in such **Moderate Flood Hazard Area**, and outside of a **Special Flood Hazard Area**, then the entire property shall be deemed to be in that **Moderate Flood Hazard Area** and the loss or damage will be subject to the sublimit stated in **A.2.b.** above.

**3. Named Storm**:

    **a.**    Annual Aggregate:  $100,000,000 for all covered loss or damage arising out of **named storm.**

    **b.**    Subject to **A.3.a.** above, for all covered loss or damage arising out of **named storm** in the **Tier 1 High Hazard Wind Zones** in Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina and Texas**:** $100,000,000

    **c.**    Subject to **A.3.a.** above, for all covered loss or damage arising out of **named storm** in the **Tier 1 High Hazard Wind Zone** in Florida: $100,000,000

    **d.**    Subject to **A.3.a.** above, for all covered loss or damage arising out of **named storm** in the **Tier 1 High Hazard Wind Zones** in  Hawaii, Puerto Rico and U.S. Virgin Islands: NOT COVERED

    **e.**    Subject to **A.3.a.** above, for all covered loss or damage arising out of **named storm** in the **Tier 2 High Hazard Wind Zone**: $100,000,000

**4. Terrorism:**  $100,000,000 for all covered loss or damage arising out of **terrorism.**

Policy Issuance Date:        <<Policy Issuance Date >>        <<Endurance Insurer>>
Policy Issuance Office:        <<Endurance Insurer Address>>        MMP 0001 0917
Page 3 of 10

**B.** **Sublimits Applicable to Additional Coverages –** Each of these sublimits is part of and not in addition to the **Policy Limit** and any sublimits shown in Item **7.A.** of the Declarations. If "Not Covered" is shown, then the Additional Coverage is not provided.

| | | |
|---|---|---|
| **1.** | Accounts Receivable: | $1,000,000 |
| **2.** | Arson or Theft Reward: | $50,000 |
| **3.** | Brands and Labels: | $50,000 |
| **4.** | Course of Construction: | $1,000,000 |
| **5.** | Debris Removal: | $1,000,000 |
| **6.** | Decontamination Costs: | $500,000 |
| **7.** | Deferred Payments: | $250,000 |
| **8.** | Demolition and Increased Cost of Construction: | |
| | Demolition Coverage A: | INCLUDED |
| | Demolition Coverage B: | $1,000,000 |
| | Demolition Coverage C: | $1,000,000 |
| **9.** | Discharge from Sewer, Drain or Sump: | $1,000,000 |
| **10.** | Downzoning: | $500,000 |
| **11.** | Electronic Data Coverages: | |
| | Electronic Data: | $1,000,000 |
| | Electronic Data Preservation Expenses: | $1,000,000 |
| | Electronic Data Period of Indemnity: | 365  days |
| **12.** | Environmental Upgrade: | $500,000 |
| **13.** | Equipment Breakdown: | $100,000,000 |
| | Consequential Damages: | $1,000,000 subject to equipment breakdown sublimit |
| | Expediting Expenses: | $5,000,000 subject to equipment breakdown sublimit |
| | Hazardous Substance: | $250,000 subject to equipment breakdown sublimit |
| | Service Interruption: | $5,000,000 subject to equipment breakdown sublimit |
| | Waiting Period: | 1 day |
| | Extended Period of Indemnity: | 30 days |
| | Spoilage: | $250,000 subject to equipment breakdown sublimit |
| | Water Damages: | $1,000,000 subject to equipment breakdown sublimit |
| **14.** | Errors or Omissions: | $1,000,000 |

**15.** Expediting Expenses: $100,000

**16.** Fine Arts: $100,000 per **occurrence** subject to a maximum sublimit of $10,000 per item

**17.** Fire Department Charges: $25,000

**18.** Fungus, Mold or Spore: $100,000 annual aggregate

**19.** Installation Coverage: $100,000

**20.** Land and Water Pollutants or Contaminants Clean-up: $1,000,000 annual aggregate

**21.** Locks and Keys: $25,000

**22.** Machinery or Equipment Startup Option: $100,000

**23.** Miscellaneous Property: $10,000

**24.** Mobile Equipment: $500,000

**25.** Newly Acquired Property: $1,000,000 180 days

**26.** Outdoor Property: $100,000

**27.** Pairs or Sets: $100,000

**28.** Preservation of Property: $500,000

**29.** Professional Fees: $100,000

**30.** Railroad Rolling Stock: NOT COVERED

**31.** Service Interruption (excluding overhead transmission and distribution lines): $1,000,000

**32.** Spoilage: $100,000

**33.** Transit: $50,000

**34.** Valuable Papers and Records: $1,000,000

**35.** Voluntary Parting: $100,000

**C.** **Sublimits Applicable to Additional Time Element Coverages** - Each of these sublimits is part of and not in addition to the **Policy Limit** and any sublimits shown in Item **7.A.** of the Declarations. If "Not Covered" is shown, then the Additional Time Element Coverage is not provided.

**1.** Attraction Property: NOT COVERED

**2.** Contingent Time Element:      $1,000,000

**3.** Contractual Penalties:      $100,000

**4.** Extended Period of Indemnity:      365 days

**5.** Extra Expense:      INCLUDED

**6.** Impounded Water Time Period:      1 day

**7.** Ingress & Egress:      60 days, subject to a maximum per **occurrence** sublimit of $1,000,000 and a distance limitation of 1 mile

**8.** Interruption by Civil or Military Authority:      60 days, subject to a maximum per **occurrence** sublimit of $1,000,000 and a distance limitation of 1 mile

**9.** Leasehold Interest:      $1,000,000

**10.** Rental Value:      INCLUDED

**11.** Research and Development Expense:      NOT COVERED

**12.** Royalties:      NOT COVERED

**13.** Service Interruption:      $1,000,000

    Waiting Period:      48 hours

**14.** Soft Costs:      $1,000,000

**D. Contractor's Equipment:** The sublimits below for contractor's equipment are part of and not in addition to the **Policy Limit** and any sublimits shown in Item **7.A.** of the Declarations.

$100,000 per **occurrence** subject to a maximum sublimit of $10,000 per item

**Item 8.** **Additional Time Element Provisions:**

**A. Ordinary Payroll**      180 days

**B. Maximum Operations Period of Indemnity (Gross Profits):**      12 months

**C. Maximum Construction Period of Indemnity (Gross Profits):**      12 months

**Item 9.** **Maximum Amount Payable:**

In the event of covered loss or damage hereunder, our liability shall be limited to the lesser of the following:

**A.** The actual adjusted amount of covered loss or damage, less applicable deductible(s), or

**B.** The **Policy Limit** or applicable sublimit(s) of liability in this Policy.

Policy Issuance Date:      <<Policy Issuance Date >>          <<Endurance Insurer>>
Policy Issuance Office:      <<Endurance Insurer Address>>          MMP 0001 0917
Page 6 of 10

Item 10.   **Deductibles:**

The deductibles shown below apply per **occurrence** unless otherwise stated.

   **A.   Policy Deductible:**

      **1.   Property Damage and Time Element Combined Deductible:**

         $5,000 applicable to all covered loss or damage under this Policy; or

   **B.   Earth Movement:**

      **1.   a.   Property Damage and Time Element Combined Deductible:**

         $50,000 applicable to all covered loss or damage arising out of **earth movement** (other than as set forth in **B.2.**, **B.3.**, **B.4.** or **B.5.**); or

      **2.**   NOT COVERED% of Total Insurable Values at the time of the loss at each **covered location** involved in the loss or damage, subject to a minimum of NOT COVERED any one **occurrence** for all covered loss or damage arising out of **earth movement** in California.

      **3.**   NOT COVERED% of Total Insurable Values at the time of the loss at each **covered location** involved in the loss or damage, subject to a minimum of NOT COVERED any one **occurrence** for all covered loss or damage arising out of **earth movement** in the **Pacific Northwest Earthquake Zone**.

      **4.**   NOT COVERED% of Total Insurable Values at the time of the loss at each **covered location** involved in the loss or damage, subject to a minimum of NOT COVERED any one **occurrence** for all covered loss or damage arising out of **earth movement** in the **New Madrid Earthquake Zone**.

      **5.**   NOT COVERED% of Total Insurable Values at the time of the loss at each **covered location** involved in the loss or damage, subject to a minimum of NOT COVERED any one **occurrence** for all covered loss or damage arising out of **earth movement** in Hawaii, Alaska, and Puerto Rico.

   **C.   Flood:**

      **1.   a.   Property Damage and Time Element Combined Deductible:**

         $50,000 applicable to all covered loss or damage arising out of **flood** (other than as set forth in **C.2.** or **C.3.**); or

Policy Issuance Date:      <<Policy Issuance Date >>                         <<Endurance Insurer>>
Policy Issuance Office:     <<Endurance Insurer Address>>                MMP 0001 0917
Page 7 of 10

    **2.** $500,000 any one **occurrence** for all covered loss or damage arising out of **flood** at any property wholly or partially in a **Special Flood Hazard Area** at the time of the loss.

    **3.** $50,000 any one **occurrence** for all covered loss or damage arising out of **flood** at any property wholly or partially in a **Moderate Flood Hazard Area**, and outside of a **Special Flood Hazard Area**, at the time of the loss.

**D.** **Named Storm:**
    **1.** 0% of Total Insurable Values at the time of the loss at each **covered location** involved in the loss or damage, subject to a minimum of $5,000 any one **occurrence** for all covered loss or damage arising out of **named storm** (other than as set forth in **D.2.**, **D.3.**, **D.4.**, **D.5.** or **D.6.**).

    **2.** 5% of Total Insurable Values at the time of the loss at each **covered location** involved in the loss or damage, subject to a minimum of $100,000 any one **occurrence** for all covered loss or damage arising out of **named storm** in the **Tier 1 High Hazard Wind Zone** (Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina and Texas).

    **3.** 5% of Total Insurable Values at the time of the loss at each **covered location** involved in the loss or damage, subject to a minimum of $100,000 any one **occurrence** for all covered loss or damage arising out of **named storm** in the **Tier 1 High Hazard Wind Zone** (Florida).

    **4.** NOT COVERED% of Total Insurable Values at the time of the loss at each **covered location** involved in the loss or damage, subject to a minimum of NOT COVERED any one **occurrence** for all covered loss or damage arising out of **named storm** in the **Tier 1 High Hazard Wind Zone** (Hawaii, Puerto Rico and U.S. Virgin Islands).

    **5.** 0% of Total Insurable Values at the time of the loss at each **covered location** involved in the loss or damage, subject to a minimum of $5,000 any one **occurrence** for all covered loss or damage arising out of **named storm** in the **Tier 2 High Hazard Wind Zone**.

**E.** **Equipment Breakdown:**

    **1.** **Property Damage and Time Element Combined Deductible:**

      $5,000 applicable to all covered loss or damage from **equipment breakdown;**

Policy Issuance Date:       <<Policy Issuance Date >>              <<Endurance Insurer>>
Policy Issuance Office:      <<Endurance Insurer Address>>          MMP 0001 0917
Page 8 of 10

In each case of loss or damage covered by this Policy, we shall not be liable unless you sustain covered loss or damage in a single **occurrence** greater than any applicable deductible described in this Policy and then only for the amount in excess of such deductible.

If an amount is not shown for any deductible, then that deductible shall not apply. Also, if an amount is not shown with respect to a part of a deductible, then such part shall not apply, but the rest of the deductible shall apply. When this Policy covers more than one **covered location**, the deductible shall apply against the total loss or damage covered by this Policy in any one **occurrence**, unless otherwise stated herein.

If two or more deductible amounts provided in this Policy apply to a single **occurrence**, the total to be deducted shall not exceed the largest applicable deductible unless otherwise stated in this Policy. However, if a separate Property Damage deductible and a separate Time Element deductible apply to loss or damage in a single **occurrence**, we shall apply both deductibles. For any coverage for which there is a waiting period or a time period before coverage commences, such period shall apply in addition to any applicable deductible(s) set forth in this Policy.

**Special Terms and Conditions:**

_____
_____
_____
_____
_____
_____
_____
_____

Item 11.   Notice:

    **A.**  Notice of **Claims**, circumstances, or loss:    Sompo Global Risk Solutions
    Attn:  Chris Adolph
    1221 Avenue of the Americas
    18th Floor
    New York, NY, 10020
    InsuranceClaims@sompo-intl.com
    1-800-676-7575

    **B.**  All Other Notices:    Global Risk Solutions
    Attn: Nicole DiPaolo
    1221 Avenue of the Americas
    18th Floor
    New York, NY 10020

Item 12.   Producer:    Synapse
    Liz McAlpin
    Address:    913 Forrest Street
    Rosewell, GA, 30075

Policy Issuance Date:    <<Policy Issuance Date >>    <<Endurance Insurer>>
Policy Issuance Office:    <<Endurance Insurer Address>>    MMP 0001 0917
Page 9 of 10

Synapse

Item 13.   Endorsements Effective at Inception:
           See attached Schedule of Forms


The Company hereby causes this Policy to be signed on the Declarations page by a duly authorized representative of the Company.


*Nicole DiPaolo*

_____                          _____3/8/2020_____
Authorized Representative                                         Date

## COMMERCIAL PROPERTY POLICY

Various provisions in this Policy restrict coverage. Please read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the words "you" and "your" refer to the Named Insured shown in Item 1. on the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance. The word "Policy" includes the Declarations, the Special Terms and Conditions, endorsements and Schedules. The words "Additional Coverage(s)" (without further description) include all: Additional Coverages and Additional Time Element Coverages.

Other words and phrases that appear in boldface type have special meaning. Refer to: (1) the DEFINITIONS Section; and (2) elsewhere in this Policy. If such ordinarily boldfaced words and phrases are not bolded then such words and phrases shall include, but not be limited to, the specific meaning set forth in this Policy.

### SECTION I – INSURING AGREEMENT AND COVERED PROPERTY

A. **INSURING AGREEMENT**

This Policy insures against all risk of direct physical loss or damage to **covered property** described herein occurring during the term of this Policy, except as hereinafter excluded.

Unless specifically indicated otherwise, references to **covered location** in this Section I includes the **covered location** and within 1,000 feet thereof.

B. **COVERED PROPERTY**

Except as excluded elsewhere in this Policy, we insure the following real property and personal property at or within a **covered location** unless otherwise indicated herein, that you own, operate, control or for which you are under a contractual obligation to insure for direct physical loss or damage, to the extent of your interest in such property.  Any such contractual obligation must be in effect prior to the direct physical loss or damage.

1. Real Property:

Such property consists of:

a. Buildings or structures;

b. New construction and additions under construction;

c. Improvements, betterments, alterations and repairs to buildings or structures;

d. Materials, equipment and supplies for new construction, additions, buildings or structures;

    e.   Temporary structures;

    f.   Machinery, equipment, and fixtures that are permanently attached to a building;

    g.   Above and below ground pipes, tanks, flues and drains; and

    h.   Contractors' interests in Subsections **a.** through **g.** above, inclusive, to the extent that you have agreed in a written contract or agreement prior to loss to insure such interests.

2.  Personal Property:

Such property consists of:

    a.   Machinery and equipment;

    b.   Merchandise, stock, supplies, **raw materials** and **finished goods**;

    c.   Furniture and fixtures;

    d.   Electronic equipment;

    e.   **Processing water**;

    f.   Moulds and dies;

    g.   Improvements and betterments in which you have an insurable interest;

    h.   Personal property, other than motor vehicles, of your directors, officers and employees at a **covered location**; and

    i.   Personal property of others in your care, custody and control at a **covered location** and for which you are legally liable.

C.    **PROPERTY NOT COVERED**

Except as otherwise provided under the Additional Coverages or Additional Time Element Coverages (and in such event, only to the extent provided therein), we do not insure the following property:

1.  **Money and securities**;

2.  Land, land values, any substance in or on land, or any alteration to the natural condition of the land; however, we do insure the following:

    a.   Any manmade: dams, dikes, levees, aqueducts and other surface containments, if

values for such structures are reported to us and accepted by us; and

   b.  Fill beneath any buildings or structures;

3.  Water, except water that is contained within any enclosed tank, piping system, or **processing water**;

4.  Standing timber, growing crops or animals not used for research;

5.  Vehicles licensed for public roadway use, **railroad rolling stock**, and locomotives; however, we do insure the following:

   a.  Vehicles that you manufacture, process or warehouse, but not vehicles held for sale, lease, loan or rent; and

   b.  Vehicles licensed for public roadway use, **railroad rolling stock**, and locomotives while at a **covered location**;

6.  Property sold by you under conditional sale, trust agreement, installment plan or other deferred payment plan;

7.  Underground mines, caverns, or mining shafts, and any property contained therein;

8.  Furs, jewelry, precious stones and precious metals;

9.  Offshore property, including offshore rigs, platforms or similar structures, and property contained therein or thereon, extending from land or shore. Floating docks, permanently moored to a dock, river bank or shore are not offshore property;

10. Watercraft, aircraft (manned or unmanned) including drones, satellites, and spacecraft, except when unfueled and manufactured by you;

11. Bridges and tunnels intended for use by motor vehicles;

12. Bulkheads, pilings, docks, piers and wharves;

13. Transmission, distribution and communication lines of any type or description, including wires, cables, poles, pylons, standards, towers or other supporting structures; except when located at the **covered location**;

14. Personal property in your care, custody, and control while you are acting as a bailee, a warehouseman, or a carrier for hire; and

15. Air supported structures and contents thereof.

## SECTION II – ADDITIONAL COVERAGES

Subject to the terms and conditions of this Policy, the following Additional Coverages in this Section and any Additional Coverage(s) added to this Section by endorsement or through the Special Terms and Conditions include coverage for **business income** loss and **extra expense** (unless otherwise stated). All loss or damage, including **business income** loss and **extra expense**, for which coverage is provided under the Additional Coverages is subject to the sublimits of liability as shown in Item **7.B.** of the Declarations, sublimits of liability shown elsewhere in this Policy and the **Policy Limit**. All **extra expense** is further limited to the Extra Expense sublimit of liability as shown in Item **7.C.** of the Declarations.

In addition, the maximum amount that we will pay per **occurrence** for all loss or damage with respect to:

1.  Miscellaneous property as set forth in the Miscellaneous Property Additional Coverage;

2.  Newly acquired property as set forth in the Newly Acquired Property Additional Coverage; or

3.  Locations for which coverage is provided under the Errors Or Omissions Additional Coverage;

is the corresponding Miscellaneous Property sublimit of liability, Newly Acquired Property sublimit of liability or Errors Or Omissions sublimit of liability, all as shown in Item **7.B.** of the Declarations for each such Additional Coverage regardless of any other applicable coverages, Additional Coverages or Additional Time Element Coverages.

1.  **ACCOUNTS RECEIVABLE**

    We will pay your shortage in the collection of accounts receivable resulting from direct physical loss or damage caused by a **covered cause of loss** to your accounts receivable records.

    In addition, we will pay for:

    a.  Any collection expenses over and above the normal collection costs; and

    b.  Interest charges on any loan to offset impaired collections pending payment of such sums that cannot be collected.

    In the event it is not possible to reconstruct your accounts receivable records after they have been physically lost or damaged and a shortage in the collection of accounts receivable is sustained, in calculating the amount due under this Additional Coverage, we shall consider the experience of the business in the collection of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurred and take into consideration any fluctuations during this same period.

    You shall reimburse us for all amounts you recover on accounts receivable paid by us under this Additional Coverage, provided that such amounts were outstanding at the time of such loss or

damage. Any amount in excess of the amount of loss paid by us under this Additional Coverage shall belong to you.

Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts shall be deducted in determining the recovery hereunder.

This Accounts Receivable Additional Coverage does not apply to loss due to:

a.  Bookkeeping, accounting or billing errors or omissions; or

b.  Alteration, corruption, erasure, falsification, manipulation, concealment, destruction, or disposal of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of **money and securities**, or other property, but only to the extent of such wrongful giving, taking, obtaining or withholding.

2.  **ARSON OR THEFT REWARD**

We cover reasonable payment of any reward offered by you or on your behalf for information that leads to conviction of the perpetrator(s) of arson or theft to **covered property**.

Regardless of the number of informants, the amount of information obtained or the usefulness of such information, our maximum liability for any one **occurrence** of arson and/or theft is the Arson Or Theft Reward sublimit of liability as shown in Item **7.B.** of the Declarations.

3.  **BRANDS AND LABELS**

If branded or labelled property covered by this Policy is physically damaged by a **covered cause of loss** and we elect to take all or any part of such property at the value established by the terms of this Policy, we will pay reasonable costs incurred by you to:

a.  Stamp "SALVAGE" on the property or its containers or remove or obliterate the brands or labels, if such stamp, removal or obliteration will not physically damage the property; and

b.  Re-label the property or containers in compliance with the requirements of applicable law.

4.  **COURSE OF CONSTRUCTION**

a.  We will pay for direct physical loss or damage to:

    i.   New buildings or structures while in the course of construction at a **covered location**;

    ii.  Existing buildings or structures while in the course of alteration, extension or renovation at a **covered location**;

    iii. Materials or supplies intended to become a permanent part of the buildings or structures in **i.** or **ii.,** above; and

iv.   Machinery and equipment intended to become a permanent part of the buildings or structures in **i.** or **ii.**, above, while in the course of erection, installation or assembly, including testing and commissioning of such machinery and equipment;

all in which you have an insurable interest at the time of loss, provided the property described in **i.** through **iv.**, above:

i.    Is not otherwise excluded in this Policy;

ii.   Is located inside the **coverage territory**; and

iii.  The gross value of the contract for **a.i.** through **a.iv.**, above, is less than or equal to the Sublimit of Liability shown in Item **7.B.** of the Declarations. However, if such gross value is more than such Sublimit of Liability, then this Course Of Construction Additional Coverage will apply up to such Sublimit of Liability.

b.   This Course Of Construction Additional Coverage does not apply:

i.    With respect to **a.ii.,** above, the portion of the buildings or structures, including any **covered property** therein, that already existed prior to such alteration, extension or renovation;

ii.   With respect to **a.iv.,** above, the **covered property** that already existed prior to such erection, installation or assembly; and

iii.  Any property:

(a)  While in transit;

(b)  While waterborne;

(c)  In the course of assembly, and which is intended to become finished goods for sale;

(d)  **Miscellaneous unnamed locations**; or

(e)  Property that is newly acquired property.

c.   Any time element loss that results from physical loss or damage covered under this Course Of Construction Additional Coverage is included within, and is not in addition to, the Sublimit of Liability for this Additional Coverage as shown in Item **7.B.** of the Declarations.

d.   Notwithstanding any Sublimit of Liability for this Course of Construction Additional Coverage as shown in Item **7.B.** of the Declarations, we will not pay more under this Additional Coverage than the lesser of:

      i.      The Sublimit of Liability for this Additional Coverage as shown in Item **7.B.** of the Declarations; or

      ii.     The gross value of the contract for **4.a.i.**, through **4.a.iv.**, above.

When this Course Of Construction Additional Coverage is provided, there is no other course of construction coverage provided by the Policy.

5. **DEBRIS REMOVAL**

   If **covered property** at a **covered location** sustains direct physical loss or damage caused by a **covered cause of loss**, we will pay the reasonable and necessary expenses actually incurred by you to remove debris of:

   a. **Covered property** remaining from the **covered location** and the area immediately adjacent to such **covered location**; and

   b. Uninsured property from the **covered location**.

   We shall not be liable for the expense of removing polluted or contaminated property, nor the **pollutant or contaminant** therein or thereon, whether or not the pollution or contamination results from a **covered cause of loss**.

   It is a condition precedent to recovery under this extension that you shall give notice to us of the intent to claim for the cost of removal of debris or cost of clean-up no later than 180 days after the date of such physical loss or damage or within 90 days after the expiration of this Policy, whichever is earlier.

6. **DECONTAMINATION COSTS**

   If **covered property** is polluted or contaminated as a direct result of physical loss or damage insured by this Policy and there is in force at the time of the loss any **law or ordinance** regulating pollution or contamination due to the actual, not suspected, presence of a **pollutant or contaminant**, then this Policy covers, as a direct result of enforcement of such **law or ordinance**, the increased cost of decontamination and/or removal of such polluted or contaminated **covered property** in a manner to satisfy such **law or ordinance**.  This Decontamination Costs Additional Coverage applies only to that part of **covered property** so polluted or contaminated due to the actual, not suspected, presence of a **pollutant or contaminant** as a direct result of insured physical loss or damage.

   We are not liable for the costs required for removing polluted or contaminated uninsured property or the **pollutant or contaminant** therein or thereon, whether or not the pollution or contamination results from a **covered cause of loss**.

   This Decontamination Costs Additional Coverage does not apply to any Equipment Breakdown - Hazardous Substance coverage provided by this Policy.

7. **DEFERRED PAYMENTS**

We will pay for your interest in personal property that sustains direct physical loss or damage caused by a **covered cause of loss** that is sold by you under a conditional sale, trust agreement or installment or deferred payment plan, but only to the extent you are unable to collect the unpaid balance of such interest.

This Deferred Payments Additional Coverage applies only to loss or damage occurring after the personal property is sold but prior to the earlier of the time your financial interest in such personal property has ceased or the termination or expiration of this Policy.

We shall only pay the least of the following:

a.  The total amount of unpaid installments due to you with respect to such personal property;

b.  The extent of your financial interest in such personal property;

c.  The **actual cash value** of such personal property at the time such direct physical loss or damage occurs; or

d.  The cost to repair or replace such personal property with materials of like kind and quality.

This Deferred Payments Additional Coverage does not apply to: (1) default by the buyer of such agreement or plan; (2) the peril of theft or conversion by the buyer; or (3) products recalled.

8. **DEMOLITION AND INCREASED COST OF CONSTRUCTION**

In the event of direct physical loss or damage caused by or resulting from a **covered cause of loss** to a **covered building**, **structure**, **machinery or equipment** at a **covered location** that results in the enforcement of any **law or ordinance** in effect at the time of loss or damage, regulating the construction, repair or use and occupancy of the property, we will pay:

a.  Demolition Coverage  A: In accordance with the VALUATION Section, the cost to  replace the undamaged portion of the damaged **covered building, structure, machinery or equipment** as a consequence of enforcement of a **law or ordinance** that requires demolition of the undamaged portion of the same **covered building, structure, machinery or equipment**;

b.  Demolition Coverage B: For the cost to demolish and clear  the site  of  the  undamaged portion of the damaged **covered building, structure, machinery or equipment**, as a consequence of enforcement of a **law or ordinance** that requires demolition of the undamaged portion of the same **covered building, structure, machinery or equipment**; and

c.  Demolition Coverage C: For the increased cost of repair or replacement of the damaged **covered building, structure, machinery or equipment** and undamaged portion of the same **covered building, structure, machinery or equipment**, limited to the cost that would have

been incurred in order to comply with the minimum requirements of such **law or ordinance** regulating the repair or replacement of the damaged **covered building, structure, machinery or equipment**. However, we shall not be liable for any such increased cost unless the damaged **covered building, structure, machinery or equipment** is actually repaired or replaced.

We shall not be liable for any cost or expense set forth above:

a.  Necessitated by the enforcement of any **law or ordinance** regulating any form of **pollutant or contaminant**;

b.  Incurred due to any **law or ordinance** with which you were legally obligated to comply prior to the time of the direct physical loss or damage; or

c.  Any machinery or equipment manufactured by or for you, unless used by you in your operations at the **covered location** sustaining covered direct physical loss or damage.

9.  **DISCHARGE FROM SEWER, DRAIN OR SUMP**

We will pay for direct physical loss or damage to **covered property** caused by or resulting from the discharge of water or waterborne material from a sewer, drain or sump at a **covered location**, provided such discharge is not induced by **flood** or **flood**-related conditions, or by **earth movement**.  For the purposes of this Discharge From Sewer, Drain Or Sump Additional Coverage, the term drain includes a roof drain and related fixtures.

Loss or damage covered under this Discharge From Sewer, Drain Or Sump Additional Coverage is not covered by any other coverage, Additional Coverage or Additional Time Element Coverage provided by this Policy.

10.  **DOWNZONING**

If a covered building at a **covered location** sustains direct physical loss or damage by a **covered cause of loss**, we will pay for **downzoning** in accordance with the VALUATION Section and time element loss arising out of such **downzoning** in accordance with the TIME ELEMENT COVERAGES Section.

11.  **ELECTRONIC DATA COVERAGES**

a.  **Electronic Data**

We will pay for: (1) **corruption, erasure or alteration** of your **electronic data** by a **covered cause of loss** or lack of electricity or refrigeration caused by a **covered cause of loss**; and (2) the actual **business income** loss sustained by you arising out of such covered loss during the **electronic data period of indemnity**.

b.  **Electronic Data Preservation Expenses**

We will pay the reasonable and necessary costs, over and above normal operating costs, incurred by you for your actions during or after a covered loss involving **corruption, erasure or alteration** of your **electronic data** on **your computer system**, to prevent further **corruption, erasure or alteration** of your **electronic data** on **your computer system** from **covered cause of loss.**

Such reasonable and necessary costs are limited to the following, and such costs shall not be considered an **extra expense** under any other Additional Coverage:

i.    Safeguarding your **electronic data** by moving such data to another location;

ii.    Temporarily obtaining additional bandwidth and/or equipment to support such bandwidth; and

iii.    Paying employee overtime wages or contractor's costs to protect or preserve your **electronic data**.

c.    **Additional Exclusions**

The following additional exclusions apply to all Additional Coverages set forth in the Electronic Data Coverages Additional Coverage:

i.    We will not pay any loss, damage, cost or expense arising out of a breach in confidentiality or privacy of, or release of, any **electronic data** for any reason.

ii.    We do not cover theft of any **electronic data.**

iii.    We will not pay any extortion payments or public relations expenses.

iv.    We will not pay any loss, damage, cost or expense arising out of a **cyber peril** or **denial of service attack**.

The maximum amount that we will pay for all loss or damage under any single Additional Coverage under this Electronic Data Coverages Additional Coverage is the corresponding sublimit of liability for such single Additional Coverage as shown herein or as shown in Item **7.B.** of the Declarations, regardless of any other applicable coverages, Additional Coverages or Additional Time Element Coverages.

12. **ENVIRONMENTAL UPGRADE**

In the event of direct physical loss or damage to **covered property** by a **covered cause of loss**, we will pay for reasonable additional costs you incur to:

a.    Repair or replace damaged **covered property** with that of like kind and quality which qualifies as **green**;

b.  Clean-up, sort, segregate, and transport debris of damaged **covered property** to recycling facilities, if such debris can be recycled. The amount we will pay is in addition to the Debris Removal Additional Coverage provided by this Policy;

c.  Replace the physically damaged portion of your roof with a vegetative roof;

d.  Flush out the air in the damaged area of the building that has been upgraded to **green** with 100% outside air and provide replacement filtration media for the building's ventilation system that controls the upgraded area;

e.  Hire an architect and/or engineer accredited by a **green authority** to participate in the design and/or construction administration of the damaged portion of the building; and

f.  Register, re-register and/or apply for certification or recertification of a building in accordance with requirements of the **green authority**.

The following additional exclusions apply to this Environmental Upgrade Additional Coverage. We will not pay to upgrade to **green**:

a.  Stock, **raw materials**, **finished goods**, merchandise, production machinery and equipment, **outdoor property**, electronic equipment not used in the functional support of the real property, **processing water**, moulds and dies, personal property of others, or personal property of directors, officers and employees;

b.  Any property which is valued at other than repair or replacement cost basis; or

c.  Any cost incurred due to any **law or ordinance** with which you were legally obligated to comply prior to the time of the direct physical loss or damage.

13. **EQUIPMENT BREAKDOWN**

a.  We will pay for direct physical loss or damage caused by an **accident** to **covered equipment.**

b.  We will also pay for direct physical loss or damage caused by an **accident** to **covered equipment** as a result of the following:

    i.  **Consequential Damages**

        We will pay for direct physical loss or damage to **covered property** due to lack of power, light, heat steam or refrigeration as a result of an **accident** to **covered equipment**.

    ii. **Expediting Expenses**

        We will pay for the reasonable and necessary expediting expense to make temporary repairs to **covered property** and expedite the permanent repair or replacement of

**covered property** that has sustained direct physical loss or damage as a result of an **accident** to **covered equipment**.

iii.   **Hazardous Substance**

We will pay for the additional expenses incurred to clean-up, repair, replace and dispose of **covered property** that is damaged, contaminated or polluted by a substance declared by a governmental agency to be hazardous to health.  The damage, contamination or pollution must result from an **accident** to **covered equipment**.  This coverage does not include contamination of **covered property** by refrigerant, including ammonia.  As used in this Additional Coverage, the term additional expenses means expenses incurred beyond those for which we would have been liable if no substance hazardous to health had been involved.

iv.   **Service Interruption**

We will pay for the actual **business income** loss sustained by you and **extra expense** arising from a service interruption as a result of an **accident** to **covered equipment**, whether or not such **covered equipment** is located on your premises, and is:

(a)   Owned by the public utility company or other company contracted by you to supply incoming electricity, gas, fuel, steam, water or refrigeration, or outgoing sewerage; and

(b)   Used to supply said services directly to you.

There shall be no loss payable under this coverage until the interruption exceeds the Waiting Period shown in Item **7.B.** of the Declarations and then the **business income** loss shall be measured from the date and time of the loss.  However, such Waiting Period does not apply if there is direct physical loss or damage to **covered property** caused by an **accident** to **covered equipment**.  The Policy deductible as shown in Item **10.** of the Declarations, if any, will apply after the application of any Waiting Period.

Coverage ends on the date and time when electricity, gas, fuel, steam, water, refrigeration or sewerage is restored, plus the lesser of the following:

(a)   The actual length of time required to restore your business to the condition that would have existed had no loss occurred; or

(b)   The length of time set forth as the Extended Period of Indemnity shown in Item **7.B.** of the Declarations under Service Interruption.

You must notify the suppliers of services of any interruption of such services as soon as reasonably practicable.  This period of time shall not be cut short by the end of the policy period.

Loss or damage covered under this Service Interruption coverage as part of the Equipment

Breakdown Additional Coverage is not covered by the Service Interruption Additional Coverage or the Service Interruption Additional Time Element Coverage.

v.   **Spoilage**

We will pay for direct physical loss or damage, including salvage expense, due to spoilage of your **perishable goods**, including while such goods are in transit, as a result of an **accident** to **covered equipment**.  Such physical loss or damage includes spoilage of your **perishable goods** due to contamination from the release of refrigerant including, but not limited to, ammonia.

Loss or damage covered under this Spoilage coverage as part of the Equipment Breakdown Additional Coverage is not covered by the Spoilage Additional Time Element Coverage.

vi.   **Water Damages**

We will pay for direct physical loss or damage, including salvage expense, to **covered property** caused by water as a result of an **accident** to **covered equipment**.

The maximum amount that we will pay for all loss or damage under this Equipment Breakdown Additional Coverage is the amount shown in Item **7.B.** of the Declarations, regardless of any other applicable coverages, Additional Coverages or Additional Time Element Coverages.  Limits for the coverages in **13.b.i** through **13.b.vi**, if any, are part of and not in addition to the limits for this Equipment Breakdown Additional Coverage as shown in Item **7.B.** of the Declarations.

14. **ERRORS OR OMISSIONS**

We will pay for direct physical loss or damage caused by a **covered cause of loss** at locations within the **coverage territory** that are owned, leased or operated by you, if such loss or damage is not payable under this Policy solely due to:

a.   Any inadvertent error or unintentional omission in the description of the address of the property whether made at the inception of the policy period or subsequent thereto; or

b.   Failure through any inadvertent error or unintentional omission to:

i.   Include in the Statement of Locations and Values any location that you intended to cover at the inception of this Policy; or

ii.   Report any newly acquired property before the automatic coverage period ceases under the Newly Acquired Property Additional Coverage.

We shall only pay for such direct physical loss or damage to the extent we would have paid had such error or omission not been made.

It is a condition of this Errors Or Omissions Additional Coverage that any error or omission be corrected and reported to us when discovered and that you shall pay any additional premium due.

No coverage is provided at any location for new buildings, additions or alterations in the course of construction if you have failed to report such location due to an error or omission (other than inadvertent error or unintentional omission in the description of the address of the property).

This Errors Or Omissions Additional Coverage does not apply to loss or damage which is covered under the Miscellaneous Property Additional Coverage or Newly Acquired Property Additional Coverage.

15. **EXPEDITING EXPENSES**

We will pay reasonable and necessary expediting expenses to:

a. Make temporary repairs to **covered property**; and

b. Expedite the permanent repair or replacement of **covered property**;

that has sustained direct physical loss or damage caused by a **covered cause of loss**.

This Expediting Expenses Additional Coverage does not apply to any **equipment breakdown** coverage provided by this Policy.

16. **FINE ARTS**

We will pay for direct physical loss or damage caused by a **covered cause of loss** to your **fine arts** at a **covered location**, temporarily on display or exhibit away from a **covered location**, or while in transit between a **covered location** and where the **fine arts** will temporarily be on display or exhibit. However, we will not pay for loss or damage as a result of restoring, repairing or retouching processes.

17. **FIRE DEPARTMENT CHARGES**

We will pay the following expenses resulting from a **covered cause of loss** to **covered property**:

a. Fire Department reasonable charges you incur when the Fire Department is called to save or protect **covered property** because of fire or **explosion** at a **covered location**; and

b. Extinguishing expenses you incur and loss and disposal of fire extinguishing materials expended.

18. **FUNGUS, MOLD OR SPORE**

We will pay for direct physical loss or damage to **covered property** caused by or resulting from

**fungus, mold or spore**, when such **fungus, mold or spore** is the direct result of direct physical loss or damage caused by a **covered cause of loss**. This coverage includes reasonable and necessary costs or expenses to clean up, remove, contain, treat, test for, detoxify or neutralize **fungus, mold or spore** from **covered property** resulting from such loss or damage.  This Additional Coverage only applies if the **covered cause of loss** occurs during the policy period and all reasonable means were used to save and preserve the property from further damage after such occurrence.  Notification to us of physical loss or damage under this Additional Coverage must occur within 180 days after the date of such **covered cause of loss** or within 90 days after the expiration of this Policy, whichever is earlier.

19. **INSTALLATION COVERAGE**

We will pay for direct physical loss or damage caused by a **covered cause of loss** to your materials, equipment, machinery and supplies that you designate for use in construction or installation projects at locations other than **covered locations**.

Coverage begins at the time when the materials, equipment, machinery or supplies arrive at the site of installation and ends on the earliest of the following times:

a.  When your interest in such property ceases;

b.  When such property has been substantially accepted by the owner or purchaser; or

c.  When this Policy is cancelled or expires.

20. **LAND AND WATER POLLUTANTS OR CONTAMINANTS CLEAN-UP**

We will pay reasonable and necessary costs and expenses incurred by you to remove, dispose of, or clean-up the actual presence of **pollutants or contaminants** from land or water at a **covered location** when such land or water is polluted or contaminated due to a **covered cause of loss** at that **covered location**. This Additional Coverage only applies if the **covered cause of loss** occurs during the policy period.  This Land And Water Pollutants Or Contaminants Clean-up Additional Coverage does not apply unless such expenses are reported to us within 180 days after the date of such **covered cause of loss** or within 90 days after the expiration of this Policy, whichever is earlier. It is a condition precedent to recovery under this clause that we shall have paid or agreed to pay for, loss or damage to **covered property** unless such payment is precluded solely by the operation of any deductible.

21. **LOCKS AND KEYS**

We will pay reasonable and necessary costs and expenses incurred by you for replacing or reprogramming your locks and keys resulting from direct physical loss or damage to such locks and keys by a **covered cause of loss**.

Coverage includes the reasonable and necessary costs and expenses to replace, adjust or reprogram undamaged locks to accept new keys or entry codes.

22. **MACHINERY OR EQUIPMENT STARTUP OPTION**

If your covered machinery or equipment has sustained direct physical loss or damage caused by a **covered cause of loss** and if such machinery or equipment sustains subsequent direct physical loss or damage as a result of a **startup**, then you shall have the option to:

a.   Treat all such loss or damage to your machinery and equipment as a single **occurrence**; or

b.   Treat the subsequent loss or damage to your machinery and equipment as a separate **occurrence**.

This Machinery Or Equipment Startup Option Additional Coverage only applies if  the **startup** occurs during this policy period or the policy period of the subsequent renewal Policy issued by us to you.

23. **MISCELLANEOUS PROPERTY**

We will pay for direct physical loss or damage to property of the type insured under this Policy by a **covered cause of loss** to the extent of your insurable interest:

a.   At or which is a **miscellaneous unnamed location.**

b.   Consisting of construction materials that are intended to be used in your construction project at a **covered location**:

   i.   From the time such construction materials are delivered to you or your contractor; and

   ii.   While such construction materials are:

      (a)  Located at an **off premises storage site**; or

      (b)  In transit from an **off premises storage site** to another **off premises storage site** or to your construction project at a **covered location**.

c.   Consisting of personal property:

   i.   Owned by you; or

   ii.   In your care, custody and control, but only to the extent of your legal liability;

   while such personal property is temporarily at a location you do not own, rent, lease or operate.

No coverage is provided for new buildings, additions or alterations in the course of construction under this Miscellaneous Property Additional Coverage.

This Miscellaneous Property Additional Coverage does not apply to loss or damage which is covered under the Errors Or Omissions Additional Coverage or Newly Acquired Property Additional Coverage.

24. **MOBILE EQUIPMENT**

We will pay for direct physical loss or damage to **mobile equipment** owned by you, or owned by others if such non-owned **mobile equipment** is in your care, custody or control at the time of loss or damage.

25. **NEWLY ACQUIRED PROPERTY**

We will pay for direct physical loss or damage caused by a **covered cause of loss** to real or personal property of the type insured under this Policy that you rent, lease, purchase or acquire after the inception date of this Policy to the extent of your interest in such property. This Newly Acquired Property Additional Coverage commences when you first acquire an insurable interest in the property and ceases at the earliest of the following:

a.  The number of days shown in Item **7.B.** of the Declarations after the effective date of the rental, lease, purchase or acquisition of such property;

b.  When the newly acquired property is bound by us;

c.  When we notify you that we will not bind the newly acquired property; or

d.  When this Policy is cancelled or expires.

This Newly Acquired Property Additional Coverage does not apply to loss or damage which is covered under the Errors Or Omissions Additional Coverage or Miscellaneous Property Additional Coverage.  We will charge you additional premium for values reported from the date you acquire the property.

26. **OUTDOOR PROPERTY**

We will pay for direct physical loss or damage to **outdoor property** at a **covered location**, but only for loss or damage caused directly by a **covered cause of loss**.

27. **PAIRS OR SETS**

If two or more components or parts that comprise **covered property** are necessary for a whole or complete object, then we will pay for the reduction in value of insured components or parts of such object due to direct physical loss or damage caused by a **covered cause of loss** to the other insured components or parts of such object.

28. **PRESERVATION OF PROPERTY**

We will pay for:

a. Reasonable and necessary costs, over and above normal operating costs, incurred by you for actions to temporarily protect or preserve **covered property**; and

b. Direct physical loss or damage by a **covered cause of loss** to **covered property** removed from a **covered location**;

provided that such actions or removal is necessary due to actual and imminent direct physical loss or damage to **covered property** by a **covered cause of loss**.  Such necessary actions for the temporary protection and preservation of **covered property** shall be added to the total physical loss or damage, if any, otherwise recoverable under this Policy and applicable deductible and without increase in the limit provisions contained in this Policy.  The Preservation of Property sublimit of liability as shown in Item **7.B.** of the Declarations does not apply to Subsection **b.** above.

This Preservation of Property Additional Coverage does not apply to **covered property** while in transit.

29. **PROFESSIONAL FEES**

We will pay reasonable and necessary expenses incurred by you for your:

a. Accountants, architects, auditors, engineers, or other professionals; or

b. Insurance agent's or broker's subsidiaries, related or associated entities;

to prepare and certify particulars or details of your claim required by us resulting from a covered loss under this Policy for which we have accepted liability.

We will not pay for expenses incurred by you to utilize the services of property managers, attorneys, public adjusters, or any of their subsidiaries, related or associated entities or insurance agents or brokers. We will not pay any fees or costs for consultation on coverage or negotiation of claims.

30. **RAILROAD ROLLING STOCK**

We will pay for direct physical loss or damage caused by a **covered cause of loss** for your insurable interest in **railroad rolling stock**, but only while located at a **covered location**.

31. **SERVICE INTERRUPTION**

We will pay for direct physical loss or damage to **covered property** arising from an interruption in: (1) incoming electricity, gas, fuel, steam, water or refrigeration; or (2) outgoing sewerage, caused by direct physical loss or damage caused by a **covered cause of loss** to a service

provider's property of the type insured under this Policy or to a transmission, distribution or communication line or a satellite, situated outside of the **covered location**.

If such service provider's property of the type insured under this Policy and/or transmission, distribution or communication lines that sustain loss or damage by a **covered cause of loss** are located at the **covered location**, then, notwithstanding Subsection **1.e.** as set forth in the PERILS EXCLUDED Section, we will pay for direct physical loss or damage to **covered property** and such loss or damage is not subject to the Service Interruption sublimit of liability shown in Item **7.B.** of the Declarations.

If the Declarations indicate this Service Interruption Additional Coverage is provided excluding overhead transmission and distribution lines, coverage under this Additional Coverage does not include loss to overhead transmission and distribution lines that deliver utility service to you. Overhead transmission and distribution lines include, but are not limited to, transmission and distribution lines, communication lines of any type or description, including wires, cables, poles, pylons, standards, towers or other supporting structures.

No coverage for **business income** loss or **extra expense** is provided under this Service Interruption Additional Coverage. However, **business income** loss and **extra expense** for Service Interruption may be provided under the Service Interruption Additional Time Element Coverage.

We shall not pay any loss under this Service Interruption Additional Coverage for any interruption intentionally caused by you or any service provider.

This Service Interruption Additional Coverage does not apply to any **equipment breakdown** coverage provided by this Policy.

32. **SPOILAGE**

We will pay for direct physical loss or damage due to spoilage of your **perishable goods**, including while such goods are in transit, by a **covered cause of loss.**  Such physical loss or damage includes spoilage of your **perishable goods** due to contamination from the release of refrigerant including, but not limited to, ammonia.

This Spoilage Additional Coverage does not apply to any **equipment breakdown** coverage provided by this Policy.

33. **TRANSIT**

We will pay for direct physical loss or damage to **covered property** by a **covered cause of loss** while such property is in transit, including the following:

a.  Personal property shipped to customers on F.O.B., C & F, or similar terms.   Your contingent interest in such shipments is admitted.

b.  Your interest in, and legal liability for, personal property of others in your actual or

constructive custody.

c.   Personal property of others that you have sold for which you have agreed, prior to loss, to insure during the course of delivery.

d.   Reasonable and necessary costs incurred by you following such loss or damage for:

i.   The transfer of **covered property** to another road vehicle and the delivery to the original destination or return to the original point of shipment, necessitated by fire, collision or overturning of any road vehicle operated by you;

ii.   The reloading of **covered property** onto a road vehicle operated by you for **covered property** which has fallen from a road vehicle operated by you; and

iii.   The removal of debris of **covered property** and site clearance of **covered property**, other than the removal of **pollutants or contaminants**.

e.   Preservation of **covered property** necessarily and reasonably incurred to minimize such loss or damage.

f.   General average and salvage charges on shipments for which coverage is provided under this Transit Additional Coverage.

Subject to the terms and conditions of this Policy, property in transit under this Transit Additional Coverage and any other Additional Coverage means from the time the property leaves the original point of shipment for the commencement of transit and covers thereafter continuously in the due course of transit in the **coverage territory** until delivered at the destination, provided that, the original point of shipment and the point of destination are within the **coverage territory**.

Permission is granted to you, without prejudice to this insurance, to accept the ordinary bills of lading used by carriers, including released and/or undervalued bills of lading and/or shipping or messenger receipts. You may waive subrogation against railroads under sidetrack agreements, but you shall not enter into any special agreement with carriers releasing them from their common law or statutory liability.

In addition to the property that is not covered under the PROPERTY NOT COVERED Section, the following property is not covered under this Transit Additional Coverage:

a.   Property insured under ocean marine policies. Coverage on export shipments, not insured under ocean marine policies, does not extend beyond the time when the property is loaded on board an overseas vessel or aircraft. Coverage on import shipments, not insured under ocean marine policies, does not attach until after discharge from an overseas vessel or aircraft;

b.   Waterborne shipments unless by: (i) inland waters; (ii) roll-on/roll-off ferries operating

between ports; or (iii) coastal shipments;

   c.  Shipments made by air unless via regularly scheduled passenger airlines or air freight carriers;

   d.  Property shipped by mail or parcel post;

   e.  Property of others, including your legal liability therefor, hauled on vehicles owned, leased, or operated by you when acting as a common or contract carrier as defined by the Interstate Commerce Commission Regulations or other state regulatory agencies; or

   f.  Any transporting vehicle or conveyance.

These additional exclusions for the TRANSIT Additional Coverage also apply to any Additional Coverage providing coverage for transit.

If another Additional Coverage, other than this Transit Additional Coverage, provides coverage for a specific type of **covered property** or **electronic data** while such property is in transit, then loss or damage for such property shall be subject to the sublimit of liability applicable to such Additional Coverage and no coverage for such property shall be provided under this Transit Additional Coverage.

34.  **VALUABLE PAPERS AND RECORDS**

We will pay for direct physical loss or damage to your **valuable papers and records** by a **covered cause of loss**, including while in transit, excluding loss or damage to property which cannot be replaced with like kind and quality.

35.  **VOLUNTARY PARTING**

We will pay for voluntary parting with any **covered property** by you or anyone else to whom you have entrusted the **covered property** if induced to do so by any fraudulent scheme, trick, device or false pretense.

**SECTION III – VALUATION**

Subject to the terms and conditions of this Policy, the property described below will be valued as follows, unless otherwise provided in this Policy:

A.  Buildings:

   1.  For buildings other than **historic buildings**, we shall pay the lesser of:

      a.  The cost to repair or replace (whichever is less) the building at the time and place of the loss with materials of like kind and quality, without deduction for depreciation and/or obsolescence; or

    b.   The actual cost incurred to repair or replace the building; or

2.   For **historic buildings**, we shall pay the lesser of:

    a.   The  cost to repair or replace (whichever is less) the building at the time and place of the loss with materials of like kind and quality, without deduction for depreciation and/or obsolescence, including the additional costs incurred by you to reproduce the damaged building or specific building features to the same design, decorative style and dimensions as existed at the time of loss, using identical materials; or

    b.   The actual cost incurred to repair or replace the building.

    In addition, we will pay for consulting costs incurred to consult with architects, engineers or similar professionals to determine the original design, materials or features of the **historic building**.

3.   If the building is not repaired or replaced within two years after the date of loss, then we shall pay the **actual cash value** of such building at the time and place of the loss.

4.   You may elect to rebuild at another site. However, if you rebuild at another site, then our liability shall not be more than what we would have paid to repair or replace at the original site.

5.   Subject to the **downzoning** sublimit, if **downzoning** has occurred, we shall pay the difference between the cost to repair or replace the building (whichever is less) had no **downzoning** occurred and the actual cost incurred to repair or replace the building.

B.   Property Other Than Buildings:

Except with respect to the property set forth in Subsections **B.1.** through **B.12.** below, adjustment of loss or damage shall be valued at the cost to repair or replace (whichever is less) at the time and place of the loss with materials of like kind and quality, without deduction for depreciation and/or obsolescence unless not repaired or replaced, then at **actual cash value**:

1.   Stock in process will be valued at the cost of **raw materials** and labor expended plus the proper proportion of overhead charges.

2.   **Finished goods** will be valued at the regular **selling price** at the location where the loss occurred or where the **finished goods** would ordinarily have been sold, whichever is greater.

3.   **Raw materials**, supplies and other merchandise not manufactured by you will be valued at: (a) if repaired, the actual expenditure incurred in repairing the damaged property; or (b) if not repaired, the replacement cost.

4.   **Valuable papers and records** will be valued at the cost to replace or restore the property with like kind and quality including the cost to research, gather and assemble information. If

such papers or records are not or cannot be replaced or restored, we will only pay the value of the blank papers or blank records.

5. **Electronic data** will be valued at the cost to restore the **electronic data** from duplicates to the condition that existed prior to the time of the loss.

   If duplicate **electronic data** is not available, then the **electronic data** will be valued at the cost to research, gather and assemble the **electronic data** to the condition that existed prior to the time of the loss. If not repaired, replaced or restored within two years from the date of the loss, we will only pay the value of the media.

6. Jigs and fixtures, dies, small tools and patterns will be valued at replacement cost, if replacement cost values have been reported to us and if actually replaced; otherwise, such items will be valued at the replacement cost minus the proper deduction for depreciation and/or obsolescence, but not to exceed the cost to repair or replace the property with materials of like kind and quality.

7. Leasehold improvements and betterments will be valued as follows:

   a. If repaired or replaced at your expense within two years after the date of the loss, the cost to repair or replace the damaged improvements and betterments with materials of like kind and quality;

   b. If not repaired or replaced within two years after the date of the loss, a proportion of your original cost determined by:

      i. Multiplying the original cost by the number of days from the date of loss to the expiration of the lease; and

      ii. Dividing the amount determined in  **i.** above by the number of days from the installation of improvements to the expiration of the lease.

      If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure; or

   c. If others pay for repairs or replacement, then no amount shall be payable.

8. **Fine arts** will be valued at the least of the following:

   a. The reasonable and necessary cost to repair such property to the physical condition that existed on the date of loss or replace the **fine art** with substantially identical property;

   b. The appraised value had no loss or damage occurred which will be determined at the time of the loss; or

   c. The agreed value, if any, on file with us.

9.  Accounts receivable will be valued in accordance with the Accounts Receivable Additional Coverage.

10. Property in transit will be valued as follows:

   a.  Property shipped to you or for your account will be valued at the actual invoice to you, plus such costs and charges (including your commission as selling agent) as may have accrued and become legally due on such property;

   b.  Property which has been sold by you and has been shipped to the purchaser or for the account of the purchaser (if covered hereunder) will be valued at the amount of your selling invoice, including prepaid or advanced freight;

   c.  Property of others not under invoice will be valued at the actual market value at the point of destination on the date of the loss, less any charges saved which would have become due and payable upon delivery at the destination; or

   d.  Your property not under invoice will be valued in accordance with this VALUATION Section applying at the location from which such property is being transported, less any charges saved which would have become due and payable upon delivery at such destination.

11. **Railroad rolling stock** will be valued at the lesser of the following:

   a.  The **actual cash value** of the **railroad rolling stock** at the time and place of the loss; or

   b.  The cost of repairing or replacing the **railroad rolling stock** at the time and place of the loss with other property of like kind and quality.

12. Contractor's equipment will be valued at **actual cash value**, unless an agreed value is on file with us.

C.  In the alternative, you may elect not to repair or replace **covered property**, including: (i) the building; (ii) furniture and fixtures; (iii) machinery, equipment, and fixtures that are permanently attached to the building; (iv) electronic equipment; and/or (v) leasehold improvements and betterments. In such case, we will pay the loss proceeds based upon the cost to repair or replace (whichever is less) such property at the time and place of the loss with materials of like kind and quality, without deduction for depreciation and/or obsolescence, provided that such proceeds have been expended on other capital expenditures related to your business operations within two years after the date of loss. As a condition of collecting under this clause, such expenditure must be unplanned as of the date of loss and made at the **covered location**. We will not pay any loss proceeds for increased cost of repair or replacement of any property in order to comply with any **law or ordinance.**

If the above alternative is not elected by you or not payable under the terms set forth in the

above paragraph, then the valuation provisions in Subsection **A.** or **B.** above, whichever is applicable, shall apply to such property.

With respect to this VALUATION Section, unless otherwise specifically stated, we will compute the valuations at the time and place of the loss.

## SECTION IV – PERILS EXCLUDED

1.  Except as otherwise provided under the Additional Coverages or Additional Time Element Coverages (and in such event, only to the extent provided therein), we do not insure loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage. The following exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:

    a.  Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or contributed to or aggravated by a **covered cause of loss**.   However, if fire not otherwise excluded ensues, we shall be liable for direct physical loss or damage caused by such ensuing fire.

    b.  i.   War, including undeclared or civil war, hostile or warlike action in time of peace or war, including action in hindering, combating, or defending against an actual, impending, or expected  attack:

        (a) By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces; or

        (b) By military, naval, or air forces; or

        (c) By an agent of any such government, power, authority, or force;

        ii.  Any weapon employing atomic fission, fusion or radioactive force, or any weapon that disperses radioactive material or a directed-energy or electromagnetic weapon, whether in time of peace or war, whether or not its discharge was accidental; or

        iii. Insurrection, rebellion, revolution, civil war, usurped power, seizure or destruction or any action taken by governmental authority in hindering,  combating,  or  defending against such  event;

        including any consequence of Subsection **i.**, **ii.**, or **iii.** above of this exclusion.

    c.  Asbestos or asbestos containing material or material that is alleged to have contained asbestos.  We shall have no duty of any kind with respect to any such loss or damage.

    d.  The actual, alleged or threatened release, discharge, migration, seepage, escape or dispersal of **pollutants or contaminants**, all whether direct or indirect, proximate or remote or in

whole  or  in  part caused by, contributed to or aggravated by any **covered cause of loss** under this Policy.

However, this exclusion shall not apply to direct physical loss or damage to **covered property** from **pollutants or contaminants** caused by a **covered cause of loss** at the **covered location**, including the cost to clean-up **pollutants or contaminants** from **covered property** at the **covered location** resulting from such loss or damage.  No coverage is provided for testing or monitoring for **pollutants or contaminants.** For the purpose of the exception to this exclusion only, **pollutants or contaminants** do not include radioactive contaminants.

e.  Lack of:

  i.   Incoming electricity, fuel, water, gas, steam or refrigeration;

  ii.  **Cloud computing service** or **data, voice or video service**; or

  iii.  Outgoing sewerage.

f.  Costs, expenses, fines or penalties incurred or sustained by or imposed on you by any government agency, court or other authority.

g.  Any functioning or malfunctioning or lack of:

  i.   The internet or similar facility; or

  ii.  An intranet or private network, computer system, computer or computing device or similar facility;

  all unless direct physical loss or damage not otherwise excluded by  this  Policy  ensues,  in which event, we shall cover only such ensuing loss or damage.

h.  Error or omission in machine programming or instructions of **electronic data**, including, loss attributable to program design constraints, networking compatibility and original business software; all unless direct physical loss or damage not otherwise excluded by  this  Policy ensues, in which event, we shall cover only such ensuing loss or damage.

i.  Loss or damage  to  electronic  equipment,  including  electronic  devices,  electronic components or electronic storage media that is rendered useless for its intended purpose due to the introduction of code which reprograms the software, including the firmware of such equipment; all unless direct physical loss or damage not  otherwise  excluded  by  this Policy ensues, in which event, we shall cover only such ensuing loss or damage.

  This exclusion shall not apply to such aforementioned electronic equipment that is physically damaged, other than the loss or damage sustained directly through the programming of the software, including the firmware of such equipment.

j.  Loss or damage due to any **cyber peril**, **denial of service attack**, or other similar peril affecting **electronic data** or the access to or use of computer hardware, software or other components thereof.

k.  Any illegal, fraudulent or dishonest act or acts committed alone by you, or in collusion with others: by any of your proprietors, partners, directors, trustees, officers, members or employees, or by any party to whom property may have been entrusted (other than a carrier for hire).

However, this exclusion does not apply to a willful act of destruction by your employee without the knowledge of any of your proprietors, partners, directors, trustees, members or officers.

l.  **Fungus, mold or spore**; or wet rot or dry rot, or any spores or toxins created or produced by or emanating from such **fungus, mold or spore**; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, we shall cover only such ensuing loss or damage.

m.  Confiscation, seizure, appropriation, expropriation, nationalization, requisition for use or title, or willful destruction by any government, sovereign power, civil authority or military authority (de jure or de facto).

n.  Loss or damage arising out of any **covered cause of loss**, Additional Coverages or Additional Time Element Coverages for which the words "Not Covered" are shown or for which the specified amount or number of days is left blank in Item **7.** of the Declarations.

o.  With respect to physical loss or damage to **covered equipment** the result of an **accident**:

    i.  Breakdown of any structure or foundation (other than a bedplate of a machine) supporting **covered equipment** or any part thereof, not caused by an **accident** to the **covered equipment**;

    ii.  Breakdown of any boiler settling, insulating or refractory material not caused by an **accident** to **covered equipment**;

    iii.  Breakdown of well casings, penstock or draft tubes;

    iv.  Breakdown of **covered equipment** manufactured or held by you for sale to others;

    v.  Breakdown of catalyst not caused by an **accident** to **covered equipment** containing such catalyst or any other **covered equipment**;

    vi.  Breakdown of any sewer piping, any buried piping or any piping forming a part of a sprinkler system or any water piping other than:

        (a)  Feed water piping between any boiler and its feed pumps or injectors;

      (b)  Boiler condensate return piping; or

      (c)  water piping forming a part of a refrigerating or air conditioning system used for cooling, humidifying or space heating purposes;

  vii.  Breakdown of **covered equipment** until such time as said **covered equipment** has been installed and completely tested on your premises. For the purposes of this exclusion, the term completely tested shall mean that the relevant **covered equipment** has operated on your premises, in the capacity for which it was designed and as part of your normal production process or processes;

  viii. Breakdown of **covered equipment** while said **covered equipment** is being maintained or altered where the **accident** is a direct result of said maintenance or alterations. However, if an **accident** otherwise covered under this Policy subsequently ensues, then we shall be liable for loss or damage to **covered property** as a result such **accident**. Any opening, closing or transporting of **covered equipment** shall not be considered a part of any maintenance or alterations; or

  ix.  As respects an **accident** to **covered equipment** utilizing sulfur dioxide or hydrogen sulfide gas:

      (a)  Loss or damage resulting from corrosion anywhere following said **accident**;

      (b)  Loss or damage to catalyst caused by steam or water contacting or permeating said catalyst following said **accident**; and

      (c)  Payment under any Time Element Coverages for any time during which the resumption of business is in any way curtailed, delayed or prevented because of loss or damage of the kinds referred to in **(a)** and **(b)**.

2.  We will not pay for loss or damage caused by, or attributable to, any of the following:

  a.  Delay, loss of market, or loss of use.

  b.  Indirect, remote, or consequential loss or damage.

  c.  Mysterious disappearance or loss or shortage disclosed on taking inventory or any unexplained loss.

  d.  Faulty workmanship, material, construction, installation or design from any cause; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, we shall cover only such ensuing loss or damage.

  e.  Processing, fabricating, testing, packaging or other similar operations as part of manufacturing or processing of stock, materials or **finished goods**, including any voluntary or

involuntary recall of any product for any reason; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, we shall cover  only  such ensuing loss or damage.

f. Deterioration, depletion, rust, corrosion, erosion, wet rot or dry rot, decay, evaporation, leakage, wear and tear, animal, insect or vermin, inherent vice or latent defect, shrinkage or change in color, flavor, texture or finish, extremes or changes of temperature or changes in relative humidity, all whether atmospheric or not; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, we shall cover only such ensuing loss or damage. However, with respect to extremes or changes in temperature, we will cover damage to fire protection equipment and machinery or equipment caused by such extremes or changes in temperature.

g. Settling, cracking, shrinking, bulging, or expansion of pavements, foundations, walls, floors, roofs, or ceilings; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, we shall cover only such ensuing loss or damage.

h. Theft of precious metals or precious stones, except for those precious metals or precious stones used by you for industrial purposes.

i. Communicable or infectious disease, condition or sickness, including (i) any causative agent of any such condition, disease, or sickness regardless of whether such agent gives rise to any such condition, disease, or sickness, or (ii) any actual or attempted testing for, containing, detoxifying, mitigating, monitoring or neutralizing of, responding to, or assessing the effects of any communicable or infectious disease, condition or sickness or causative agent.

## SECTION V – TIME ELEMENT COVERAGES

A. **INSURING AGREEMENT**

We will pay the actual **business income** loss sustained by you due to the necessary partial or total interruption of your business operations, services or production during the **period of indemnity** as a result of direct physical loss or damage to: (1) **covered property** by a **covered cause of loss**; or (2) property of the type insured under this Policy by a **covered cause of loss** which directly affects your use of the **covered property**, provided that you are a lessee  or occupant of the premises where the direct physical loss or damage occurred.

B. **BUSINESS INCOME LOSS CALCULATIONS**

For **business income** loss covered under this Policy, we will pay the greater of **Business Income Option #1** or **Business Income Option #2**, and all time element losses payable under any Additional Coverage or Additional Time Element Coverage will be adjusted using the same option:

1. **Business Income Option #1 (Gross Profits):**

a. **Business income** means **gross profits** which is calculated as the sum produced by adding the **net profit** to the charges and expenses (including **ordinary payroll**, but only to the extent shown in Item **8.A.** of the Declarations) which necessarily continue during the **period of indemnity**. If there is no **net profit**, **business income** means the sum of such charges and expenses which necessarily continue less any loss from business operations which would have been sustained had there been no **occurrence**.

The amount payable as **gross profits** shall be limited to such loss resulting from a reduction in sales and shall not include **rental value**.

b. **Net profit** means the net profit after charges and expenses that would have been earned by you, but not including any capital receipts, outlays properly chargeable to capital, and deductions for taxes on profits.

2. **Business Income Option #2 (Gross Earnings):**

   a. **Business income** means:

      i. **Gross earnings**; less

      ii. Charges and expenses which do not necessarily continue.

   b. **Gross earnings** means net sales, including the sales value of production, derived from the operation of the business that would have been earned by you, excluding **rental value**, less the cost of all:

      i. **Raw materials** utilized in such production;

      ii. Materials and supplies consumed in the operations or services;

      iii. Services purchased from others (not your employees, including leased or temporary employees) that do not continue under contract;

      iv. Merchandise sold; and

      v. **Ordinary payroll** (except to the extent **ordinary payroll** is shown in Item **8.A.** of the Declarations).

3. **Expenses to Reduce Loss**

   We will pay reasonable and necessary expenses, over and above normal operating expenses, you incur in reducing loss otherwise payable under this coverage, but in no event shall we be liable for an amount greater than that for which we would have been liable had you been unable to continue any business operations or services.

C.   **ADDITIONAL TIME ELEMENT CONDITIONS**

1.   The following conditions are taken into consideration when calculating time element loss under this Policy:

a.   Any amount recovered elsewhere under this Policy for physical loss or damage to goods and merchandise valued at **selling price** will not be considered as part of your **business income** loss nor shall the time required for the reproduction of **finished goods** be included as part of your **business income** loss.

b.   Due consideration shall be given to the experience of the business before the date of physical loss or damage and the probable experience thereafter during the **period of indemnity** had no physical loss or damage occurred and to the continuation of only those normal charges and expenses that would have existed had no interruption of production or suspension of business operations or services occurred.

c.   Any goods sold or services rendered at any location, whether or not a **covered location**, for the benefit of the business, either by you or on your behalf, shall be included in determining the amount of sales during the **period of indemnity**.

d.   Due consideration shall be given to any **business income** which is made up within a reasonable period of time, not limited to the period during which business is interrupted.

2.   You agree, as soon as practicable, to use overtime, extra time and any service or property owned, controlled or acquired by you or obtainable from other sources, whether or not the property or service is at a **covered location** or at any other location, for the purpose of continuing sales and reducing the loss payable hereunder.

3.   You must act with due diligence and dispatch in repairing or replacing, in whole or in part, the physically damaged property to the same or equivalent physical and operating conditions that existed prior to the damage in order to continue sales and to reduce the loss payable hereunder.

D.   **ADDITIONAL TIME ELEMENT COVERAGES**

The following Additional Time Element Coverages and any Additional Time Element Coverages added to this Subsection by endorsement or through the Special Terms and Conditions are subject to the terms and conditions of this Policy. All loss or damage, including **business income** loss and **extra expense**, for which coverage is provided under the Additional Time Element Coverages is subject to the sublimits of liability as shown in Item **7.C.** of the Declarations, the sublimits of liability shown elsewhere in this Policy and the **Policy Limit**. All **extra expense** is further limited to the Extra Expense sublimit of liability as shown in Item **7.C.** of the Declarations.

The **period of indemnity** for each Additional Coverage or Additional Time Element Coverage shall be the period corresponding with **Business Income Option #1 (Gross Profits)** or **Business**

**Income Option #2 (Gross Earnings)**, whichever is applicable, unless a different time period is set forth in any of the Additional Coverages or Additional Time Element Coverages.

1. **ATTRACTION PROPERTY**

   We will pay the actual **business income** loss sustained by you and **extra expense** caused by direct physical loss or damage caused by a **covered cause of loss** to property of the type insured under this Policy that attracts business to a **covered location**, provided that such property is within the distance from the **covered location** as shown in Item **7.C.** of the Declarations under Attraction Property (hereinafter, the **attraction property**).

   Coverage begins on the date and time that the **attraction property** sustains such direct physical loss or damage and ends on the date and time that the **attraction property** could be reopened for business, but in no event for more than the number of days shown in Item **7.C.** of the Declarations under Attraction Property.

2. **CONTINGENT TIME ELEMENT**

   a. If direct physical loss or damage caused by a **covered cause of loss** to property of the type insured under this Policy is sustained by your direct supplier or your direct customer, anywhere in the world and such loss or damage:

      i. Wholly or partially prevents your direct supplier from supplying their goods and/or services to you; or

      ii. Wholly or partially prevents your direct customer from accepting your goods and/or services;

      then we will pay the actual **business income** loss and **extra expense** sustained by you during the **period of indemnity** with respect to such property of the type insured under this Policy. This coverage does not apply to new buildings or additions in the course of construction of any direct supplier or direct customer.  You will cooperate with your direct supplier or direct customer and take any reasonable and necessary actions, including the use of other machinery, supplies or locations, to mitigate the loss payable herein.

   b. Subject to the Contingent Time Element sublimit(s) of liability shown in Item **7.C.** of the Declarations, we will pay the actual **business income** loss and **extra expense** sustained by you in accordance with Subsection **a.** above:

      i. If ingress to or egress from your direct supplier's or your direct customer's location is partially or totally prevented in accordance with the same exclusions, limitations and time period that apply to the Ingress & Egress Additional Time Element Coverage;

      ii. If an order of civil or military authority limits, restricts or prohibits access to

property not insured under this Policy, provided that the effect of such order partially or totally prohibits access to your direct supplier's or your direct customer's location in accordance with the same exclusions, limitations and time period that apply to the Interruption By Civil Or Military Authority Additional Time Element Coverage; or

iii. If an order of civil or military authority limits, restricts or prohibits partial or total access to your direct supplier's or your direct customer's location and such order is a direct result of: (i) a violent crime, suicide, attempted suicide, or armed robbery at such location, or (ii) a death or bodily injury (not including, disease or sickness) at such location. Coverage begins on the date and time that the order of civil or military authority limits, redirects or prohibits partial or total access to your direct supplier's or your direct customer's location and ends on the date such location could be reopened for business but in no event for more than the number of days shown in Item **C.** of the Declarations under Interruption By Civil Or Military Authority.

No Extended Period of Indemnity shall apply to Subsection **b.(i)**, **b.(ii)**, or **b.(iii)**.

c. For the avoidance of doubt, the sublimit(s) of liability for Contingent Time Element is/are subject to any applicable sublimit of liability for **earth movement**, **flood** or **named storm**.

d. Notwithstanding the foregoing, this Contingent Time Element Additional Time Element Coverage does not apply to:

i. Any supplier of electricity, gas, fuel, steam, water, refrigeration, sewerage service, internet, **cloud computing service** or **data, voice or video service**; or

ii. Your customers, if you are a supplier of electricity, gas, fuel, steam, water, refrigeration, sewerage service, internet, **cloud computing service** or **data, voice or video service**.

3. **CONTRACTUAL PENALTIES**

We will pay for contractual penalties you are legally liable to pay under the written provisions of a contract executed prior to the loss or damage due to direct physical loss or damage caused by a **covered cause of loss** to **covered property**.

4. **EXTENDED PERIOD OF INDEMNITY**

With respect to: (i) **Business Income Option #2 (Gross Earnings)**, (ii) the Rental Value Additional Time Element Coverage; and/or (iii) the Contingent Time Element Additional Time Element Coverage **(Business Income Option #2 – Gross Earnings only)**, we will pay **business income** loss or **rental value** loss, whichever is applicable, for the additional length of time required with the exercise of due diligence and dispatch, to restore your business to the

condition that would have existed had no loss occurred, commencing with the later of the following dates:

a.  The date on which our liability for loss or damage would otherwise terminate; or

b.  The earlier date on which either:

    i.   The date normal operations resume or could resume with reasonable speed; or

    ii.  Repairing, replacing, or rebuilding of the **covered property** that has been damaged is actually completed;

but in no event for a period of time exceeding the lesser of 365 days or the number of days shown in Item **7.C.** of the Declarations for the Extended Period of Indemnity.

The maximum amount payable for all covered loss under:

a.  This Extended Period Of Indemnity Additional Time Element Coverage and the Rental Value Additional Time Element Coverage combined shall be the Rental Value sublimit of liability; and

b.  This Extended Period Of Indemnity Additional Time Element Coverage and the Contingent Time Element Additional Time Element Coverage combined shall be the applicable Contingent Time Element sublimit of liability.

This Extended Period Of Indemnity Additional Time Element Coverage does not apply to any Additional Coverages or Additional Time Element Coverages other than the Rental Value Additional Time Element Coverage and the Contingent Time Element Additional Time Element Coverage.

5.  **EXTRA EXPENSE**

We will pay loss sustained by you for **extra expense** during the **period of indemnity** resulting from direct physical loss or damage caused by a **covered cause of loss**.

The maximum amount that we will pay for all **extra expense** under this Policy is the Extra Expense sublimit of liability as shown in Item **7.C.** of the Declarations regardless of any other applicable coverages, Additional Coverages or Additional Time Element Coverages.

6.  **IMPOUNDED WATER**

We will pay for actual **business income** loss sustained by you arising from an interruption of incoming water caused by direct physical loss or damage to dams, reservoirs, or equipment connected thereto by a **covered cause of loss**, when water used as a raw material or used for power or for other purposes, stored behind such dams, reservoirs, or equipment is released from storage.

Notwithstanding the foregoing, we will not pay for any interruption intentionally caused by you or any service provider.

Coverage is only provided for the lesser of:

a. 30 days or the number of days shown in Item **7.C.** of the Declarations in the Impounded Water Time Period; or

b. The number of days until the water used as a raw material or used for power or for other purposes, stored behind such dams, reservoirs, or equipment is restored.

7. **INGRESS & EGRESS**

We will pay the actual **business income** loss sustained by you and **extra expense** caused by direct physical loss or damage caused by a **covered cause of loss** to property not insured under this Policy, provided that:

a. Such direct physical loss or damage to such property totally prevents physical ingress to or egress from a **covered location**; and

b. Such property not insured under this Policy is within the distance from the **covered location** as shown in Item **7.C.** of the Declarations under Ingress & Egress.

Coverage begins on the date and time that ingress to or egress from the **covered location** is totally prevented and ends on the date and time that the **covered location** could be reopened for business, but in no event for more than the lesser of 30 days or the number of days shown in Item **7.C.** of the Declarations under Ingress & Egress.

This Ingress & Egress Additional Time Element Coverage does not apply to any loss resulting from disruption of incoming or outgoing electricity, gas, fuel, water, steam, sewerage, refrigeration, **cloud computing service**, or any **data, voice or video service**.

8. **INTERRUPTION BY CIVIL OR MILITARY AUTHORITY**

We will pay the actual **business income** loss sustained by you and **extra expense** if an order of civil or military authority limits, restricts or prohibits access to property not insured under this Policy, provided that:

a. Such property sustains direct physical loss or damage caused by a **covered cause of loss**;

b. Such property is within the distance from the **covered location** as shown in Item **7.C.** of the Declarations under Interruption by Civil or Military Authority; and

c. The effect of such order is to totally prohibit access to a **covered location**.

Coverage begins on the effective date and time of such order and ends on the date and time that the **covered location** could be reopened for business, but in no event for more than the lesser of 30 days or the number of days shown in Item **7.C.** of the Declarations under Interruption By Civil Or Military Authority.

9. **LEASEHOLD INTEREST**

If **covered property** is: (1) rendered wholly or partially untenantable by direct physical loss or damage to the **covered property** by a **covered cause of loss** during the policy period; and (2) your lease is canceled by an entity other than you or an entity that has a common ownership with you, in accordance with the conditions of the lease, then we will pay **your interest as lessee** or **your interest as lessor**, whichever is applicable, but as lessor only for the first three months following the date of the loss and the **net lease interest** shall be paid for the remaining months of the unexpired lease unless a shorter time period is indicated in Item **7.C.** of the Declarations.

Recovery as lessee under this Additional Time Element Coverage shall be the pro-rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on your interest in:

**a.** The amount of bonus paid by you for the acquisition of the lease not recoverable under the terms of the lease;

**b.** Improvements and betterments to real property which are not covered under any other provision of this Policy; and

**c.** The amount of advance rental paid by you and not recoverable under the terms of the lease.

You shall use due diligence to mitigate loss under this Leasehold Interest Additional Time Element Coverage. Any amount payable under this Leasehold Interest Additional Time Element Coverage shall only be provided to the extent not covered under any other provision of this Policy.

10. **RENTAL VALUE**

We will pay the actual **rental value** loss sustained by you due to direct physical loss or damage by a **covered cause of loss** to **covered property** held for rental to others at a **covered location**. The **rental value** loss shall not exceed the reduction in **rental value** less charges and expenses which do not necessarily continue.

The conditions set forth in the ADDITIONAL TIME ELEMENT CONDITIONS Subsection of the TIME ELEMENT COVERAGES Section shall apply to the calculation of **rental value** loss. For the purpose of this Rental Value Additional Time Element Coverage, any reference to **business income** or **period of indemnity** contained in such Subsection shall be deemed to mean **rental value** or **rental value period**, respectively.

Coverage is provided for the **rental value period** plus the Extended Period of Indemnity.

11. **RESEARCH AND DEVELOPMENT EXPENSE**

We will pay **ordinary payroll**, but only to the extent shown in Item **8.A.** of the Declarations, and continuing fixed charges and expenses as a result of direct physical loss or damage caused by a **covered cause of loss** to materials used or developed as part of your research and development activities. The **ordinary payroll** and continuing fixed charges and expenses must be directly attributable to research and development activities, provided that such activities would not have produced income during the **period of indemnity**.

We shall only pay:

a.   Covered **ordinary payroll** until research and development activities have been restarted at the same or another location with due diligence and dispatch; and

b.   Continuing fixed charges and expenses until that part of the **covered location** where such research and development activities were performed is repaired, rebuilt or replaced with due diligence and dispatch.

12. **ROYALTIES**

We will pay loss of income sustained by you during the **period of indemnity** under a royalty, licensing fee, or commission agreement between you and another party arising out of direct physical loss or damage caused by a **covered cause of loss** to such other party's property, provided that such property is of the type insured under this Policy.

13. **SERVICE INTERRUPTION**

We will pay for the actual **business income** loss sustained by you and **extra expense** arising from an interruption in: (1) incoming electricity, gas, fuel, steam, water, or refrigeration; or (2) outgoing sewerage, caused by direct physical loss or damage caused by a **covered cause of loss** to a service provider's property of the type insured under this Policy or to a transmission, distribution or communication line situated outside of the **covered location**.

If such service provider's property of the type insured and/or transmission, distribution or communication lines that sustain loss or damage by a **covered cause of loss** are located at the **covered location**, then, notwithstanding Subsection **1.e.** as set forth in the PERILS EXCLUDED Section, we will pay the actual **business income** loss sustained by you and **extra expense** and such amounts are not subject to the Service Interruption sublimit of liability shown in Item **7.C.** of the Declarations.

There shall be no loss payable under this Service Interruption Additional Time Element Coverage until the interruption exceeds the greater of 24 hours or the Waiting Period shown in Item **7.C.** of the Declarations and then the **business income** loss shall be measured from

the date and time of the loss. However, such Waiting Period does not apply if there is direct physical loss or damage to **covered property** caused by the interruption.

Such Additional Time Element Coverage ends on the date and time when: (1) incoming electricity, gas, fuel, steam, water, or refrigeration; or (2) outgoing sewerage, is restored, plus the lesser of the following:

a.  The actual length of time required to restore your business to the condition that would have existed had no loss occurred; or

b.  The length of time set forth as the Extended Period of Indemnity shown in Item **7.C.** of the Declarations;

subject to the Service Interruption sublimit of liability shown in Item **7.C.** of the Declarations. You must notify the suppliers of services of any interruption of such services as soon as reasonably practicable.

This period of time shall not be cut short by the end of the policy period.

We shall not pay any loss under this Service Interruption Additional Time Element Coverage for any interruption intentionally caused by you or any service provider.

This Service Interruption Additional Time Element Coverage does not apply to any **equipment breakdown** coverage provided by this Policy.

14. **SOFT COSTS**

For **covered property** consisting of new buildings, additions or alterations in the course of construction only, we will pay for reasonable and necessary **soft costs** incurred by you during the period of delay in completion if such property sustains direct physical loss or damage caused by a **covered cause of loss**.

With respect to the Ingress & Egress Additional Time Element Coverage and the Interruption By Civil Or Military Authority Additional Time Element Coverage, if a **covered cause of loss** results in coverage under both of these Additional Time Element Coverages, we will only pay for loss under one of these Additional Time Element Coverages, whichever you select.

E.  **ADDITIONAL TIME ELEMENT EXCLUSIONS**

For time element loss covered under this Policy, we will not pay for:

1.  **Idle Periods**

Any loss during any period in which business would not or could not have been conducted for any reason other than a loss for which coverage would have been provided under this Policy.

2. **Remote Loss**

   a.  Any increase in loss due to the suspension, cancellation, or lapse of any lease, contract, license or order;

   b.  Any loss due to fines or damages for breach of contract or for late or non-completion of orders or penalties of whatever nature; or

   c.  Any other consequential or remote loss;

   unless coverage is provided under any Additional Time Element Coverage and then only to the extent provided therein.

3. **Transit**

   Any loss resulting from loss or damage to property in transit, except to the extent provided under the Transit Additional Coverage.

4. **Interference by Strikers**

   Any increase in loss due to interference at the **covered location** or the supplier's or customer's location by strikers or other persons with rebuilding, repairing, or replacing the property damaged or destroyed, or with the resumption or continuation of business, or with the re-occupancy of such location.

5. **Finished Goods**

   Any loss resulting from loss or damage to **finished goods** nor for the time required for their reproduction.

### SECTION VI – CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT

A.  **ABANDONMENT**

There can be no abandonment of any property to us.

B.  **ADJUSTMENT OF LOSSES**

Loss or damage will be adjusted with the **First Named Insured** and shall be payable as directed in writing by the **First Named Insured** subject to: mortgageholder; loss payee; lender; or similar interests; as their interests may appear.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgageholder and/or loss payee on a Certificate of Insurance, endorsement or Schedule that is validly issued prior to the loss.

When named on a Certificate of Insurance issued by the **First Named Insured's** broker with our permission, such additional interests are added to this Policy as their interests may appear when such Certificate of Insurance is issued prior to the loss and on file with us. The effective date of any such interest will be the issue date of the certificate unless a later date is specified on the Certificate of Insurance. The Certificate of Insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

C.  **APPRAISAL**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In such event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire.  If the appraisers cannot agree on an umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the replacement cost and **actual cash value** of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire.   A decision agreed to by any two will be binding.   Each party will:

1.  Pay its chosen appraiser; and

2.  Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, it is without prejudice to our rights under the terms and conditions of this Policy and our right to deny the claim in whole or in part.  A demand for appraisal will not relieve you of your continuing obligations to comply with the terms of this Policy.

D.  **CONTROL OF DAMAGED MERCHANDISE**

This Policy gives you control of physically damaged **finished goods** that have been manufactured by or for you, provided that such goods have been physically damaged as a result of direct physical loss or damage caused by a **covered cause of loss**.

Under such circumstances, you shall have full rights to the possession and control of all such physically damaged **finished goods,** provided that you perform or have proper testing performed to demonstrate what property is physically damaged.

You, exercising reasonable judgment, will decide if the physically damaged **finished goods** can be reprocessed or sold. Physically damaged **finished goods** judged by you to be fit for reprocessing or for selling will be sold or otherwise disposed of and the salvage proceeds shall be handled in accordance with the SALVAGE AND RECOVERIES Subsection of the GENERAL CONDITIONS Section.

These rights and obligations also are extended to merchandise that you are contractually obligated by the manufacturer or designer to exercise control of damaged merchandise, as long as the obligation is in writing prior to the loss or damage.

E.  **PARTIAL PAYMENT OF LOSS**

In the event the amount of loss or damage for which we are liable is determined by us to be in excess of the applicable deductible, we may advance partial payment(s) with respect to any claim, subject to all other terms and conditions of this Policy.

F.  **DUTIES IN CASE OF LOSS OR DAMAGE**

In case of loss or damage, you shall:

1.  Give written notice of any loss or damage to us as soon as practicable after the date of such loss or damage;

2.  Promptly contact the applicable authority having jurisdiction in the event a law has been broken, and promptly file a written report with such authority;

3.  Protect the property from further loss or damage;

4.  Separate the damaged and undamaged personal property;

5.  Maintain such property in the best possible order;

6.  Furnish a complete inventory of the lost, destroyed, damaged and undamaged property, showing in detail quantities, costs, **actual cash value** and amount of loss claimed;

7.  Allow us to examine and audit your books and records at any reasonable time for the purpose of investigating or verifying any claim;

8.  Furnish all other documents or insurance policies that we may reasonably require;

9.  Allow us to access and inspect any damaged or undamaged property;

10. Submit to examination under oath at such times as we reasonably may require concerning any matter relating to this insurance or any claim;

11. Cooperate with us in all aspects of any claim and provide us with any additional information that we require; and

12. Provide us with a proof of loss, signed and sworn to by you as soon as practicable, but in no event more than 90 days after a loss, stating your knowledge and belief as to the following:

    a.  The time and origin of the loss;

    b.  Your interest and the interest of all others in the property;

    c.  The value of each item thereof determined in accordance with the VALUATION Section

and the amount of loss thereto and all encumbrances thereon;

   d. All other contracts of insurance, whether collectible or not, covering any of the **covered property**; and

   e. Any changes in the title, use, occupancy, location, possession or exposures of the **covered property** subsequent to the issuance of this Policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss, whether or not it then stood on leased ground.

G. **SETTLEMENT OF CLAIMS**

The amount of loss for which we may be liable shall be payable within 30 days after proof of loss, as herein required, is received and agreed to by us or the amount of loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

We shall have the option to take all or any part of the property at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing you with notice of our intention to do so within 60 days after our receipt of the proof of loss herein required.

H. **SUBROGATION**

We may require from you an assignment of all rights of recovery against any party for loss to the extent that payment is made by us. However, you have the right to waive subrogation, provided such waiver is entered into by you in writing prior to the loss, such waiver shall not prejudice your rights of recovery under this Policy.

Any recovery by us as a result of subrogation proceedings arising out of an **occurrence**, after expenses, including our legal fees, incurred in such subrogation proceedings are deducted, shall accrue to you in the proportion that the deductible amount and/or any provable uninsured loss amount bears to the entire provable loss amount.

You are required to cooperate with us in any subrogation proceedings and, upon our request and expense will:

1. Attend hearings and trials; and

2. Assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and conducting suits.

I. **SUIT AGAINST COMPANY**

No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless:

1. You have fully complied with all provisions of this Policy; and

2. Such suit, action or proceeding is commenced within 24 months immediately after the date of the loss, provided however, that if under the laws of the applicable jurisdiction such time limitation is unenforceable, then the period within which such action or proceeding must be commenced shall be the shortest period of time permitted by the laws of such jurisdiction.

J.   **KNOWLEDGE OF OCCURRENCE**

Knowledge of loss or damage arising out of an **occurrence** on the part of your risk manager, legal counsel, chief executive officer, president, general counsel, chief financial officer (or their functional equivalents), or anyone authorized to give or receive notice of a claim constitutes knowledge by you.

**SECTION VII – GENERAL CONDITIONS**

A.   **ASSIGNMENT**

You may not assign this Policy without our prior written consent.

B.   **CANCELLATION**

This Policy may be cancelled by the **First Named Insured** at any time by surrendering this Policy to us or by mailing or delivering to us written notice stating when thereafter such cancellation shall take effect. We may cancel this Policy by giving the **First Named Insured** written notice stating when, not less than 90 days thereafter, or 10 days thereafter for nonpayment of premium, such cancellation shall be effective.

We shall pay return premium to the **First Named Insured** on a pro-rata basis if we cancel and on the customary short rate basis if the **First Named Insured** cancels.

Payment or tender of any unearned premium by us shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If any specific state amendatory endorsement provides less than 90 days' notice of cancellation for reasons other than nonpayment of premium, where permitted by law, we shall provide the 90 days' notice set forth herein.

C.   **CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Policy is voidable by us if you, whether before or after a loss, have willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, including any insurable claim, or have committed any act of fraud, attempted fraud or false swearing concerning any matter relating to this insurance or the subject thereof.

D.   **CONFORMANCE TO STATUTE**

Any provisions of this Policy which are in conflict with statutes applicable to this Policy are understood, declared and acknowledged by us to be amended to conform to such statutes in force at the time of loss or damage.

E. **DIVISIBLE CONTRACT**

Subject to Concealment, Misrepresentation Or Fraud of the GENERAL CONDITIONS Section, if any **covered location** includes two or more buildings or the contents of two or more buildings, the breach of any condition of this Policy with respect to any one of the insured buildings or contents contained within any one insured building, shall not prejudice your right to recover for direct physical loss or damage caused by a **covered cause of loss** occurring in any other insured building or contents contained within any other insured building if, at the time of such loss or damage, a breach of condition does not exist with respect to such other building or contents.

F. **ECONOMIC AND TRADE SANCTIONS**

We shall not be deemed to provide cover and we shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose us, our parent company or our ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.

G. **FIRST NAMED INSURED**

If this Policy insures more than one person or organization, the **First Named Insured** is authorized to act on behalf of all other insureds with respect to such insureds' rights, obligations, and duties under this Policy including, but not limited to, the giving and receiving of notices under this Policy. Payment of loss or return premium under this Policy to the **First Named Insured** shall satisfy our obligations with respect to all insureds under this Policy.

H. **GOVERNING LAW**

Any interpretation of this Policy or issue relating to its construction, validity or operation shall be determined by the applicable state law in the United States. The parties will submit to the exclusive jurisdiction of the applicable court within the United States.

I. **JURISDICTIONAL INSPECTIONS**

We shall be permitted, but not obligated, to inspect, at all reasonable times, any **covered equipment** under this Policy to comply with state or municipal boiler and pressure vessel regulations.  The right to make inspections, the inspections themselves and any reports created from these inspections shall not constitute an undertaking, on behalf of or for the benefit of the insured or others, to determine or warrant that the **covered equipment** is safe or healthful.

When we are not providing jurisdictional inspections, the owner/operator of the **covered equipment** has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their **covered equipment**.

J.   **INCREASE IN HAZARD**

This Policy will not apply to any loss at a **covered location** to the extent that such loss is a result of or in connection with a material increase in hazard over which you have control or knowledge. Any material increase in hazard at one or more **covered locations** will not affect coverage at other **covered locations** where, at the time of loss or damage, the increase in hazard does not exist.

K.   **VACANCY – UNOCCUPANCY**

You have permission to cease operations or to have any insured building remain vacant or unoccupied, provided that: (1) fire protection, watch and alarm services are maintained; and (2) written notice is given to us prior to the 120th consecutive day of cessation of business operations, vacancy or unoccupancy at such insured building.  An insured building is considered vacant or unoccupied when it does not contain adequate **covered property** to conduct customary business operations.

If a building where loss or damage occurs has been vacant for more than 60 consecutive days before such loss or damage occurs, we will not pay for any loss or damage caused by or resulting from:

1.   **Vandalism and malicious mischief**;

2.   Leakage from fire protection equipment, unless you have protected the system against freezing;

3.   Breakage of glass in buildings;

4.   Water damage;

5.   Theft; or

6.   Attempted theft.

L.   **INSPECTION**

We shall be permitted, but not obligated, to inspect **covered property** at all reasonable times during the policy period.  Any inspection by us shall relate only to the insurability and premium to be charged.  Neither our right to make inspections nor the making thereof nor any report thereon shall constitute any undertaking by us, on behalf of or for the benefit of you or others, to  determine or warrant that such **covered property** is safe or healthful or that  such **covered property** complies with any law,  rule,  regulation,  code,  engineering  or industry standard.

M.  **LIBERALIZATION**

If we adopt a standard revision that would broaden the coverage under this Policy within 45 days prior to the inception date of this Policy or during the policy period of this Policy and if no additional premium is required for such revision, then the broadened coverage will immediately apply to this Policy.

N.  **MORTGAGEHOLDERS**

1.  We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown on the Declarations in their order of precedence, as their interests may appear.

2.  Any such mortgageholder has the right to receive loss payment even if the mortgageholder has commenced foreclosure or similar action on the building or structure.

3.  If we deny your claim because of your acts or because you have failed to comply with the terms of this Policy, any such mortgageholder will nevertheless have the right to receive loss payment if such mortgageholder:

    a.  Pays the premium due under this Policy at our request if you have failed to do so;

    b.  Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

    c.  Has notified us of any change in ownership, occupancy, or substantial change in risk known to the mortgageholder.

    All of the terms of this Policy will then apply directly to the mortgageholder.

4.  If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Policy:

    a.  The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

    b.  The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

    At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

5.  If we cancel this Policy, we will give written notice to the mortgageholder at least:

    a.  10 days before the effective date of cancellation if we cancel for nonpayment of

premium; or

    b.  30 days before the effective date of cancellation if we cancel for any other reason.

O.  **NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of **covered property** will benefit from this insurance.

P.  **OTHER INSURANCE/EXCESS INSURANCE/UNDERLYING INSURANCE**

In the event there is other insurance covering loss or damage insured under this Policy, then this Policy shall apply only as excess and in no event as contributory insurance (unless this Policy is specifically written to be contributory insurance), and then only after all such other insurance has been exhausted, whether or not such insurance is collectible. You may purchase excess insurance over the limits provided by this Policy, and underlying insurance on all or any part of the deductibles of this Policy.

Q.  **PRESERVATION OF PROPERTY**

In case of imminent loss or damage, you must make reasonable efforts to protect property from such loss or damage.

R.  **REINSTATEMENT OF LIMITS**

Except for any **covered cause of loss** which is subject to an Annual Aggregate limit of liability or Annual Aggregate sublimit of liability, payment of a claim will not reduce the amount payable under this Policy for any subsequent covered loss.

S.  **RECOVERY FROM OTHER PARTIES**

No loss or damage in whole or in part shall be paid hereunder to the extent you have collected such loss or damage from others.

T.  **SALVAGE AND RECOVERIES**

All salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this Policy, shall reduce the loss accordingly.

U.  **SUSPENSION**

Upon the discovery of a dangerous condition with respect to **covered equipment**, we or our representative may immediately suspend the insurance against loss from an **accident** to such **covered equipment** or any part thereof by notifying you or your representative at the **covered location** of such dangerous condition. Upon such notification, coverage shall cease with respect

to such **covered equipment**. Written notice of the suspension will also be mailed or delivered to you at the address of the **First Named Insured**. The insurance so suspended may be reinstated by us, but only by an endorsement to this Policy. You shall be entitled to a pro-rata return of the unearned portion of the premium paid for such suspended insurance.

V.   **TITLES**

The titles in this Policy are solely for reference.  The titles do not in any way affect the provisions of this Policy.

## SECTION VIII – DEFINITIONS

1.   **Accident** means a fortuitous event that causes direct physical loss or damage to **covered equipment**.  The event must be one of the following:

   a.   Mechanical breakdown, including rupture or bursting caused by centrifugal force;

   b.   Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires;

   c.   **Explosion** of steam boilers, steam pipes, steam engines or steam turbines, except **explosion** of accumulated gases or unconsumed fuel;

   d.   Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

   e.   Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

2.   **Actual cash value** shall mean replacement cost minus depreciation and/or obsolescence.

3.   **Aircraft or vehicle impact** means physical contact by:

   a.   An aircraft including a drone, spacecraft, satellite, self-propelled missile, or objects falling therefrom; or

   b.   A vehicle or an object thrown up, by, or from a vehicle.

4.   **Biological and/or chemical terrorism** means the dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances in an act(s) of **terrorism**.

5.   **Cloud computing service** means a service: (i) in the business of storing, managing and processing **electronic data** for which your company has a written contract and (ii) that provides access to and use of: software and/or a network of remote servers hosted away from your **covered location** to store, manage or process such data.  **Cloud computing service** does not

include a **data, voice or video service.**

6. **Collapse** means an abrupt falling down or caving in of a building or structure or any part of a building or structure.

7. **Corruption, erasure or alteration** means **electronic data** that has been corrupted, destroyed or deleted such that the **electronic data** can no longer be accessed or used for its intended purpose.

8. **Coverage territory** means the coverage territory as shown in Item **4.** of the Declarations.

9. **Covered building, structure, machinery or equipment** means a building, structure, machinery or equipment of the type insured under this Policy at a **covered location**, including **outdoor property** at a **covered location.**

10. **Covered cause(s) of loss** means a peril or other type of loss, not otherwise excluded under this Policy.

11. **Covered equipment** means the following:

    a. Equipment that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or

    b. Equipment which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

    The following is not **covered equipment**:

    a. Structure, foundation, cabinet, compartment or air supported structure or building;

    b. Insulating or refractory material;

    c. Sewer piping, underground vessels or piping, or piping forming a part of a sprinkler system or fire suppression system;

    d. Water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

    e. Vehicle or any equipment mounted on a vehicle;

    f. Satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

    g. Dragline, excavation or construction equipment; or

    h. Equipment manufactured by you for sale.

12. **Covered location** means:

    a.  The location(s) as specified in the most recent Statement of Locations and Values on file with us;

    b.  A **miscellaneous unnamed location**; or

    c.  A location which is covered in accordance with the Errors Or Omissions Additional Coverage or the Newly Acquired Property Additional Coverage;

in the **coverage territory**.

13. **Covered property** means property as described in the COVERED PROPERTY Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section, which is not otherwise excluded under the PROPERTY NOT COVERED Section.

14. **Cyber peril(s)** means **unauthorized access**, **unauthorized use**, **malicious code** and **magnetic damage to electronic data**.

15. **Cyber terrorism** means **terrorism** caused by or arising from **unauthorized access**, **unauthorized use**, **malicious code** or **magnetic damage to electronic data**.

16. **Data, voice or video service** means a service that allows you to transmit and receive data, voice or video, whether directly or indirectly through a third party service provider, such as an internet service provider or telecommunications provider. **Data, voice or video service** does not include a **cloud computing service**.

17. **Defined peril** means fire; lightning; **explosion**; **windstorm or hail**; **smoke**; **aircraft or vehicle impact**; **riot, strike or civil commotion**; **vandalism and malicious mischief**; **collapse**; or leakage from fire protection equipment. **Defined peril** also includes **equipment breakdown**, provided that **equipment breakdown** is covered under this Policy.

18. **Denial of service attack** means a malicious attack which is designed to slow or completely interrupt access to a targeted computer system, including computer hardware, software or any components thereof or website by other third parties authorized to gain access to that computer system or website. **Denial of service attack** does not include a malicious attack by any principal, partner, executive officer, director or organizational equivalent of an insured, whose acts shall be imputed to other insureds.

19. **Downzoning** means a **law or ordinance** regulating the construction or repair of a covered building that prevents the re-construction of such building to its original size, height, floor area, number of units, configuration, occupancy or operating capacity.

20. **Earth movement** means any natural or manmade:

    a.  Earthquake, including any earth sinking, rising or shifting related to such event;

    b.  Landslide, including any earth sinking, rising or shifting related to such event;

    c.  Mine subsidence, meaning subsidence of a manmade mine, whether or not mining activity has ceased;

    d.  Earth sinking, rising or shifting, including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of real or personal property. Soil conditions include, but are not limited to, contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface;

    e.  Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, sinkhole collapse, or subsidence; or

    f.  Any cause or event occurring concurrently or in any sequence with **a.**, **b.**, **c.**, **d.** and **e.** above, except for direct physical loss or damage to **covered property** caused by fire, **sprinkler leakage** or **explosion** following **earth movement**.

If **earth movement** is not covered, then any cause or event occurring concurrently or in any sequence with such peril is also not covered, except for direct physical loss or damage to **covered property** caused by fire, **sprinkler leakage** or **explosion** following **earth movement**.

21.  **Electronic data** means data, messages, information, coding, programs, instructions or software in a form suitable for communications, storage, or processing by electronic, electromechanical, electromagnetic data processing or electronically controlled production equipment.  **Electronic data** does not include electronic storage media.

22.  **Electronic data period of indemnity** means the period of time:

With respect to the Electronic Data Additional Coverage, beginning with the **material interruption** and ending when your **electronic data** could be restored in accordance with the VALUATION Section with exercise of due diligence and dispatch, but in no event for longer than the number of days shown as the Maximum Electronic Data Period of Indemnity in Item **7.B.** of the Declarations after the **material interruption.**

This period of time shall not be cut short by the end of the policy period.

23.  **Equipment breakdown** means direct physical loss or damage to **covered equipment** that is the direct result of an **accident**.

24.  **Explosion** means a violent expansion, destructive shattering or blowing apart of something in which energy is transmitted outward as a shockwave.  However, arcing is not included as part of this definition.

25.  **Extra expense** means reasonable and necessary:

    a.  Extra expense incurred to temporarily continue as nearly normal as practicable the conduct

of your business;

b.   Extra costs of temporarily using your property or your facilities or the property  or facilities of others; and

c.   Costs to purchase **finished goods** from third parties to fulfill orders when   such orders cannot be met, less the payment received for the sale of such **finished goods;**

all less any value remaining at the end of the **period of indemnity** for property obtained in connection with the above.

26.   **Fine arts** means paintings; etchings; pictures; tapestries; rare or art glass; art glass  windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit, excluding vehicles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft and **money and securities**.

**Fine arts** shall include unspecified **fine arts**.  However, if such property cannot be replaced with like kind and quality then such property will not be considered unspecified **fine arts** and must be specifically declared and described to be covered under the Fine Arts Additional Coverage.

**Fine arts** do not include any item which would qualify as **valuable papers and records**.

27.   **Finished goods** means stock manufactured or processed by you which is in final packaging and ready for shipment or sale.

28.   **First Named Insured** means the Named Insured first shown in Item **1.** of the Declarations.

29.   **Flood** means, whether natural or manmade, flood waters, rapid accumulation of rain or water, surface water, waves, tide, tidal water, tsunami, overflow or rupture of a dam, levy, dike or other surface containment structure, storm surge, storm tide, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.  Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy.  However, any direct physical loss or damage to **covered property** caused by fire, **sprinkler leakage** or **explosion** following **flood**, shall not be considered **flood**.

If **flood** is not covered, then any cause or event occurring concurrently or in any sequence with such peril is also not covered, except for direct physical loss or damage to **covered property** caused by fire, **sprinkler leakage** or **explosion** following **flood**.

30.   **Fungus, mold or spore** means:

a.   Fungus including, but not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including mold, yeast, rusts, mildews, smuts and mushrooms;

b. Mold including, but not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and fungi that produce mold; and/or

c. Spore including, but not limited to, any dormant or reproductive body produced by or arising or emanating out of any fungus, mold, mildew, plants, organisms or microorganisms.

31. **Green** means products, materials, methods and processes certified by a **green authority** that conserve natural resources, reduce energy or water consumption, avoid toxic or other polluting emissions or otherwise minimize environmental impact.

32. **Green authority** means an authority on **green** buildings, products, materials, methods or processes that is certified and accepted by Leadership in Energy and Environmental Design (LEED®), Green Building Initiative Green Globes®, Energy Star Rating System, BREEAM or any other recognized **green** rating system.

33. **Historic building** means any building or structure designated as a **historic building** or structure by a governmental or other authority having jurisdiction to do so or any building or structure entered in the National Landmark Register of Historic Places or other recognized registering entity as a historic place.

34. **Law or ordinance** means any law, ordinance, governmental directive or standard.

35. **Magnetic damage to electronic data** means the **corruption, erasure or alteration** of **electronic data** through magnetism. However, no coverage is provided for loss or damage to **electronic data** arising out of directed-energy weapons or electromagnetic weapons or through deterioration of the storage media or data for any reason.

36. **Malicious code** means unauthorized, corrupting or harmful software code, including computer viruses, Trojan horses, keystroke loggers, cookies, spyware, adware, worms and logic bombs.

37. **Material interruption** means the date and time of the actual and measurable interruption or suspension of your business operations, services or production directly caused by: (i) **corruption, erasure or alteration** of your **electronic data** or (ii) **denial of service attack** that prevents access to or use of **your computer system**, whichever is applicable. Such **material interruption** must first occur during the policy period.

38. **Miscellaneous unnamed location(s)** means a location, building or part of a building owned, rented or leased by you that is not reported on the Statement of Locations and Values on file with us.

39. **Mobile equipment** means:

a. Contractors' equipment and similar items of a mobile nature;

b. Unlicensed vehicles which are not operated on public roadways; however, are built for public roadway use; and

    c.    Self-propelled vehicles built and utilized for carrying equipment attached to them.

    **Mobile equipment** does not include vehicles and other self-propelled motorized machines licensed for road use.

40. **Moderate Flood Hazard Area** means the areas labeled Zone B or Zone X (the areas between the limit of the 100 year and 500 year flood areas) on the current FEMA Flood Insurance Rate Map available at the time of loss.

41. **Money and securities** means:

    a.    Currency, coins, bank notes, bullion, traveler checks, registered checks, money orders, cryptocurrency; and

    b.    Negotiable and non-negotiable instruments or contracts representing money including: tokens, tickets, revenue stamps and other stamps (whether represented by actual stamps or unused value in a meter), and evidence of debt issued in connection with credit card or charge cards that are issued to you.

42. **Named storm** means a storm that, at any time, has been declared by the United States National Weather Service, World Meteorological Organization, or similar organization or body responsible for naming tropical weather systems, to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm. **Named storm** shall include direct physical loss or damage including but not limited to:

    a.    Direct action of wind excluding ensuing storm surge;

    b.    Any material, object or debris that is carried, propelled or in any manner moved by such windstorm;

    c.    Any tornado(s) that is the result of actions or effects of such windstorm;

    d.    Hail that is the result of actions or effects of such windstorm;

    e.    Lightning that is the result of actions or effects of such windstorm; or

    f.    Rain or water (not constituting a **flood**), whether the rain or water is driven by wind or not, that enters a building or structure insured under this Policy.

However, any direct physical loss or damage to **covered property** caused by fire, **sprinkler leakage** or **explosion** following **named storm**, shall not be considered **named storm**. If **named storm** is not covered, then any cause or event occurring concurrently or in any sequence with such peril is also not covered, except for direct physical loss or damage to **covered property** caused by fire, **sprinkler leakage** or **explosion** following the **named storm**.

43. **New Madrid Earthquake Zone** means the following counties (unless otherwise stated) within the following states of the United States of America:

a. Arkansas: Clay, Craighead, Crittenden, Cross, Greene, Jackson, Lawrence, Randolph, Sharp, Mississippi, Poinsett;

b. Illinois: Alexander, Massac, Pulaski, Union, Williamson, Johnson, Pope, Saline, Jackson, Franklin, Perry, Hardin, Randolph, Monroe, St. Clair, Washington, Clinton, Bond, Madison, Jefferson;

c. Indiana: Posey, Vanderburgh, Gibson, Warrick, Pike;

d. Kentucky: Ballard, Carlisle, Fulton, Graves, Hickman, Livingston, McCracken, Marshall, Calloway;

e. Mississippi: Desoto, Tunica, Marshall, Tate, Coahoma, Bolivar;

f. Missouri: Bollinger, Butler, Cape Girardeau, Dunklin, Mississippi, New Madrid, Pemiscot, Scott, Stoddard, St. Louis, St. Francois, St. Charles, Jefferson, Franklin, Warren, Washington, Iron, Wayne, Reynolds, Madison, St. Genevieve, Perry and the City of St. Louis; and

g. Tennessee: Crockett, Dyer, Haywood, Lake, Lauderdale, Obion, Shelby, Tipton, Gibson, Madison, Fayette, Hardeman.

44. **Net lease interest** means the discounted amount that at 6% interest would be equivalent to you receiving the full amount of **your interest as lessee** or **your interest as lessor**, whichever is applicable, for each separate month of the unexpired term of the lease.

45. **Nuclear terrorism** means an act(s) of **terrorism** involving or resulting in nuclear reaction or nuclear radiation or radioactive contamination.

46. **Occurrence** means any one **accident**, loss, disaster, casualty, incident or series of **accidents**, losses, disasters, casualties or incidents, including all resultant or concomitant insured losses, not otherwise excluded by this Policy and with respect to:

a. **Terrorism** (to the extent **terrorism** is covered), arises out of the same or related purpose or cause or is in close in geography; or

b. Covered perils other than **terrorism**, arises out of a single event or originating cause.

The **occurrence** must occur during the policy period.

When the term applies to loss or losses from the perils of **windstorm or hail**, **named storm**, **riot, strike or civil commotion**, **vandalism and malicious mischief**, **earth movement**, **flood** or **terrorism,** to the extent any such peril(s) are covered, all losses arising from such peril(s) occurring during a continuous period of 72 hours shall be deemed to be a single **occurrence**. You may elect the moment at which the 72 hour period shall be deemed to have commenced, which shall not be earlier than the time when the first loss occurs to the **covered property**, but no two such 72 hour periods shall overlap.

If the **occurrence** commences during this policy period, then we shall treat the entire **occurrence** as occurring during this policy period.

47. **Off premises storage site** means a storage site away from a **covered location**.

48. **Ordinary payroll** means payroll expenses for your employees other than officers, executives, department managers and employees under contract (other than under collective bargaining agreements).

    **Ordinary payroll** includes employee benefits, FICA, Medicare payments, union dues, and workers' compensation premiums.

49. **Outdoor property** means outdoor: (i) lawns (including fairways, greens and tees), trees, shrubs, plants, and (ii) walkways, roadways, patios or other paved surfaces, including the fill beneath such paved surfaces.

50. **Pacific Northwest Earthquake Zone** means:

    a. The following counties within Washington state: Chelan, Clallam, Clark, Cowlitz, Harbor, Island, Jefferson, King, Kitsap, Kittitas, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum and Whatcom;

    b. The following counties within Oregon state: Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Jackson, Josephine, Klamath, Lake, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington and Yamhill; and

    c. The geographic area of British Columbia, Canada (including Vancouver Island and other Canadian islands) that is south of 50° north latitude and west of 120° west longitude.

51. **Period of indemnity** means:

    a. **Business Income Option #1 (Gross Profits):**

       i. With respect to business operations, services and production (except as set forth in Subsection **a.ii.** below), the period of time that:

          (a) (i) Begins on the date and time of the loss or damage to the **covered property** or property of the type insured as described in the INSURING AGREEMENT Subsection of the TIME ELEMENT COVERAGES Section;

              (ii) With respect to the CONTINGENT TIME ELEMENT Additional Time Element Coverage, begins on the date and time of the loss or damage to the property of the applicable supplier or applicable customer; or

              (iii) With respect to the Royalties Additional Time Element Coverage, begins on

the date and time of the loss or damage to the property of the party with whom you have a royalty, licensing fee, or commission agreement; and

(b) Ends no later than the number of months shown as the Maximum Operations Period of Indemnity in Item **8.B.** of the Declarations during which sales are directly affected by covered loss or damage.

ii. With respect to new buildings, additions or alterations in the course of construction, the period of time that:

(a) Begins on the anticipated date of substantial completion had there been no such loss or damage to **covered property**; and

(b) Ends no later than the number of months shown as the Maximum Construction Period of Indemnity in Item **8.C.** of the Declarations during which sales are directly affected by covered loss or damage.

This period of time shall not be cut short by the end of the policy period.

b. **Business Income Option #2 (Gross Earnings):**

i. With respect to business operations, services and production (except as set forth in Subsection **b.ii.** below), the period of time that:

(a) (i) Begins on the date and time of the loss or damage to **covered property** or property of the type insured as described in the INSURING AGREEMENT Subsection of the TIME ELEMENT COVERAGES Section;

(ii) With respect to the Contingent Time Element Additional Time Element Coverage, begins on the date and time of the loss or damage to the property of the applicable supplier or applicable customer; or

(iii) With respect to the Royalties Additional Time Element Coverage, begins on the date and time of the loss or damage to the property of the party with whom you have a royalty, licensing fee, or commission agreement; and

(b) Ends on the earlier of:

(i) The date when such property could be repaired, rebuilt or replaced with materials of like kind, size, capacity and quality to the same or equivalent physical operating conditions with the exercise of due diligence and dispatch, including any additional time to meet the applicable and covered **law or ordinance** requirements, if any; or

(ii) The date when the business is resumed at a new permanent location.

    ii.  With respect to new buildings, additions or alterations in the course of construction, the period of time that:

        (a)  Begins on the anticipated date of substantial completion had there been no such loss or damage to **covered property**; and

        (b)  Ends on the earlier of:

            (i)  The date of substantial completion with the exercise of due diligence and dispatch to repair or rebuild the **covered property** with materials of like kind, size, capacity and quality; or

            (ii)  The date when the business is resumed at a new permanent location.

    iii.  The **period of indemnity** does not include any additional time:

        (a)  Required for staffing or training employees, except the reasonable and necessary additional time needed to train employees, not to exceed 30 consecutive days;

        (b)  Resulting from your inability to procure, due to the same **covered cause of loss**, suitable **raw materials** and/or supplies to replace those physically lost or damaged; or

        (c)  Due to your inability to resume production or business operations or services regardless of the reason.

    This period of time shall not be cut short by the end of the policy period.

52.  **Perishable goods** means personal property:

    a.  Maintained under controlled conditions for their preservation, and

    b.  Susceptible to loss or damage if the controlled conditions are not maintained.

53.  **Policy Limit** means the limit of liability shown in Item **6.** of the Declarations.

54.  **Pollutants or contaminants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, hazardous substances. Waste includes materials to be recycled, reconditioned or reclaimed. **Pollutants or contaminants** do not include **fungus, mold or spore**, wet rot or dry rot, bacteria or virus.

55.  **Processing water** means water used directly in your business process that is contained within any enclosed tank, piping system or any other processing equipment.

56. **Railroad rolling stock** means railcars, excluding locomotives.

57. **Raw materials** means materials and supplies in the state in which you receive them for conversion by you into **finished goods**.

58. **Rental value** means the sum of:

    a.  The total anticipated gross rental income from tenant occupancy of the **covered location** (due consideration shall be given to the rental experience before the date of damage or destruction), as furnished and equipped by you including taxes, rent based on percentage of sales, and other charges paid by tenants with respect to the leased premises;

    b.  The amount of all charges which, by the terms of a written lease, are the legal obligation of the tenant(s) and which would otherwise be your obligations; and

    c.  The fair rental value of any portion of such **covered location** which you occupy;

less any operating expenses that do not continue from tenant occupancy of the **covered location** as furnished and equipped by you.

59. **Rental value period** means the period of time that:

    a.  Begins on the date and time of the loss or damage to **covered property** held for rental to others at a **covered location**; and

    b.  Ends on the earlier of:

        i.  The date when such property could be repaired, rebuilt or replaced with materials of like kind, size, capacity and quality to the same or equivalent physical operating conditions with the exercise of due diligence and dispatch, including any additional time to meet the applicable and covered **law or ordinance** requirements, if any; or

        ii.  The date when the business is resumed at a new permanent location.

This period of time shall not be cut short by the end of the policy period.

60. **Riot, strike or civil commotion** means riot or civil commotion including, but not limited to:

    a.  Acts of striking employees while occupying a **covered location**; and

    b.  Pilferage or looting occurring at the time and place of a riot or civil commotion.

61. **Selling price** means the price, less discounts and charges, at which goods and merchandise would have been sold to your regular customers had no loss occurred.

62. **Smoke** means sudden and accidental release of smoke.  **Smoke** does not include loss or damage

caused by smoke from agricultural smudging or industrial operations.

63. **Soft costs** means:

   a. The amount of actual interim or construction financing interest, including loan fees and other one-time charges incurred to negotiate a new construction loan and/or extend the existing one;

   b. Real estate taxes and ground rent, if any;

   c. Advertising and promotional expenses;

   d. Cost of additional commissions;

   e. Architects, surveyors, legal, consulting engineers or other fees, not otherwise covered under this Policy;

   f. Project administration expenses, but not including development fees;

   g. Insurance premiums; and

   h. Finder's fee refunds.

64. **Special Flood Hazard Area** as defined by the Federal Emergency Management Agency (FEMA) means the area where the National Flood Insurance Program's floodplain management regulations must be enforced and the area where the mandatory purchase of flood insurance applies. The **Special Flood Hazard Area** includes Zones A, AO, AH, A1-30, AE, A99, AR, AR/A1-30, AR/AE, AR/AO, AR/AH, AR/A, VO, V1-30, VE and V. However, if FEMA's definition of **Special Flood Hazard Area** at the time of the loss or damage has been amended from the preceding definition, then the amended definition shall apply.

65. **Sprinkler leakage** means any leakage or discharge of any substance from automatic fire extinguishing equipment including the collapse of a tank that is connected to the equipment.

66. **Startup** means:

   a. The introduction of feedstock or other materials into your machinery or equipment; or

   b. The commencement of fuel or energy supply to your machinery or equipment.

67. **Terrorism** means the use or threatened use of force or violence against a person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

   a. The government de jure or de facto of any nation or political division thereof;

b.   The civilian population of a country, state or community; or

c.   Disrupt the economy of a country, state or community.

However, **cyber terrorism** shall not be considered **terrorism**, except to the extent it is included within the definition of a certified act of terrorism.  So long as the Terrorism Risk Insurance Act of 2002, and any revisions or amendments thereto (TRIPRA) is in effect, **terrorism** includes a certified act of terrorism defined by Section 102. Definitions of TRIPRA.

If TRIPRA coverage is provided under this Policy, then a corresponding premium will be shown in Item **5.B.** of the Declarations. Whether or not **terrorism** or TRIPRA coverage is provided under this Policy, we do not cover loss or damage caused directly or indirectly by **biological and/or chemical terrorism** or **nuclear terrorism**, whether controlled or uncontrolled, proximate or remote, sudden or over any length of time, or which is contributed to or aggravated by any other cause or event. Such **biological and/or chemical terrorism** or **nuclear terrorism** is excluded regardless of any other cause or event occurring concurrently or in any sequence with such **biological and/or chemical terrorism** or **nuclear terrorism**.

If **terrorism** is not covered then any cause or event occurring concurrently or in any sequence with such **terrorism** is also not covered, including, any action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except for direct physical loss or damage to **covered property** caused by fire following **terrorism**. With respect to this exception for fire following **terrorism**, no coverage is provided for: (1) fire following **biological or chemical terrorism** or **nuclear terrorism**; (2) any Additional Coverage, except debris removal under the Debris Removal Additional Coverage; or (3) any time element loss (including time element loss related to debris removal). Notwithstanding any other valuation provision of this Policy to the contrary, we shall only pay the **actual cash value** of the insured building or other **covered property** at the time and place of the loss caused directly by the ensuing fire.

68.  **Tier 1 High Hazard Wind Zone** means the following wind zones:

| | |
|---|---|
| Alabama | Counties of Baldwin and Mobile; |
| Florida | Entire state; |
| Georgia | Counties of Bryan, Camden, Chatham, Glynn, Liberty and McIntosh; |
| Hawaii | Entire state; |
| Louisiana | Parishes of Ascension, Assumption, Calcasieu, Cameron, Iberia, Jefferson, Lafourche, Livingston, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John the Baptist, St. Martin (South), St. Martin (North), St. Mary, St. Tammany, Tangipahoa, Terrebonne, Vermilion and Washington; |
| Mississippi | Counties of George, Hancock, Harrison, Jackson, Pearl River and Stone; |

| North Carolina | Counties of Beaufort, Bertie, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Hyde, Jones, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Tyrrell and Washington; |
| --- | --- |
| Puerto Rico | Entire Territory; |
| South Carolina | Counties of Beaufort, Berkeley, Charleston, Colleton, Dorchester, Georgetown, Hampton, Horry and Jasper; |
| Texas | Counties of Aransas, Brazoria, Calhoun, Cameron, Chambers, Galveston, Harris, Jackson, Jefferson, Kenedy, Kleberg, Liberty, Matagorda, Newton, Nueces, Orange, Refugio, San Patricio, Victoria and Willacy; and |
| U.S. Virgin Islands | Entire territory, including St. Croix, St. John and St. Thomas; and |
| Virginia | Accomack, Gloucester, Hampton City, Isle of Wight, James City, Lancaster, Mathews, Middlesex, Northampton, Northumberland, Surry, York; Independent Cities of Chesapeake, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, Williamsburg. |

69. **Tier 2 High Hazard Wind Zone** means the following wind zones:

| Georgia | Counties of Brantley, Charlton, Effingham, Long and Wayne; |
| --- | --- |
| Louisiana | Parishes of Acadia, East Baton Rouge, Iberville, Jefferson Davis, Lafayette and West Baton Rouge; |
| North Carolina | Counties of Bladen, Duplin, Gates, Hertford, Lenoir, Martin and Pitt; |
| South Carolina | Counties of Florence, Marion and Williamsburg; and |
| Texas | Counties of Bee, Brooks, Fort Bend, Goliad, Hardin, Hidalgo, Jasper, Jim, Montgomery, Wells and Wharton. |

70. **Unauthorized access** means the gaining of access to computer hardware, software or any components thereof by an unauthorized person, or by an authorized person or persons in an unauthorized manner.

71. **Unauthorized use** means the use of computer hardware, software or any components thereof by any person in an unauthorized manner.

72. **Your computer system** means your computer hardware, device, software or any components thereof that are used to store, process or access your **electronic data**, while your **electronic data** is located at a **covered location**, on your mobile electronic device or your electronic storage media anywhere in the world.

73. **Your interest as lessee** is defined as:

    a.  The difference between the rental value of similar premises and the actual rent payable by you (including any maintenance or operating charges paid by you) during the unexpired term of the lease; and

    b.  The rental income earned by you from sublease agreements over and above the rental expenses specified in the lease between you and the lessor.

74. **Your interest as lessor** is defined as the difference between the rents payable to you under the terms of the lease in effect at the time of loss and the actual rent collectible by you during the unexpired term of the lease provided the lease is canceled by the lessee.

75. **Your service provider's computer system** means your service provider's computer hardware, device, software or any components thereof that are used to store, process or access your service provider's **electronic data**, while your service provider's **electronic data** is located at your service provider's location (not including a satellite) anywhere in the world.

76. **Valuable papers and records** means:

    a.  Books, manuscripts, abstracts, maps and drawings; film and other photographically produced records, such as slides and microfilm;

    b.  Legal and financial agreements such as deeds and mortgages;

    c.  Addressograph plates;

    d.  Any data stored on printouts or punched cards;

    e.  Any paper, record or recording, in any form, that is irreplaceable due to the nature of the recording; and

    f.  Account receivable records.

    **Valuable papers and records** do not include **fine arts**, **money and securities** or **electronic data**.

77. **Vandalism and malicious mischief** means willful or malicious damage to, or destruction of **covered property** or with respect to the Electronic Data Coverages Additional Coverage, such willful or malicious damage to, or destruction of **covered property** resulting in **corruption, erasure or alteration** of **electronic data**.

78. **Windstorm or hail** means the direct action of wind or the direct action of hail, whether accompanied by wind or not.  However, **windstorm or hail** does not mean:

    a.  Loss or damage caused by or resulting from frost or cold weather, ice (other than hail), snow or sleet, whether driven by wind or not;

    b.  Loss or damage to the interior of any building or structure, or the property inside the

building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its   roof   or   walls through which the rain, snow, sand or dust enters; or

c.  Loss or damage caused when weight of snow, rainwater, ice or sleet is a contributing factor to the fall or **collapse** of a building or structure or any part thereof.

# EXHIBIT B



June 19, 2020

<u>Via Email</u>
Eric Gordon
Frontier Development LLC
1801 SW 3rd Avenue
Miami, FL 33129
egordon@fdllc.com

Benjamin H. Brodsky
Brodsky Fotiu-Wojtowicz, PLLC
200 SE 1st Street
Suite 400
Miami, Florida 33131
bbrodsky@bfwlegal.com

**Re:**   Claim No. 10275421
Insurer: Endurance American Specialty Insurance Company
Insured: Frontier Development LLC
DOL: May 26, 2020
Loss Location: TBD
Report Date: May 26, 2020
Description of Loss: Business Interruption due to Covid-19

Dear Messrs. Gordon and Brodsky:

We acknowledge receipt of a notice of claim occurring on or after the reported loss date of March 26, 2020 and reported to us on that same date.  The claim has been reported under Policy No. MPR30000603002 issued by Endurance American Specialty Insurance Company ("Endurance") Frontier Development LLC ("Frontier") for the policy period March 8, 2020 to March 8, 2021 (the "Policy"). Endurance is now a member of the Sompo International Companies ("Sompo") and Sompo is responsible for handling claims on behalf of Endurance.

We received an initial report regarding your claim from the independent adjuster, Marco de Leon. He acknowledged the claim by way of correspondence dated June 4, 2020, at which time he also requested additional information from Frontier.  Sompo has not yet received this additional information and, therefore, knows very little about this claim. Please continue to work with Mr. de Leon to provide documentation regarding your claimed losses.

In the meantime, we would like to draw your attention to the policy provisions set forth below as they may apply to your claim.  Please note that bolded terms are specifically defined in the Policy.  We recommend that you review this letter alongside a copy of the Policy.



The Policy contains the following provisions:

**COMMERCIAL PROPERTY POLICY**

**SECTION I – INSURING AGREEMENT AND COVERED PROPERTY**

**INSURING AGREEMENT**

This Policy insures against all risk of direct physical loss or damage to **covered property** described herein occurring during the term of this Policy, except as hereinafter excluded.

\*        \*        \*

**SECTION V – TIME ELEMENT COVERAGES**

A.  **INSURING AGREEMENT**

We will pay the actual **business income** loss sustained by you due to the necessary partial or total interruption of your business operations, services or production during the **period of indemnity** as a result of direct physical loss or damage to: (1) **covered property** by a **covered cause of loss**; or (2) property of the type insured under this Policy by a **covered cause of loss** which directly affects your use of the **covered property**, provided that you are a lessee or occupant of the premises where the direct physical loss or damage occurred.

\*        \*        \*

D.  **ADDITIONAL TIME ELEMENT COVERAGES**

\*        \*        \*

2.  **CONTINGENT TIME ELEMENT**
    a. If direct physical loss or damage caused by a **covered cause of loss** to property of the type insured under this Policy is sustained by your direct supplier or your direct customer, anywhere in the world and such loss or damage:
    i. Wholly or partially prevents your direct supplier from supplying their goods and/or services to you; or
    ii. Wholly or partially prevents your direct customer from accepting your goods and/or services;
    then we will pay the actual **business income** loss and **extra expense** sustained by you during the **period of indemnity** with respect to such property of the type insured under this Policy. This coverage does not apply to new buildings or additions in the course of construction of any direct supplier or direct customer. You will cooperate with your direct supplier or direct customer and take any reasonable and necessary actions, including the use of other machinery, supplies or locations, to mitigate the loss payable herein.



\*        \*        \*

7. **INGRESS & EGRESS**

We will pay the actual **business income** loss sustained by you and extra expense caused by direct physical loss or damage caused by a **covered cause of loss** to property not insured under this Policy, provided that:

a. Such direct physical loss or damage to such property totally prevents physical ingress to or egress from a **covered location**; and

b. Such property not insured under this Policy is within the distance from the **covered location** as shown in Item **7.C.** of the Declarations under Ingress & Egress.

\*        \*        \*

8. **INTERRUPTION BY CIVIL OR MILITARY AUTHORITY**

We will pay the actual **business income** loss sustained by you and **extra expense** if an order of civil or military authority limits, restricts or prohibits access to property not insured under this Policy, provided that:

a. Such property sustains direct physical loss or damage caused by a **covered cause of loss**;

b. Such property is within the distance from the **covered location** as shown in Item **7.C.** of the Declarations under Interruption by Civil or Military Authority; and

c. The effect of such order is to totally prohibit access to a **covered location**.

\*        \*        \*

9. **LEASEHOLD INTEREST**

If **covered property** is: (1) rendered wholly or partially untenantable by direct physical loss or damage to the **covered property** by **a covered cause of loss** during the policy period; and (2) your lease is canceled by an entity other than you or an entity that has a common ownership with you, in accordance with the conditions of the lease, then we will pay **your interest as lessee** or **your interest as lessor**, whichever is applicable, but as lessor only for the first three months following the date of the loss and the **net lease interest** shall be paid for the remaining months of the unexpired lease unless a shorter time period is indicated in Item **7.C.** of the Declarations.

\*        \*        \*

10. **RENTAL VALUE**

We will pay the actual **rental value** loss sustained by you due to direct physical loss or damage by a **covered cause of loss** to **covered property** held for rental to others at a **covered location**. The **rental value** loss shall not exceed the reduction in **rental value** less charges and expenses which do not necessarily continue.

\*        \*        \*



Please note that the above-cited provisions require "direct physical loss or damage."  To the extent there has been no "direct physical loss or damage," Sompo reserves the right to deny coverage for the claim.

The Policy also contains the following potentially applicable exclusions:

**SECTION VI – PERILS EXCLUDED**

\*     \*     \*

2.   We will not pay for loss or damage caused by, or attributable to, any of the following:

 a.   Delay, loss of market or loss of use;

 b.   Indirect, remote of consequential loss or damage;

\*     \*     \*

 i.   Communicable or infectious disease, condition or sickness, including (i) any causative agent of any such condition, disease, or sickness regardless of whether such agent gives rise to any such condition, disease, or sickness, or (ii) any actual or attempted testing for, containing, detoxifying, mitigating, monitoring or neutralizing of, responding to, or assessing the effects of any communicable or infectious disease, condition or sickness or causative agent.

To the extent these exclusions apply, Sompo reserves the right to limit or deny coverage for the claim.

Please note that Sompo's investigation of this claim is ongoing, and our acknowledgement of this notice of claim is being made under a complete reservation of the rights and defenses found under the Policy and the law.  Any and all such rights and defenses are hereby expressly reserved under the Policy and the law and no such rights and duties should be construed as waived.  We understand that Frontier similarly reserves its rights.



Kind Regards,



**Kimberly James**
**Commercial Property Claims Specialist**
469-872-7126
kjames@sompo-intl.com

cc:     marco.deleon@mclarens.com

6976477

IN THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Case No.: 2021-000819-CA-01

FRONTIER DEVELOPMENT, LLC,

        Plaintiff,

v.

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY,

        Defendant.

_____/

## **NOTICE OF SERVICE OF INTERROGATORIES TO DEFENDANT**

Plaintiff, Frontier Development, LLC, by and through undersigned counsel, hereby propounds Interrogatories numbered 1 through 29 to Defendant, Endurance American Insurance Company, to be answered in accordance with the Florida Rules of Civil Procedure, Rule 1.340.

WE HEREBY CERTIFY that a true and correct copy of the foregoing document has been served on the Defendant along with the Complaint.

Respectfully submitted,

By: */s/ Joshua Truppman*
Joshua Truppman, Esq.
Florida Bar No. 111795
By: */s/ Robert Visca*
Robert Visca, Esq.
Florida Bar No. 111800
By: */s/ Benjamin H. Brodsky*
Benjamin H. Brodsky, Esq.
Florida Bar No. 73748
BRODSKY FOTIU-WOJTOWICZ, PLLC
*Counsel for Plaintiff*
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: (305) 503-5054
bbrodsky@bfwlegal.com
joshua@bfwlegal.com
robert@bfwlegal.com
docketing@bfwlegal.com

-AND-

By: */s/ Keith A. Truppman*
Keith A. Truppman, Esq.
Florida Bar No. 473715
MINTZ TRUPPMAN, P.A.
*Counsel for Plaintiff*
1700 San Souci Blvd.
North Miami, FL  33181
Tel: (305) 893-5506
ktruppman@mintztruppman.com

IN THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Case No.: 2021-000819-CA-01

FRONTIER DEVELOPMENT, LLC,

       Plaintiff,

v.

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY,

       Defendant.

_____/

**<u>NOTICE OF SERVICE OF INTERROGATORIES TO DEFENDANT</u>**

Plaintiff, Frontier Development, LLC, by and through undersigned counsel, hereby propounds Interrogatories numbered 1 through 29 to Defendant, Endurance American Insurance Company, to be answered in accordance with the Florida Rules of Civil Procedure, Rule 1.340.

WE HEREBY CERTIFY that a true and correct copy of the foregoing document has been served on the Defendant along with the Complaint.

Respectfully submitted,

By: */s/ Joshua Truppman*
Joshua Truppman, Esq.
Florida Bar No. 111795
By: */s/ Robert Visca*
Robert Visca, Esq.
Florida Bar No. 111800
By: */s/ Benjamin H. Brodsky*
Benjamin H. Brodsky, Esq.
Florida Bar No. 73748
BRODSKY FOTIU-WOJTOWICZ, PLLC
*Counsel for Plaintiff*
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: (305) 503-5054
bbrodsky@bfwlegal.com
joshua@bfwlegal.com
robert@bfwlegal.com
docketing@bfwlegal.com

-AND-

By: */s/ Keith A. Truppman*
Keith A. Truppman, Esq.
Florida Bar No. 473715
MINTZ TRUPPMAN, P.A.
*Counsel for Plaintiff*
1700 San Souci Blvd.
North Miami, FL  33181
Tel: (305) 893-5506
ktruppman@mintztruppman.com

## **INTERROGATORIES**

1.      Please state the full name, occupation, present residence and business address of the person answering these interrogatories and anyone who assisted in answering same.

   **ANSWER:**

2.      Please state the basis in the insurance policy, in relation to the facts and applicable law, for your failure to provide coverage for the Claim, as defined in the Complaint, without inspection or investigation.

   **ANSWER:**

3.      Please describe each document upon which you rely for your failure to provide coverage for the Claim, as defined in the Complaint, with sufficient particularity to allow their description in a Request for Production to the loss.

   **ANSWER:**

Case No.  2021-000819-CA-01

4.      Please describe all facts and circumstances and insurance policy provisions giving rise to each of your defenses and affirmative defenses in this matter to the loss.

**ANSWER:**

5.      Please list the name, address and telephone numbers of all witnesses who have knowledge of the basis for or facts and circumstances giving rise to each of your Affirmative Defenses in this matter, and please describe each document on which you rely for each Affirmative Defense or which is related to same, with sufficient particularity to allow a description in a Request for Production relative to the loss.

**ANSWER:**

6.      Please state with specificity any and all defenses the Defendant asserts to Plaintiff's Complaint, outlining all individuals who will testify in support thereof, listing any and all documents which support each defense and outlining any and all evidence the Defendant has to support said defense relative to the loss.

**ANSWER:**

Case No. 2021-000819-CA-01

7.     State the full name, occupation and present residence and business address and phone numbers of any and all persons who conducted or witnessed an inspection or investigation of the claims described in Plaintiff's Complaint relative to the loss.

**ANSWER:**

8.     State the exact section and paragraph number of each and every policy provision of policy of insurance attached to Plaintiff's Complaint as Exhibit "A" which is an exclusion or exception to insurance coverage for the claims described in Plaintiff's Complaint relative to the loss.

**ANSWER:**

9.     Please list all prior claims by Plaintiff to Defendant.

**ANSWER:**

10.     Please describe the experience, training and educational background of each person who investigated, evaluated, managed and reviewed or otherwise handled Plaintiff's claim, or rendered any written or oral report regarding the claim relative to the loss.

**ANSWER:**

Case No.  2021-000819-CA-01

11.     If Plaintiff's claim was reviewed by the regional and/or home office, identify each person in that office who reviewed the file, that person's supervisor, all writings or other evidence communication to and from that office regarding the handling of Plaintiff's claim relative to the loss.

**ANSWER:**

12.     Please list the following:

A.     All adjusters who adjusted the loss for the insurance company relative to the loss.

B.     All Supervisors of the adjusters who were responsible for overseeing the Claim described in Plaintiff's Complaint relative to the loss.

C.     All persons responsible for payment or denial of all or part of the claim described in Plaintiff's Complaint relative to the loss.

**ANSWER:**

13.     Please list any reports that have been prepared by Endurance American Specialty Insurance Company concerning the cause of loss in regard to the Claim described in the Plaintiff's Complaint which were relied on in approving or disapproving payment to the Plaintiff in regard to the Claim described in the Plaintiff's Complaint relative to the loss.

**ANSWER:**

Case No.  2021-000819-CA-01

14.     Please list any reports or estimates that have been prepared concerning the amount of damage in regard to the Claim described in Plaintiff's Complaint relative to the loss.

**ANSWER:**

15.     Please list the names and addresses of any and all persons with whom the Defendant, and/or any of their agents, servants or employees obtained a statement, either oral, recorded or written, and state the date the statement was taken, who was present when said statement was taken, and whether the state was oral, recorded or written and who is in possession of said statement relative to the loss.

**ANSWER:**

16.     Please list the names and addresses of all persons who are believed or known by you, your agents or attorneys, to have any knowledge concerning any of the issues raised by the pleadings, and specify the subject matter about which the witness has knowledge relative to the loss.

**ANSWER:**

Case No.  2021-000819-CA-01

17.      Please state whether you, through your agent or otherwise utilized the services of a contractor(s), engineer(s), accountant(s) and/or any other individual/entity to inspect the real and/or personal property which is the subject matter of the instant litigation. If the answer is yes, then please identify the date of inspection or inspections, whether any report(s) was provided to you, and whether any payment was made to the contractors/engineer(s) and or individual/entity, including who tendered payment and the amount of payments relative to the loss.

**ANSWER:**

18.      Please state with specificity what further information/documentation you assert has not been provided that you allege is necessary to complete your investigation of the subject claim, specifying why said information is relevant and/or material and/or necessary to pay the Plaintiff, in whole or part, for any of the damages sustained in the subject loss relative to the loss.

**ANSWER:**

Case No.  2021-000819-CA-01

19.     Do you deny that the damage to the subject real and/or personal property was caused by a covered peril?  If your answer is yes, then please state what caused the damage to the subject real and/or personal property.   Further, please describe in detail, each and every fact which in any way supports or tends to support the basis for what you state caused such damage (including details regarding witnesses, photographs, documents, dates, times, etc.).  If you do not know what caused the damage to the subject real and/or personal property then please describe in detail, each and every fact which in any way supports or tends to support your contention that the damage was not caused by a covered peril relative to the loss.

**ANSWER:**

20.     Please note whether the subject policy of insurance excluded the loss to the subject real and/or personal property identifying the specific term of the policy you are relying upon relative to the loss.

**ANSWER:**

Case No.  2021-000819-CA-01

21.     Please state, in detail, the complete detailed factual basis (including witnesses, photographs, documents, dates, times, etc.) for the applicability of any exclusions contained in the policy of insurance relative to the loss which is the subject matter of the instant litigation (i.e., each and every fact which supports or tends to support the applicability of such exclusions) relative to the loss.

**ANSWER:**

22.     Did you (and/or any representative/agent on your behalf) perform any inspections of the subject real and/or personal property prior to and/or upon issuance of the subject insurance policy herein.  If the answer is yes then please identify the date, scope and individuals involved in the inspections) relative to the loss.

**ANSWER:**

23.     Please set forth your definition of "physical damage" under the subject policy.

**ANSWER:**

Case No.  2021-000819-CA-01

24.     Please set forth your definition of "physical loss" under the subject policy.

**ANSWER:**

25.     Do any of your policies issued to insureds in the State of Florida include Endorsement CP 01 40 07 06?

**ANSWER:**

26.     Please state whether you advised the insured that the subject Policy did not include Endorsement CP 01 40 07 06, and describe the contents of those communications.

**ANSWER:**

27.     Did you advise the insured, at any time, that the Policy excluded damage caused by viruses, bacterium and/or microorganisms?  If so, state when you advised the insured of same and describe in detail the contents of any such communications.

**ANSWER:**

Case No.  2021-000819-CA-01

28.     Do you contend that the Additional Time Element Coverages do not cover the subject loss?  If so, please explain why.

**ANSWER:**

29.     Do you contend that there is anti-concurrent cause language under the subject Policy which is relevant to this claim?  If so, please identify the language and explain its relevance to the subject claim.

**ANSWER:**

Case No.  2021-000819-CA-01

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY

By: _____
Print Name: _____
Print Title: _____

STATE OF FLORIDA          )
                          )
COUNTY OF                 )


  The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization, this ___ day of 2021 by  (name of officer or agent, title of officer or agent)  of  (name    of    corporation    acknowledging) ,  a  (state    or    place    of incorporation)  corporation, on behalf of the corporation. He/she is personally known to me or has produced  (type of identification)  as identification.



_____
NOTARY PUBLIC
My Commission Expires:
(Seal)

13

Case 1:21-cv-20611-DPG  Document 1-1  Entered on FLSD Docket 02/12/2021  Page 138 of 156

IN THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Case No.: 2021-000819-CA-01

FRONTIER DEVELOPMENT, LLC,

        Plaintiff,

v.

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY,

        Defendant.

_____/

**FIRST REQUEST FOR ADMISSIONS TO DEFENDANT**

Plaintiff, Frontier Development, LLC, by and through undersigned counsel, hereby requests Endurance American Specialty Insurance Company, provide admissions of the truth of the following matters relevant to the subject matter of the pending action and relating to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents described hereto, in accordance with the applicable Florida Rules of Civil Procedure.

**REQUEST FOR ADMISSIONS**

1.      Admit that physical loss is not defined in the subject insurance policy.

2.      Admit that there is a difference between physical loss and physical damage.

3.      Admit that the policy provides Business Income and Extra Expense Coverage.

4.      Admit that Plaintiff paid for and Defendant provided Additional Time Element Coverages under the Policy.

5.      Admit that Defendant promised to pay for loss of Business Income caused by the action of a Civil Authority prohibiting access to the Plaintiff's property.

Case No. 2021-000819-CA-01

6.      Admit that Plaintiff's loss of rental income from its commercial tenants as described in the Complaint would be covered under the subject insurance policy if it was deemed caused by a covered cause of loss.

7.      Admit that Plaintiff's loss of rental income from its commercial tenants as described in the Complaint is covered under the subject insurance policy.

8.      Admit that an action of civil authority that prohibited access to the Plaintiff's premises occurred no later than March 17, 2020.

9.      Admit that Emergency and/or Executive Orders issued by Miami-Dade County, Broward County, the State of Florida and the City of Miami constitute actions of a civil authority under the subject insurance policy.

10.     Admit that the State and local Emergency described in the Complaint prohibited access to the subject property.

11.     Admit that the subject policy of insurance is an all-risk policy, which means that there is coverage unless there is a specific exclusion contained within the policy that is applicable to the subject loss.

12.     Admit that the Defendant had the ability to place a virus exclusion within the policy and chose not to insert any such exclusion that would be applicable to Plaintiff's Claim.

13.     Admit that Plaintiff's commercial tenants at covered properties were forced to suspend business operations as a result of COVID-19 beginning in March 2020.

14.     Admit that the presence of COVID-19 and the public health emergency it has created has prompted actions by civil authorities restricting and prohibiting access to the Insured's covered property.

15.     Admit that the action of Civil Authority was taken in response to the dangerous

Case No. 2021-000819-CA-01

physical conditions created by the COVID-19 pandemic.

16.     Admit that the Civil Authority provision is an additional coverage that was purchased by the Plaintiff and provided by the Defendant relative to the actual loss of Business Income Plaintiff sustained and necessary Extra Expenses incurred and caused by action of civil authority that prohibits access to the described premises.

17.     Admit that access to the area immediately surrounding the Plaintiff's covered property was prohibited by civil authority and was taken in response to dangerous physical conditions created by COVID-19.

18.     Admit that the subject policy does not contain any exclusions which would apply to allow Defendant to deny coverage for losses of Business Income or Extra Expense caused by COVID-19.

19.     Admit that the covered properties occupied by Plaintiff's commercial tenants were shut down due to government mandates, including a mandate that all non-essential businesses close.

20.     Admit that you did not inspect the subject property to determine whether there was any physical damage to the premises and/or damage off premises.

21.     Admit that Plaintiff's commercial tenants who operate restaurants were not legally permitted to serve "dine-in" customers due to actions of civil authority.

22.     Admit that Plaintiff's commercial tenants who operate healthcare and/or medical facilities were not legally permitted to provide elective procedures to patients due to actions of civil authority.

23.     Admit that Coronavirus, or COVID-19, has been deemed to constitute a dangerous physical condition by civil authorities in the State of Florida.

Case No. 2021-000819-CA-01

24.     Admit that if Plaintiff's commercial tenants who operate restaurants were forced to close due to COVID-19 in or near the restaurant, this constitutes a "physical loss" of use of their property, with resulting business interruption losses.

25.     Admit that if Plaintiff's commercial tenants who operate who operate healthcare and/or medical facilities were forced to close due to COVID-19 in or near the facilities, this constitutes a "physical loss" of use of their property, with resulting business interruption losses.

26.     Admit that Plaintiff has suffered a loss of use of all or a portion of their property due to COVID-19.

27.     Admit that "direct physical loss of or damage to" language in the Policy encompasses "loss of use".

28.     Admit that any purported anti-concurrent cause language, including the language set forth under Section IV of the Policy, does not apply to losses covered by the Additional Time Element Coverages.

29.     Admit that the exclusions set forth under Section IV of the Policy do not apply to Additional Time Element Coverages pertinent to Contingent Time Element, Ingress & Egress, Interruption by Civil or Military Authority, Leasehold Interest and Rental Value set forth under Sections V(D)(2), V(D)(7), V(D)(8), V(D)(9) and V(D)(10) of the Policy.

Case No. 2021-000819-CA-01

Respectfully submitted,

By: */s/ Joshua Truppman*
Joshua Truppman, Esq.
Florida Bar No. 111795
By: */s/ Robert Visca*
Robert Visca, Esq.
Florida Bar No. 111800
By: */s/ Benjamin H. Brodsky*
Benjamin H. Brodsky, Esq.
Florida Bar No. 73748
BRODSKY FOTIU-WOJTOWICZ, PLLC
*Counsel for Plaintiff*
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: (305) 503-5054
bbrodsky@bfwlegal.com
joshua@bfwlegal.com
robert@bfwlegal.com
docketing@bfwlegal.com

-AND-

By: */s/ Keith A. Truppman*
Keith A. Truppman, Esq.
Florida Bar No. 473715
MINTZ TRUPPMAN, P.A.
*Counsel for Plaintiff*
1700 San Souci Blvd.
North Miami, FL  33181
Tel: (305) 893-5506
ktruppman@mintztruppman.com

Case No. 2021-000819-CA-01

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document has been furnished by the Florida Courts e-filing Portal pursuant to Fla. R. Jud. Admin. 2.516(b)(1), this 21st day of January 2021.  I further certify that a true and correct copy of the foregoing document has been served on the Defendant along with the Complaint.

By: _/s/ Joshua Truppman_
Joshua Truppman, Esq.

Case 1:21-cv-20611-DPG   Document 1-1   Entered on FLSD Docket 02/12/2021   Page 144 of 156

IN THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Case No.: 2021-000819-CA-01

FRONTIER DEVELOPMENT, LLC,

      Plaintiff,

v.

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY,

      Defendant.

_____/

### **FIRST REQUEST FOR PRODUCTION TO DEFENDANT**

Plaintiff, Frontier Development, LLC, by and through undersigned counsel, hereby requests Defendant, Endurance American Specialty Insurance Company, produce the documents requested below for inspection and copying at the offices of Benjamin Brodsky, Esq., in accordance with the applicable Florida Rules of Civil Procedure.

### **DEFINITIONS**

Plaintiff hereby adopts and incorporates by reference the following uniform definitions and rules of construction for these requests:

1.    The term "document" is broadly defined to include all forms of recorded information, specifically including, but not limited to, writings, drawings, graphs, charts, photographs, phone records and other date compilations. The term "document" is defined to also include information contained or stored in an electronic medium or format. If any of the requested "documents" includes information retained on a computer or other electronic device, you are requested to produce the information, translated if necessary, in usable form. A draft or non-identical copy is a separate document within the meaning of this term.

Case No.  2021-000819-CA-01

2.      The phrase "any and all documents" means each document or group of documents or communication as above defined in Paragraph 1 known to you and every such document or communication which can be located or discovered by reasonably diligent efforts.

3.      The term "person" is defined as any natural person, or any business, legal or governmental entity or association.

4.      The term "you," "yourself," "your," means the Defendant, its employees, agents, consultants, accountants and lawyers, and all other persons who are acting or who have acted on behalf of, or who are or have been subject to the direction or control.

5.      The term "person" is defined to include any natural person or any business, legal or governmental entity or association.

6.      The phrase "possession, custody, or control" shall be construed in the broadest possible manner, and includes not only those documents in the Defendant's immediate possession, but also those documents which are subject to its control.   Defendant is required to obtain such documents which are subject to its control, but not in its immediate possession, and produce the same to Plaintiff hereunder.   For example, if any partners, employees, agents, consultants, accountants or lawyers of Defendant have documents in their immediate possession which are called for by this Request for Production of Documents, Respondent is required to obtain, and produce such documents hereunder.

Case No.  2021-000819-CA-01

## <u>INSTRUCTIONS</u>

1.      This request for documents and information is continuing in nature.  Defendant is required to supplement its responses if it obtains further or different information and Plaintiff specifically reserves the right to seek supplemental responses to these discovery requests before the final hearing in this proceeding.

2.      Where a claim of privilege is asserted in objecting to any request, identify the nature of the privilege (including work product) which is being claimed and the privilege rule being invoked, and for each answer, or portion thereof, that is withheld provide the following information:

(a) For documents:(I) the type of document; (ii) the date of the document; (iii) the author(s), addressee(s), and recipient(s) of the document (including, without limitation, any indicated or blind copy recipients, and all persons to whom the document was distributed, shown or explained), and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to one another; (iv)the number of pages; (v) the identity of any enclosure(s) or attachment(s); and (vi) the general subject matter of the document; and

(b) For oral communications:(i) the name of the person making the communication and the names of the persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communication; (ii) the date and place of the communication; and (iii) the general subject matter of the communication.

3.      Documents produced in response to any of these discovery requests are to be produced as they are kept in the ordinary course of business and are to be labeled in such a way as to reflect the names of the source files from which they came.

4.      In the event that any documents called for by any of these discovery requests has

3

Case No.  2021-000819-CA-01

been destroyed or discarded, that document is to be identified by stating: (i) any addressee; (ii) any indicated or blind copy recipients; (iii) the document's date, subject matter, number of pages, and attachments, enclosures, or appendices; (iv) all persons to whom the document was distributed, shown or explained; (v) the date of destruction or discard and the reason for destruction or discard; and (vi) the person authorizing and carrying out such destruction or discard.

5.    If any information or data is withheld because such information or data is stored only electronically, it is to be identified by the subject matter of the information or data, the storage mode, and the place or places where such information is maintained.

6.    This request for production calls for the production of the original and all non-conforming copies, and drafts of the same.  Documents which contain written comments, notes, corrections, or to which additional material has been attached or appended are not to be construed as an exact duplicate, and, therefore, must be produced.

## DOCUMENTS TO BE PRODUCED

1.    A true and correct copy of any and all statements, whether written, oral or recorded, in whatever fashion, taken of the Plaintiff(s), their representatives, employees or agents in regard to the subject matter of this litigation.

2.    A true and correct copy of any and all statements, whether written, oral or recorded in whatever fashion, taken of all independent witnesses or other persons by the Defendant with regard to the subject matter of this lawsuit.

3.    A list and/or documents showing the names, addresses and telephone numbers of any and all witnesses whose statements have been taken, indicating their full legal name, resident addresses and telephone numbers in regard to the subject matter of this litigation.

4.    Any and all invoices and bills reflecting payments made by the Plaintiff with regard

to premiums paid under the subject policy of insurance herein.

5.      A true certified copy of the applicable insurance policy issued to the Plaintiff by Defendant, including any and all endorsements in effect on the date of this loss.

6.      All applications for insurance and any documents submitted by Plaintiff to procure coverage from Defendant.

7.      True and correct copies of any and all policies issued by Defendant to Plaintiff, from January 1, 2015 to the present.

8.      Any and all memoranda, notes, correspondence and any and all other documents or tangible things which, in any way, show or purport to show any communications between the Defendant, and the Defendant's servants and/or employees on the one hand, and the Plaintiff(s), their representatives and/or employees and/or agents and/or attorneys concerning the subject matter of this litigation.

9.      All correspondence between Defendant and Belken Insurance Group, or any of its agents, concerning the insurance claim in this case.

10.      Any and all questionnaires sent by Defendant to Plaintiff regarding the subject insurance claim.

11.      Any and all communications between Defendant and Plaintiff related to the Coronavirus and/or COVID-19.

12.      Any and all correspondence by and between any independent adjuster and the Defendant relative to their investigation of the subject claim.

13.      Any and all documentation to support your conclusion that no employee or patron contracted Coronavirus, or COVID-19, at or near the premises.

14.      Any and all documentation to support your conclusion that there was no physical

damage on or off premises which has impacted Plaintiff's business.

15.     Any and all documentation to support your contention that "take-out and delivery was permitted but the restaurant did not lend itself to this style of business since it is a seafood restaurant."

16.     Any and all orders from civil authorities reviewed by Defendant in preparing the April 21, 2020 letter sent by Defendant to the insured.

17.     Any and all photographs within the possession, custody and control of the Defendant, their agents or employees, concerning the subject matter of this litigation.

18.     Any and all documents of whatever nature and kind submitted by the Plaintiff and/or Plaintiff(s) employees, agents, representatives and/or attorneys, etc., to the Defendant, its' agents, servants, and/or employees in regard to the subject loss.

19.     The entire claim file in this matter, including any table of contents or summaries thereof, excluding documents which encompass the attorney/client privilege and/or work product doctrine.  [Any and all documents excluded, please list documents with sufficient particularity such that the Court can conduct an in-camera inspection of same.]

20.     The entire underwriting file with regard to the subject matter of this litigation and/or all inspection reports contained therein of Plaintiff's property.

21.     Any and all internal rules, regulations, memos, guidelines, claim department and technical procedure manuals with regard to the Defendant's policy on the investigation, evaluation and interpretation of policy provisions relative to loss of business or extra expense claims arising from the coronavirus.

22.     Any and all documents of any kind or nature showing the current and last known addresses and telephone numbers of all persons involved with regard to the underwriting and claim

Case No. 2021-000819-CA-01

handling decision and /or reservation of rights letter concerning the file which is the subject matter of this litigation.

23.     Any and all communications between you and any insurance agent and/or broker relative to the initial issuance of the subject insurance policy and any renewals relative to the insurance involved herein, including but not limited to, any and all communications relating to the initial issuance of the subject insurance policy, compliance with any and all underwriting guidelines, as well as any and all communications relative to the subject claim including notice of the subject claim.

24.     Copies of any and all communications by and between the Defendant and its insurance adjusters and/or independent adjusters retained relative to the subject claim and relating to the subject matter of the Plaintiff's Complaint, which was not prepared in anticipation of litigation. (As to any objections, please provide a detailed privileged log so that the Court can conduct an in-camera inspection.).

25.     Any and all manuals, educational materials and written instructions used for the training of Defendant's adjusters, agents, and/or personnel who are involved in the processing of Plaintiff's business interruption claim.

26.     Any and all expert reports including but not limited to reports regarding, policy interpretation, coverage for coronavirus, loss of business income or extra expense damage to Plaintiff's property, or any other subject matter concerning this litigation prepared by any experts who will be utilized at the time of trial on behalf of the Defendant.

27.     Copy of any reports relating to any issue in this lawsuit which have been prepared by experts that you intend to call as witnesses in this cause or relied upon by Defendant in their denial of the claim and /or referred to in Defendant's reservation of rights and/or denial letter.

Case No.  2021-000819-CA-01

28.      A copy of any photographs, videotape or film in the possession of the Defendant, its agents, employees or attorneys, which depict the Plaintiff's property or the area not more than one mile from the damaged property, including but not limited to any dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage.

29.      Any and all reports, appraisals, work papers, ledgers, inventories, evaluations or estimates existing, gathered, prepared, organized or assembled, relating to the claim which is the subject matter of this litigation.

30.      Any and all inspections reports, financial reports, photographs and/or video taken by and/or on behalf of the Defendant relative to providing the insurance coverage to the Plaintiff and/or the issuance and/or renewal of the subject policy of insurance and/or relate to the subject claim.

31.      Copies of any and all documentation of any kind or nature relied upon by the Defendant relative to their denial of coverage for the subject loss, failure to pay indemnity Plaintiff(s) and/or Reservation of Rights letter sent to Plaintiff relative to the subject claim and relative to all damages sustained as a result of the subject claim.

32.      Any and all documents of any kind or nature outlining any disputed amount of loss as determined by the Defendant relative to the damage to Plaintiff's property as a result of the subject claim.

33.      Any and all documentation or other tangible evidence which you contend has not been provided by the Plaintiff that is necessary to complete your investigation and/or indemnify your Insured/Plaintiff relative to the subject claim.

34.      A copy of any and all reports by any personnel hired by the Defendant to examine

and/or evaluate any of the claims asserted by the Plaintiff.

35.     Copies of any and all documents relied upon by the Defendant for failing to fully indemnify the Plaintiff related to the subject claim.

36.     Copies of any and all documents relied upon by the Defendant relative to any and all defenses to payment of the subject claim and/or denial of the subject claim.

37.     Copies of any and all documents obtained from any lien-holder, mortgage company, etc., relative to the subject property.

38.     Copies of any and all sworn proof(s) of loss submitted by or on behalf of the Plaintiff relative to the subject claim and documentation accepting and/or rejecting said proof(s) of loss and, any and all documentation of any kind or nature relied upon relative to the Defendant's rejection of said proof(s) of loss and/or any and all documentation requesting and/or providing the Plaintiff/Insured with the Sworn Proof of Loss relative to the subject claim.

39.     Any and all documentation of any kind or nature that the Defendant relies upon relative to their position that there are limitations and/or exclusions to coverage that would apply to the subject loss.

40.     Any and all documentation relative to the subject loss of any kind or nature reflecting communications between the Defendant and any expert retained to investigate the subject loss.

41.     Any and all documentation and/or evidence you rely upon relative to your failure to indemnify Plaintiff for the subject loss and /or your denial letter and/or Reservation of Rights letter dated April 21, 2020.

42.     Any and all evidence the Defendant relies upon relative to any assertions that the exclusions contained within the Policy applies to the facts and circumstances of the subject loss.

Case No. 2021-000819-CA-01

43. The names and addresses of all witnesses the Defendant relies upon relative to their denial of the subject claim or failure to pay.

44. Any and all documentation the Defendant relies upon relative to the denial of subject claim and/or their failure to pay.

45. Any and all replacement cost evaluations and/or appraisals and/or financial documentation that was obtained by and on behalf of the Defendant relative to the placement of the subject insurance policy that was in effect at the time of the loss.

46. Any and all evidence reflecting the names and addresses of witnesses and/or documentation Defendant relies upon relative to their assertions as to each and every exclusion to be raised by Defendant relative to the subject claim.

47. Any and all documentation of any kind or nature that would allow the Defendant to apply above-referenced exclusions provision of the subject policy relative to the facts and circumstances of the subject loss.

48. Any and all documentation of any kind or nature relative to any prior or subsequent claims.

49. Any and all documentation reflecting Defendant's compliance with Fla. Stat. Section 626.9201.

50. Any and all documentation and/or names and addresses of any witnesses Defendant Insurance Company is relying upon for the assertion that there is no coverage for business income loss or that there was no Civil Authority prohibiting access to the covered property due to a Covered Cause of Loss off the described premises.

51. Any and all insurance policy endorsements or provisions in effect on the date of loss which exclude the coronavirus as a Covered Cause of Loss.

Case No.  2021-000819-CA-01

52.     Any and all documents supporting any of the assertions made in your Reservation of Rights Letter dated June 29, 2020.

53.     Any and all documents supporting your position that the subject loss is not covered by any of the Additional Time Element Coverages referenced in your Reservation of Rights Letter dated June 29, 2020.

54.     Any and all documents supporting your position with respect to any anti-concurrent cause language under the subject Policy, including but not limited to language set forth under Section IV of the subject Policy.

Case No.  2021-000819-CA-01

Respectfully submitted,

By: */s/ Joshua Truppman*
Joshua Truppman, Esq.
Florida Bar No. 111795
By: */s/ Robert Visca*
Robert Visca, Esq.
Florida Bar No. 111800
By: */s/ Benjamin H. Brodsky*
Benjamin H. Brodsky, Esq.
Florida Bar No. 73748
BRODSKY FOTIU-WOJTOWICZ, PLLC
*Counsel for Plaintiff*
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: (305) 503-5054
bbrodsky@bfwlegal.com
joshua@bfwlegal.com
robert@bfwlegal.com
docketing@bfwlegal.com

-AND-

By: */s/ Keith A. Truppman*
Keith A. Truppman, Esq.
Florida Bar No. 473715
MINTZ TRUPPMAN, P.A.
*Counsel for Plaintiff*
1700 San Souci Blvd.
North Miami, FL  33181
Tel: (305) 893-5506
ktruppman@mintztruppman.com

12

Case No.  2021-000819-CA-01

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that the foregoing document has been furnished by the Florida Courts e-filing Portal pursuant to Fla. R. Jud. Admin. 2.516(b)(1), this 21st day of January 2021.  I further certify that a true and correct copy of the foregoing document has been served on the Defendant along with the Complaint.

By: _/s/ Joshua Truppman_

Joshua Truppman, Esq.